# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MYRON WARD,

    Plaintiff,

v.

JOHN LAMANNA, et al.,

    Defendants.

CIVIL ACTION NO. 04-11E

JUDGE McLAUGHLIN
MAGISTRATE JUDGE BAXTER

*(Electronic Filing)*

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

AND NOW, come Defendants, John J. LaManna, Debora Forsyth, Marty Sapko, Stephen Housler, Ned Watson, and the United States of America (hereinafter collectively referred to as "Defendants"), by their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Christy Criswell Wiegand, Assistant U.S. Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully move the Court to dismiss the Second Amended Complaint filed by Plaintiff, Myron Ward ("Plaintiff" or "Ward"), or, in the alternative, grant summary judgment in favor of the Defendants.

## I.  INTRODUCTION

Plaintiff Ward, a federal inmate, has brought a pro se action styled after the type recognized by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), as well as a negligence action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2675, et seq. Plaintiff's claims generally relate to alleged hazardous work conditions at his UNICOR job assignment at the Federal Correctional Institution, in McKean County, Pennsylvania ("FCI McKean"). As relief, Plaintiff

seeks: (1) unspecified compensatory and punitive damages from each Defendant and the United States; (2) reasonable attorney's fees, costs, and interest; and (3) such other relief as the Court deems proper and just.  For the reasons that follow, the Court should dismiss Plaintiff's Second Amended Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## II.    PROCEDURAL BACKGROUND

Plaintiff filed his original Complaint in this action on February 6, 2004.  See Docket No. 3.  After service was completed as to all named Defendants, on August 17, 2004, Defendants filed a Motion to Dismiss or in the Alternative, for Summary Judgment, along with a Brief in Support of the Motion.  See Docket Nos. 17-18.   Plaintiff filed an opposition to that motion on September 27, 2004.  See Docket No. 24.

On January 31, 2005, the Court issued a Report and Recommendation ("R&R") relating to Defendants' Motion to Dismiss.  Specifically, the Court recommended that 1) the Second Claim be dismissed for failure to exhaust Administrative Remedies; 2) that all named defendants be dismissed, to the extent they were named in their official capacities; and 3) that Plaintiff's procedural Due Process Claim be dismissed for failure to state a claim.  Finally, the Court recommended that Plaintiff be allowed to amend the Complaint to more fully state an Equal Protection claim.  See Docket No. 25.  An Amended R&R, correcting several clerical errors, was issued on February 10, 2005.  See Docket No. 27.

On March 1, 2005, Defendants submitted objections to the Amended R&R.  See Docket No. 28.   On April 1, 2005, the Court adopted the Amended R&R, and also dismissed Plaintiff's Fourth Claim – Negligence.  The Court also invited Defendants to file an additional Motion for Summary Judgment, based upon arguments and evidence which were raised in Defendants' Objections to the Amended R&R.  See Docket No. 29.  On April 14, 2005, Magistrate Baxter

held a Case Management Conference, and set May 27, 2005 as the deadline for dispositive motions.  See Docket No 33.

Plaintiff filed an Amended Complaint on May 3, 2005.  See Docket No. 34. Defendants submitted a Motion to Dismiss or for Summary Judgment on May 26, 2005.  See Docket Nos. 35-36.  Before ruling on Defendants' Motion to Dismiss, however, the Court granted Plaintiff's renewed Motion for Appointment of Counsel.  See Docket Nos. 33, 42-43.  On November 30, 2005, the Court appointed counsel to represent Plaintiff; dismissed without prejudice Defendants' dispositive motion; and afforded Plaintiff an opportunity to file a Second Amended Complaint.  See Docket No. 43.

Plaintiff filed his Second Amended Complaint on January 20, 2006.  See Docket No. 44. Plaintiff's Second Amended Complaint asserts the following claims: 1) that Plaintiff was exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Eighth Amendment (Count I); 2) that Plaintiff was exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Fifth Amendment Due Process Clause (Count I); 3) that Plaintiff was negligently[1] exposed to environmental hazards inside the UNICOR factory at FCI McKean (Count II).[2]

## III.    FACTUAL BACKGROUND

### A.    Background

Plaintiff, a Federal inmate, is currently incarcerated in the Federal Correctional Institution

---

[1] The Second Amended Complaint marks the first time that Plaintiff named the United States as a party in this action.

[2] Although Plaintiff had previously alleged violations of the Fifth Amendment Equal Protection Clause, and the First Amendment, based upon a theory of retaliation, those claims have not been included in Plaintiff's Second Amended Complaint.

("FCI") in Petersburg, Virginia.  He was convicted in the Western District of Virginia of various

drug related offenses, in violation of 21 U.S.C. §§ 841, 844, and 846.  He was sentenced to 24

years and 4 months in prison on January 15, 1999.  His projected release date is July 10, 2018,

via Good Conduct Time Release.  See Exhibit 1, Declaration of Douglas S. Goldring ¶ 3, and

Attachment A.

     Plaintiff arrived at FCI McKean on July 20, 2001, and was first assigned to the Federal

Prison Industries, Inc. (FPI or trade name UNICOR) factory on April 9, 2002.  See Exhibit 2,

Declaration of Martin Sapko ¶ 6, and Attachment B.  FPI is a wholly-owned government

corporation, created by Congress in 1934 with the mission of providing work simulation

programs and training opportunities for inmates confined in federal correctional facilities.  In

order to achieve this goal, FPI operates factories in over 100 locations across the country.  It

manufactures products and services in seven different business groups: Electronics, Clothing &

Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling,

and  Industrial Products.  See Exhibit 2 ¶ 3.

     Typically, each prison (with the exception of minimum security and administrative/

pretrial facilities) in the federal system contains one UNICOR factory which is a division of one

of the above referenced business groups.  At all times relevant to this case, the FCI McKean

factory was part of the Office Furniture Business Group.   It is UNICOR's goal to employ a

minimum of 25% of all eligible inmates incarcerated in the federal system.  See Exhibit 2 ¶ 4.

### B.    OSHA Inspection

     On July 3, 2001, the Area Director of the Occupational Safety and Health Administration

("OSHA") sent a letter to Stephen Housler, the Safety Manager at FCI McKean.  The letter

advised  Housler that OSHA had received a notice of safety hazards regarding the ventilation

system in the UNICOR factory at FCI McKean.  Specifically, the notice of safety hazards alleged

that ventilation was inadequate, employees were being exposed to excessive wood dust, and that

dust masks were not readily available.  The letter indicated that OSHA had not made any

determination that the alleged hazards existed, nor did OSHA intend to conduct an inspection at

that time.  Nevertheless, since allegations of violations and/or hazards had been made, OSHA

requested that FCI McKean investigate the alleged conditions and make any necessary

corrections or modifications.  See Exhibit 3, Declaration of Stephen Housler ¶¶ 8-10, and

Attachment A.

The Warden responded to OSHA's concerns on July 27, 2001.  In that letter, he described

the dust collection system in the UNICOR factory and indicated that dust masks are available in

the UNICOR tool room, and are issued upon request.  See Exhibit 3 ¶ 11, and Attachment B.

Specifically, the UNICOR factory at FCI McKean is equipped with two dust collection

systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste

portal.  Each dust collector has the capacity to move 34,000 cubic feet of air per minute from the

UNICOR factory.  See Exhibit 2 ¶ 7, and Attachment C.  The dust collection system is connected

to the furniture-manufacturing machinery in the UNICOR building.  According to operational

procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be

operated unless the dust collection system is turned on first.  See Exhibit 2 ¶¶ 8-9.

Dust and air entering the dust collection system are moved by fans within the dust

collection system from the machinery process through smooth round ducts, to a large vacuum

located on the outside of the building.  The vacuum pulls dust and air from the factory to one of

the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a

hopper, which is also located outside of the UNICOR building.  The filtered air is then returned

to the factory though square ducts.  The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory.  See Exhibit 2 ¶ 10, and Attachments D and E.

On July 31, 2001, in response to the letter from OSHA, FCI McKean had Microbac Laboratories, Inc. conduct an indoor air quality survey of the FCI McKean UNICOR factory. Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for total Particulates/Nuisance Dust.  See Exhibit 3 ¶ 12, and Attachment C.[3]

On April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean.  The OSHA Notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes.  The dusts included wood dust, particle board dust and Micoreboard dust.  The Notice also alleged that ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes.  See Exhibit 3 ¶¶ 14-15, and Attachment D.

On April 16, 2003, an OSHA compliance officer visited the FCI McKean UNICOR factory and conducted a walk-through inspection.  At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and necessary practices were being followed in accordance with OSHA regulations.  The inspector indicated that OSHA inspectors would return to the UNICOR factory to conduct a formal inspection.  See Exhibit 3 ¶

---

[3]Indeed, the survey results showed that the air quality was well within OSHA standards. According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/ Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/ Respirable Nuisance Dust.  According the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter.  See Exhibit 3 ¶ 13, and Attachment C.

16.

On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory.  On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct air monitoring of the UNICOR factory.  On or about June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist informed Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory.  See Exhibit 3 ¶ 17.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards.  The letter included results of the OSHA air monitoring, which had evaluated worker exposures to airborne dust concentrations of vitreous fiber and perlite.  The results showed that no worker's exposure exceeded 10% of the relevant exposure limit.  See Exhibit 3 ¶ 18, and Attachment E.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, issued a Notice of Unsafe or Unhealthful Working Conditions.   The only cited OSHA violation which is relevant to Plaintiff's complaints regarding hazardous substances in the UNICOR factory air  was described as, "Adequate precautions against the ignition of flammable vapors were not taken." 29 C.F.R. § 1910.106(e)(6)(I).  See Exhibit 3 ¶¶ 19-20, and Attachments F-G.  The citation indicated the following:

> LokWeld 860/861 had a flash-point of approximately 15 degrees Fahrenheit and was applied to project items from a 5-gallon container with a roller.  Mechanical exhaust ventilation in combination with the enclosures were not utilized to control the LokWeld's flammable vapors.  Potential ignition sources in the area included but were not limited to the designated smoking area, woodworking machinery, and normal electrical systems.  The smoking area was located within approximately 16 feet to 30-feet from the areas where the LokWeld was applied to

the items.

Id.

Lokweld 860/861 ("Lokweld") is a spray grade adhesive used in the UNICOR factory at

FCI McKean.  Lokweld is applied to materials in the UNICOR factory using a sprayer which is

located in an enclosed spraying booth, with its own independent exhaust system. See Exhibit 3 ¶

21. The booth in which Lokweld is used is a completely enclosed unit.  No leaks or other hazards

have been identified.  Furthermore, if a leak were to form, the vapors emanating from the booth

would have a noxious and easily identifiable odor.  There have been no reports or complaints of

any unusual odors or vapors in or around the Lokweld spray station.  See Exhibit 3 ¶ 22.

During the OSHA inspection of the UNICOR factory, which occurred from April 16,

2003 through August 1, 2003, OSHA personnel fully inspected the Lokweld spray booth.  During

its inspection, OSHA did not note any concerns relating to Lokweld fumes emanating from the

spray booth, ventilation of the Lokweld, or inmate protection against Lokweld fumes.  See

Exhibit 3 ¶¶ 23-28, and Attachments E-G.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI

McKean had taken corrective measures regarding all of the identified Unsafe Working

Conditions, with four exceptions, which were awaiting additional information from the Bureau of

Prisons Central Office.  Defendant LaManna's letter advised OSHA that by April 25, 2003,

LokWeld glue and the fire cabinet had been removed from the Special Projects Area.  The

Warden advised that LokWeld would no longer be used in making their products.  See Exhibit 3

¶ 29-30, and Attachment H.

### III.    LEGAL ARGUMENTS

#### A.    Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered

"forthwith" if there is no genuine issue as to any "material fact."  In recent years there has been a

dramatic change and much greater willingness of the courts to grant this remedy.  In 1986, the

Supreme Court decided three cases which greatly liberalized summary judgment practice and

encouraged a much greater use of summary judgment by trial courts.  See Matsushita Electrical

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Anderson v. Liberty Lobby, Inc. 477

U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

> As stated by Chief Justice Rehnquist, summary judgment now:
> is properly regarded not as a disfavored procedural shortcut but rather as an
> integral part of the Federal Rules as a whole... Rule 56 must be construed with due
> regard not only for the rights of person asserting claims and defenses tried to a
> jury, but also for the rights of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior to trial, that the claims and
> defenses have no factual basis.

Celotex, 477 U.S. at 327.   "Modern, post-trilogy summary judgment doctrine is a stronger and

more aggressive approach to summary judgment practice that places a reduced burden on the

movant, greater burdens on the nonmovant, and makes summary judgment more likely to be

granted than the pre-trilogy approach."  Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually

unsupported claims or defenses."  Celotex, 477 U.S. at 323-324.  The defendants have the initial

burden of showing that there is an absence of evidence to support an essential element of the

plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts"

showing that there is a genuine issue for trial.  LaBounty v. Coughlin, 137 F.3d 68, 73 (2nd  Cir.

1998).  The failure to sufficiently support all elements necessary to support a case will render all

other facts immaterial.  Celotex, 477 U.S. at 323.

        The fact that a plaintiff has some facts on his side, or that there are some factual disputes,

is not enough to deny the motion.  The "mere existence of a scintilla of evidence in support of

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  Anderson, 477 U.S. at 252;  Matsushita Elec. Indus. Co., 475

U.S. at 586 (The motion will not be denied merely because of  "some metaphysical doubt" about

the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd  Cir. 1997)(The existence of  "some"

alleged factual dispute is not enough to defeat summary judgment, the opponent must show that

there is no "genuine" issue of material fact");  Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd

Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the

motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(The responding

party may not rest on the allegations of his/her pleading but must present by affidavit or

otherwise specific facts sufficient to create a genuine issue of material fact.  Fed.R.Civ.P. 56(e)).[4]

---

[4] In the alternative, Defendants also seek dismissal of the Second Amended Complaint
pursuant to Fed. R. Civ. Pro. 12(b)(6).  In a Rule 12(b)(6) Motion to Dismiss, the complaint is
liberally construed, and all well-pleaded fact allegations, and any reasonable inferences to be
drawn from the facts alleged, viewed in the light most favorable to the non-moving party.
Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1384 (3d Cir. 1994). This
concession of truth, however, goes only to well-pleaded fact allegations, not legal or unsupported
conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual
allegations.  See Mires v. Dekalb County, Ga., 433 U.S. 25, 27 n. 2 (1977); Washington Legal
Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); Davidson v. State of Ga.,
622 F.2d 895 (5th Cir. 1980); Wilson v. Lincoln Redevelopment Corp., 488 F.2d 339 (8th Cir.
1973); Stanturf v. Sipes, 335 F.2d 224 (8th Cir.), cert. denied, 379 U.S. 977 (1965); Violenti v.
Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1255 (M.D. Pa. 1994).
        Moreover, the claimant must set forth sufficient information to outline the elements of his
claim or to permit inferences to be drawn that these elements exist.  See Fed. R. Civ. Pro. 8(a)(2);
Conley v. Gibson, 355 U.S. 41, 45-6 (1957).
        In short, the court must dissect the complaint, eliminate mere rhetoric, legal conclusions

**BIVENS ACTION**

> **B.    Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation**

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has satisfied neither the objective nor subjective prongs of the Eighth Amendment test.  Farmer v. Brennan, 511 U.S. 825 (1994) and Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

> **1.    The Eighth Amendment Standard**

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of action exists under the Eighth Amendment when a prisoner alleges that prison officials have exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS") that pose an unreasonable risk of harm to his future health.  Id. at 35.  In Helling, the Court established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth Amendment.  The first prong is objective.  The Plaintiff must show that "he himself is being exposed to unreasonably high levels of ETS."  Id. at 35 (emphasis added).  With respect to this prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to the contaminant, but also "to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Id. at 36 (emphasis in original).

---

and unsupported factual conclusions, and determine whether or not well-pleaded fact allegations, when construed in a light more favorable to the Plaintiff, state a factual claim on some legal theory upon which relief can be granted, but not whether a plaintiff will ultimately prevail on that claim.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

The second prong is a subjective one: a plaintiff must show that prison officials were deliberately indifferent to a serious risk of harm.  Id.  The Supreme Court has held that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts for which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore Board fibers and Lokweld adhesive without appropriate ventilation and/or protective gear.  However, the evidence presented by Plaintiff with respect to this claim fails to establish either prong of the Helling test, because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution or toxins, or that Defendants exhibited deliberate indifference to such exposure.

### 2.    Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency.  Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors.  See Exhibit 3 ¶¶ 12-13 and 18, Attachments C and E.  Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit.  See Exhibit 3 ¶ 18, Attachment E.  Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory.  Plaintiff simply cannot, in this case, "show that

he himself is being exposed to unreasonably high levels of" harmful substances, as required by

Helling, where the UNICOR facility is in compliance with the relevant federal air quality

standards.

Additionally, in the Second Amended Complaint, Plaintiff alleges that Defendants'

failure to provide him with a NIOSH-approved respirator also constituted a violation of his

Eighth Amendment rights.  The Micore Fiber MSDS sheet clearly discusses the circumstances

under which a NIOSH-approved respirator should be used. Section VIII of the MSDS indicates

that special respiratory protection is "not typically necessary under normal conditions of use."

See Exhibit 3 ¶ 32, and Attachment I.   A NIOSH-approved respirator is necessary only "in

poorly ventilated areas, if TLV is exceeded and/or when dusty conditions exist."  See Exhibit 3

¶¶ 34-35, and Attachments C, E and I.   Here, however, Defendants' evidence establishes that

Plaintiff was exposed only to air that comported with federal guidelines, was not poorly

ventilated or unusually dusty, and that any American might be exposed to on a daily basis in the

course of his or her job.  See Exhibit 3 ¶¶ 18 and 35, and Attachments C, E and I; Exhibit 2 ¶¶ 7-

10, and Attachments C-E.  Based upon the tests and inspections conducted by the OSHA

inspectors, the conditions in the UNICOR factory did not require the Defendants to take any

other precautions with respect to the use and processing of Micore Board.   See Exhibit 3 ¶¶ 18

and 32-34, and Attachments C, E and I.  Although several suggestions were made to increase the

safety measures available to personnel assigned to the UNICOR factory, these were

recommendations only, and OSHA fully recognized that levels of contaminants in the UNICOR

factory were well within the applicable guidelines.  See Exhibit 3 ¶ 18, and Attachment E.

Because the respiratory exposure level for dangerous contaminants amounted to a mere

10% of the relevant exposure limit, and BOP did not violate requirements regarding safety

precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the <u>Helling</u> test.  OSHA standards reflect contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA.  <u>See, e.g.</u>, <u>Wooten v. Goord</u>, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), <u>aff'd.</u>, 2005 WL 387971 (2nd Cir., Feb 17, 2005);  <u>Saahir v. Holligan</u>, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards.  As such, Plaintiff cannot establish the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards.  The United States District Court for the Western District of New York recently addressed a § 1983 claim by *pro se* prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments.  <u>See</u> <u>Wooten v. Goord</u>, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), <u>aff'd.</u>, 2005 WL 387971 (2nd Cir. Feb. 17, 2005).  The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems.  <u>See</u> <u>id.</u> at *1.  In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment. <u>See</u> <u>id.</u>  The OSHA specialist had not taken air quality samples.  An industrial hygienist

14

associated with the state department of corrections later conducted air quality tests to determine whether employees were being exposed to hazardous chemicals at levels that exceeded state guidelines. Id. at *2. The air quality tests confirmed that the substances tested were below the permissible levels set by the state. Id. Based on the air quality tests, the correctional officials determined that the air quality in the print shop did not pose an unreasonable risk to inmate employees' health. Id.

The Wooten Court agreed with the correctional officials' decision and granted summary judgment in their favor. The Court concluded that plaintiffs had not shown that the allegedly poor ventilation in the print shop was serious enough to satisfy the objective element of their Eighth Amendment claim. Id. at *5. The Court acknowledged that plaintiffs' evidence had shown that OSHA had made recommendations for improvements to the print shop air quality. Id. However, plaintiffs' evidence did not show that the air quality failed to comply with federal workplace safety standards. Id. Moreover, defendants' evidence regarding air quality indicated that print shop workers were not being "excessively exposed to hazardous materials." Id. Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were erroneous or unreliable. Id. Accordingly, plaintiffs failed to raise a triable issue of fact with respect to the objective element of their Eighth Amendment claim. See also Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes. Defendants were entitled to summary judgment based on fact that boot factory had been inspected and air quality met OSHA standards).

Similarly, the United States District Court for the District of Delaware granted summary

15

judgment in favor of state correctional officials on an inmate's claim that he was exposed to unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth Amendment rights.  See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002).  In Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky" conditions, as well as a chart detailing the time of day and the number of inmates smoking at any given time over the course of a five-day period.  Id.  He also produced affidavits from several other inmates in support of his claims.  Id.  The Baker Court granted summary judgment in favor of defendant prison officials because, even if plaintiff had shown that he was subject to some level of environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of such ETS."  Id.  Accordingly, the Court found that the inmate failed to meet the Supreme Court's requirement in Helling that he show his exposure to a toxin "created a risk [that] is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Id. (quoting Helling, 509 U.S. at 36).  See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution had an "open air only" smoking policy).  Here, like the inmate in Baker, Plaintiff Ward cannot show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency.  To the contrary, Defendants have come forward with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff to that kind of risk.  See Exhibit 3 ¶¶ 12-13, 18, and Attachments C and E.

Courts have granted summary judgment in favor of prison officials even where the correctional facility is not in compliance with applicable federal standards.  In Carroll v. DeTella,

255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted

summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment

claim that the prison drinking water was contaminated with radium.  There, it was undisputed

that the radium levels in the drinking water of the correctional facility did exceed the maximum

level set by the United States Environmental Protection Agency ("EPA").  See id. at 472.

However, despite the fact that the correctional facility's radium level continued to exceed the

federal maximum, the state environmental agency informed the plaintiff-inmate that other

communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was

also informed that no remedial action would be taken to address radium levels, because the EPA

was considering raising the maximum level.  However, at the time plaintiff filed suit, the EPA

had not raised the radium standard, and the plaintiff continued to be subject to radium levels that

violated the applicable federal standards.  Nonetheless, the Seventh Circuit affirmed the District

Court's grant of summary judgment in favor of prison officials.

     In granting summary judgment, the Carroll Court recognized that prisons are not under a

duty to provide a maximally safe environment, completely free from pollution or safety hazards.

Id.  Because many Americans live under conditions of exposure to various contaminants, the

Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners

with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial

numbers of free Americans."  Id. (internal citations omitted).  As the Court recognized,

> It would be inconsistent with this principle to impose upon prisons in the name of
> the Constitution a duty to take remedial measures against pollution or other
> contamination that the agencies responsible for the control of these hazards do not
> think require remedial measures.  If the environmental authorities think there's no
> reason to do anything about a contaminant because its concentration is less than
> half the maximum in a proposed revision of the existing standards, prison officials
> cannot be faulted for not thinking it necessary for them to do anything either.

17

They can defer to the superior expertise of those authorities.

Id. at 472-73.

Here, Plaintiff Ward is being exposed to air quality and working conditions that OSHA, and our society, deems to be entirely acceptable for all persons, whether free or incarcerated. Because Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of air pollutants, he has failed the objective portion of the Helling Eighth Amendment test, and summary judgment must be entered in favor of Defendants.

### 3.    Plaintiff Cannot Establish Deliberate Indifference on the Part of Prison Officials[5]

Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment test, which he has not, he cannot show deliberate indifference by prison officials, as required by the subjective portion of the Helling test.  As discussed in section 2, supra, Defendants' compliance with OSHA standards clearly insulates them from liability.  See Helling v. McKinney, 509 U.S. 25 (1993); Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004),

---

[5] Pursuant to the Prison Litigation Reform Act,  Pub.L.No. 104-134, 110 Stat. 1321 (April 26, 1996) (PLRA) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**."  PLRA, 42 U.S.C. § 1997e(e)(emphasis added). Mitchell v. Horn, 318 F.3d 523, 533-36 (3d Cir. 2003); Davis v. District of Columbia, 158 F. 3d 1342 (D.C. Cir. 1998); Zehner v. Trigg, 133 F. 3d 459 (7th Cir. 1997). Fear of a future medical condition does not constitute a physical injury for purposes of the PLRA.  See Fontroy v. Owens, 150 F.3d 239, 243 (3d Cir. 1998); Herman v. Holiday, 238 F.3d 660, 665-66 (5th Cir. 2003)(§ 1997e(e) bars claims for mental and emotional damages caused by the fear that one's exposure to environmental hazards may result in exposure related diseases). Additionally, during the time in which Plaintiff was assigned to the UNICOR factory, he neither reported  any work-related health problems, nor did his medical records indicate that he suffered from any work related health problems or injuries.   See Exhibit 1 ¶ 6, and Attachment D; Exhibit 3 ¶¶ 46-47; Exhibit 2 ¶ 11; Exhibit 4, Declaration of Debora Forsyth ¶ 8. Therefore, his Eighth Amendment claim relating to exposure to environmental hazards must be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

aff'd., 2005 WL 387971 (2ⁿᵈ Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790 (N.D.

Tex., June 24, 2004);  Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002);  Jones v.

Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming, arguendo, that

Defendants' compliance with OSHA standards is not enough, Defendants also evaluated, and

complied with, the Material Safety Data Sheets for substances utilized in the UNICOR factory.

Courts have established that, with respect to the subjective prong of the Eighth

Amendment analysis, defendants are not deliberately indifferent to plaintiffs' health where they

conduct air quality testing and results comply with federal standards.  In Carroll, the Seventh

Circuit stated that even if inmate print shop employees had met the objective portion of their

burden, they could not satisfy the subjective element despite the fact that defendants were on

notice that the ventilation system may have needed improvements.  See 2004 WL 816919, at *5.

"Any claim that defendants were aware that the conditions in the Print Shop posed an excessive

risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed

that the air quality was acceptable according to federal standards."  Id. at *5.

Here, as in Carroll, OSHA conducted air quality tests and concluded that the air quality

in the UNICOR factory was well within applicable acceptable guidelines for the relevant

contaminants.  See Exhibit 3 ¶¶ 12-13, 18, and Attachments C and E.  It was thus reasonable for

FCI McKean to rely on available air quality test results to determine what, if any, safety

equipment it needed to make available for staff and inmates assigned to the UNICOR factory.

There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded,

an excessive and serious risk to Plaintiff Ward's health.  The Court may not hold Defendants to a

higher standard than that required by federal agencies who are charged with monitoring

workplace safety.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth

Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted consistently with, the applicable MSDS sheets and product warning labels in determining what protective equipment to provide for UNICOR employees. MSDS sheets are required to, and do, list risks associated with overexposure to various chemicals. More importantly, however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect against such risks. See Exhibit 3 ¶ 33. Defendants' decisions regarding the UNICOR work environment and protective equipment were consistent with the MSDS sheets and with product warning labels. See Exhibit 3 ¶¶ 32-38, and Attachment C, E, I, and J.

The product warning label for Micore Board states: "Dust hazard. Cut and trim with knife, razor, or hand saw. Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn." See Exhibit 3 ¶ 38, and Attachment J. Defendants do not dispute that power equipment was used to cut Micore Board. However, in accordance with the Micore 300 label, the UNICOR factory employed a dust collector on the cutting equipment. See Exhibit 3 ¶ 36; Exhibit 2 ¶¶ 7-10, and Attachments C-E. Because the UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-approved mask was not required. See Exhibit 3 ¶¶ 34-38, and Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-approved masks are not required when a dust collecting system is in use.[6] See Exhibit 3 ¶¶ 32-

_____

    [6]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of chemicals they produce or

35, and Attachment C, E, and I.  An MSDS is a technical bulletin prepared by chemical

manufacturers and importers to supplement the information contained on product labels.  29

C.F.R. § 1910.1200, App. E.  Pursuant to OSHA regulations, employers may rely on the

information contained on the product labels, as supplemented by the MSDS, and have no

independent duty to analyze the chemical or evaluate the hazards of it.  See Exhibit 3 ¶ 33.

      Section VII of the MSDS for Micore Board provides:

**Respiratory protection:** Not typically necessary under normal conditions of use.
Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold
Limit Values)]  requirements of individual ingredients and to control dusting
conditions.  Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated
areas, if TLV is exceeded, and/or when dusty conditions exist.  Avoid prolonged
and repeated breathing of dust.

See Exhibit 3 ¶ 32, and Attachment I.

      Thus, according to the MSDS for Micore Board, there are three situations which would

necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated

areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist.  See

Exhibit 3 ¶ 35, and Attachment I.  However, the air quality tests performed by OSHA in the

UNICOR factory definitively establish that the UNICOR factory was not poorly-ventilated, that

the Threshold Limit Values for hazardous ingredients of Micore Board were not exceeded, and

that dusty conditions did not exist.  See Exhibit 3 ¶¶ 12-13, 18, and Attachments C and E.

Indeed, the evidence shows that air quality tests conducted in 2001 and 2003, by Microbac

Laboratories and by OSHA, respectively, revealed that the respiratory particulates were well

---

import.  Using that information, they must prepare labels for containers, and the more detailed
MSDS technical bulletins.  Chemical manufacturers, importers and distributors of hazardous
chemicals are required to provide the appropriate labels and MSDS to the employer to which
they ship the chemicals.  29 C.F.R. §1910.1200, App. E.  See Exhibit 3 ¶ 33.

below applicable OSHA limits.  See Exhibit 3 ¶¶ 12-13, 18, and Attachments C and E.   More specifically, with respect to the level of dust in the UNICOR factory, the objective air quality tests show that the total particulate level was 1.1 mg per cubic meter, which is well below the applicable TLV standard for total Particulates/Nuisance Dust – 15 mg per cubic meter.  See Exhibit 3 ¶¶ 12-13, 18, and Attachments C and E.

It is also clear that the UNICOR factory at FCI McKean was more than adequately ventilated.  Specifically, the factory is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors have been operational in the FCI McKean UNICOR factory since approximately September 11, 1989, and each dust collector has the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory.  See Exhibit 2 ¶7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first.[7]  See Exhibit 2 ¶8.

---

[7]  Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1)  a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine.  Each of these connections provides dust collection to the saw blade at the point of machining.  In the next step of the process, the four edges of the Micore Board are shaped on the Delta Shaper machine.  This machine has one four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining.  In the third and final machining operation, the Onsrud Inverted Router is used to create a pocket in the back side of the Micore Board for support brackets.  This operation is only performed on half of the quantity ordered.  This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom.  All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems.  See Exhibit 2 ¶9.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary. That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation... Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn." See Exhibit 3 ¶¶ 32-37, and Attachment I. This language is similar to, but not the same as, the warning contained on the Micore Board product label. The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators. Defendants reasonably opted to employ a dust collector system. See Exhibit 3 ¶ 38, and Attachment J; Exhibit 2 ¶¶ 7-10, and Attachments C-E. The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required. See Exhibit 3 ¶¶ 32-37, and Attachment I. Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, but did not require, the use of NIOSH-approved respirators. See Exhibit 3 ¶ 18, and Attachment E.

With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive

---

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above, are actually smooth on the inside for better dust collection. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Exhibit 2 ¶10, and Attachments D-E.

that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation."  See Exhibit 3, Attachment G.  Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth with an independent exhaust system.  See Exhibit 3 ¶ 21.  The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld.  See Exhibit 3 ¶ 22.  Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor.  See Exhibit 3 ¶ 22.  FCI McKean has not received any complaints about odors in or around the Lokweld station, nor has the Safety Manager ever noticed any unusual odors in the area. See Exhibit 3 ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, they fully inspected the Lokweld spray booth.  See Exhibit 3 ¶ 23.  The OSHA inspectors did not reveal any concerns relating to any Lokweld fumes emanating from the spray booth.  See Exhibit 3 ¶¶ 24-25, and Attachment F.   The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory.  See Exhibit 3 ¶¶ 24-27, and Attachment F.  FCI McKean corrected each of OSHA's concerns relating to Lokweld by September 22, 2003.  See Exhibit 3 ¶ 29, and Attachment H.  Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the Declaration of Safety Manager Housler, each of which indicates that Lokweld fumes were not emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

In conclusion, Defendants properly relied on objective air quality data, the results of the OSHA inspection of the UNICOR factory, and the relevant MSDS sheets in making decisions

regarding UNICOR factory conditions and necessary protective equipment. They were in no way deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.[8]

### C. Any Claim Pursuant to the Fifth Amendment Substantive Due Process Clause is Foreclosed by Plaintiff's Eighth Amendment Claim.

As part of the First Count of his Second Amended Complaint, Plaintiff alleges that the Defendants deprived him of his rights under the Fifth Amendment of the Constitution. See Second Amended Complaint ¶ 36. It is well settled that if a constitutional claim is covered by a specific constitutional provision, it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. See U.S. v. Lanier, 520 U.S. 259, 272 n.7 (1997). Any substantive due process claim raised by Plaintiff as a result of his alleged exposure to silica dust relates to a specific government behavior against which the Eighth Amendment explicitly protects. Helling v. McKinney, 509 U.S. 25 (1993). As such, Plaintiff cannot obtain relief pursuant to the Fifth Amendment Substantive Due Process Clause, and this

---

[8] Plaintiff further alleges that Defendants violated his Eighth Amendment rights by altering the Material Safety Data Sheet ("MSDS") for Micore Fiber. See Second Amended Complaint ¶ 22. Even if this allegation could satisfy Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet. Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one. See Exhibit 2 ¶ 12; Exhibit 3 ¶¶ 32-48; Exhibit 4 ¶ 8. An unauthorized marking or alteration which was allegedly made on the MSDS sheet, and never noticed by any staff member at the time, played no part in this calculus. See Exhibit 2 ¶ 12; Exhibit 3 ¶¶ 32-48; Exhibit 4 ¶ 8. Finally, because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet. Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution. See Exhibit 2 ¶ 13; Exhibit 3 ¶¶ 43-45; Exhibit 4 ¶ 9. Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable. See Exhibit 2 ¶ 13; Exhibit 3 ¶¶ 43-45; Exhibit 4 ¶ 9.

claim must be dismissed with prejudice.[9]

**D.    Defendants LaManna and Watson  Must Be Dismissed Because Plaintiff Has Plead No Claims Against Them And Can Show No Personal Involvement.**

A plaintiff, in order to state a viable civil rights claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of law; and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990).

An inmate must plead and later prove that the individual Defendant committed some affirmative act or omission, in order to submit him to personal liability for the actions of another person.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988).  See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986);  Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(plaintiff attempting to present a civil action against individual government officials must: present material facts on which he contends he can establish a right to recovery; be able to state those facts with some particularity; and show why the official cannot show a valid defense of immunity).

Furthermore, the doctrine of respondeat superior cannot form the basis of a Bivens claim.

---

[9] To the extent that Plaintiff's First Count states a Procedural Due Process claim, that claim was previously dismissed by the Court in its March 31, 2005, Order adopting the Report and Recommendation.  See Docket Nos. 25, 27, and 29.  Specifically, the Court held that Plaintiff could not show that he was deprived an opportunity to be heard with regard to the conditions of which he complained. Id.  As such, Plaintiff is now foreclosed by this Court's previous Order from raising a Procedural Due Process claim again.

Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362, 371 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc), cert. denied, 502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See also Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991).  To find a supervisory official personally liable for the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." Haynesworth v. Miller, 820 F.2d 1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman, 942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a defendant is necessary before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in

motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury.  Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447.  A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible.  Ybarra, 723 F.2d at 680.

_____In the Second Amended Complaint, Plaintiff has not alleged any facts implicating either Defendant LaManna or Defendant Watson in the alleged denial of any constitutional rights. Rather, Defendant LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean. Accordingly, the Plaintiff's claims against him should be dismissed for failure to show personal involvement.  It is also clear from the face of the Second Amended Complaint that there are no longer any pending allegations involving Defendant Watson.  Defendant Watson had been named in the previous Complaints solely based upon Plaintiff's retaliation claim, which alleged that Defendant Watson interfered with Plaintiff's attempts to submit administrative remedies.  That claim is no longer raised in the Second Amended Complaint.  Furthermore, Defendant Watson, as Plaintiff indicates, is a Correctional Counselor.  See Second Amended Complaint ¶ 6. As a Correctional Counselor, Defendant Watson is an employee of the BOP, not FPI, and he does not have any direct involvement in the operation of the UNICOR factory.  As such, Defendant Watson no longer plays any role in this litigation, and should be dismissed from this action.

**E.    Defendants Are Protected from Suit by the Doctrine of Qualified Immunity, Because None of Plaintiff's Clearly Established Constitutional Rights Were Violated**

Summary judgment is appropriate with regard to all of the named Defendants based on the doctrine of qualified immunity.   A plaintiff may maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).  The Supreme Court, however,  has held that federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages.  Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978). "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818.  See also Jeffers v. Gomez, 267 F.3d 895, 910-912 (9th Cir. 2001).  This is an "immunity from suit rather than a mere defense to liability."  Mitchell v. Forsyth, 472 U.S. 511 (1985); see also Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam).   Therefore, once an individual raises qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3d  Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d  at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified

immunity should be decided by the court before trial.  <u>Hunter</u>, 502 U.S. at 227.  <u>See also</u>

<u>Cunningham v. Gates</u>, 229 F.3d 1271 (9th Cir. 2000).  The Plaintiff has the burden of showing

that the defendant federal employees violated his clearly established Constitutional rights.

<u>Zeigler v. Jackson</u>, 716 F.2d 847 (11th Cir. 1983).

     The Supreme Court further clarified the <u>Harlow</u> rule on qualified immunity in <u>Anderson</u>

<u>v. Creighton</u>, stating: "whether an official protected by qualified immunity may be held

personally liable for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action, ... assessed in light of the legal rules that were 'clearly established'

at the time it was taken."  483 U.S. at 639 (citation to <u>Harlow</u> omitted).  Both questions are to be

decided by the court. This standard "gives ample room for mistaken judgments by protecting all

but the plainly incompetent or those who knowingly violated the law."  <u>Hunter v. Bryant</u>, 502

U.S. 224, 229 (1991) (per curiam) (<u>quoting</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 343 (1986)).  As

long as a defendant government employee could reasonably have thought his actions were

consistent with the rights he was alleged to have violated, the defendant federal employee is

entitled to qualified immunity.  <u>Anderson</u>, 483 U.S. at 638.

     Government officials are not expected to be legal scholars like law professors. <u>Ward v.</u>

<u>San Diego County</u>, 791 F.2d 1329, 1332 (9th Cir.), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u>, <u>Duffy v. Ward</u>, 483

U.S. 1020 (1987).  The contours of the right allegedly violated must be sufficiently clear so that a

reasonable government official would understand that his or her conduct violated the plaintiff's

constitutional rights.  Officers who reasonably but mistakenly conclude their conduct was lawful

are entitled to immunity.  <u>Anderson</u>, 483 U.S. at 641;  <u>Hunter</u>, 502 U.S. at 228-229.

     Furthermore, the Supreme Court recently clarified the standard for the qualified immunity

defense, making it much more difficult for Plaintiff to prevail.  <u>Saucier v. Katz</u>, 533 U.S. 194

30

(2001). There, the Court held that the lower courts had been ignoring a significant threshold question. Specifically, this Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 200-01. Only if a constitutional violation could be made out from the Plaintiff's allegations does the analysis move to the second sequential step, asking "whether the right in question was clearly established." Id. The Court went on to caution, however, that this second inquiry is not taken in a broad, general context, but must be "undertaken in light of the specific context of the case." Id. The reason for such an analysis is to avoid treating prison administrators as attorneys or holding them to an impossible standard. As such:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted). Thus, if the law "did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

In the present case, Plaintiff has not shown that the Defendants violated any of his Constitutional rights. See discussion in Sections B-D, supra. Therefore, he has failed to establish his burden of proof, as required by Saucier, Anderson and Harlow. Assuming for the sake of argument, however, that any of Plaintiff's allegations constituted violations of his Constitutional rights, none of those rights were so clearly established as to satisfy the second prong of the Saucier analysis. As such, the Defendants are entitled to qualified immunity.

**FEDERAL TORT CLAIMS ACT**

    **F.**    **Plaintiff's Federal Tort Claims Act Claim in Count II Must Be Dismissed for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1).**

    The United States as a sovereign is immune from lawsuit except to the extent it consents to be sued. FDIC v. Meyer, 510 U.S. 471, 475 (1994); Lehman v. Nakshian, 453 U.S. 156 (1981); Matsko v. United States, 372 F.3d 556 (3rd Cir. 2004). Thus, it is axiomatic that unless the United States expressly waives this immunity, a district court will have no subject matter jurisdiction to hear the suit.[10] Meyer, 510 U.S. at 475; U.S. v. Mitchell, 463 U.S. 206, 212 (1983); U.S. v. Testan, 424 U.S. 392 (1976). Further, there can be no consent by implication or

---

    [10] A defense of lack of jurisdiction over the subject matter may come in one of two forms: a facial attack or a factual attack. Gould Electronics, Inc. v. United States, 220 F.3d 169, 176 (3rd Cir. 2000); Mortensen v. First. Fed. Sav. And Loan Ass'n., 549 F.2d 884, 891 (3rd Cir. 1977). In a facial attack, the defense merely files a Rule 12 (b)(1) motion with no supporting documents, affidavits or other factual allegations. Id.; PBGC v. White, 998 F.3d 1192, 1196 (3rd Cir. 1993); Paterson v. Weinberger, 644 F. 2d 521, 523 (5th Cir. 1981). In reviewing a facial attack, therefore, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id.

    The Court, however, is not limited to the face of the complaint in determining a Rule 12(b)(1) motion. In a factual attack, the court may also consider evidence outside the pleadings, including affidavits, testimony, depositions, documents and other evidence to resolve factual issues bearing upon jurisdiction. Gould Electronics, 220 F.2d at 176; Gotha v. United States, 115 F.3d 176, 178-79 (3rd Cir. 1997); Biotecs Research Corp. v. Heckler, 710 F.2d 1375, 1379 (9th Cir 1983) (consideration of materials outside the pleadings will not convert a 12(b)(1) motion into one for summary judgment). Unlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) Motion to Dismiss, the Court may resolve issues of fact relating to jurisdiction for itself. Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897 (1981); Biase v. Kaplan, 852 F. Supp. 2d 268, 277 (D. NJ 1994).

    Regardless of whether the motion is based upon a facial attack or a factual attack, once the defense of lack of jurisdiction over the subject matter is raised, the Plaintiff bears the burden of showing why the case should not be dismissed. Gibbs v. Buck, 307 U.S. 66, 72 (1939); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3rd Cir.), cert. denied, 501 U.S. 1222 (1991); Mortensen, 549 F.2d at 891. Plaintiff's burden, however, is lighter than a motion to dismiss pursuant to Rule 12(b)(6). Dismissal here is only appropriate where, "the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a Federal controversy." Growth Horizons, Inc. v. Delaware Cty., Pa., 938 F.2d 1277, 1280-81 (3rd Cir. 1993)(citing cases).

by use of ambiguous language.  Library of Congress v. Shaw, 478 U.S. 310, 318 (1986); United States v. Mitchell, 445 U.S. 535, 538 (1980)(waiver of sovereign immunity may not be found in the absence of unequivocally expressed Congressional intent.)

     In the case of actions sounding in tort, however, Congress has expressly issued a limited waiver of sovereign immunity in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 2671, *et seq.* Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 1194 (3rd Cir), cert. denied sub nom, Livera v. United States Small Business Ass'n, 493 U.S. 937 (1989); Matsko, 372 F. 3d at 558; Gotha, 115 F.3d at 179.  This is the only waiver of sovereign immunity for actions sounding in tort against the United States, and it must be strictly construed, and all doubt is to be resolved in favor of the government.  Meyer, 510 U.S. at 474-75.  Further, limitations placed upon the waiver are to be expansively reviewed, and only express exceptions to these limits may be recognized.  U.S. v. Nordic Village, Inc., 503 U.S. 30 (1992); Bowen v. City of New York, 476 U.S. 467 (1986). Thus, if any limitations upon this waiver of sovereign immunity apply, then a 12(b)(1) motion to dismiss for lack of jurisdiction over the subject matter is the appropriate means for disposal of the action against the United States.  Matsko, 372 F. 3d at 558 (district court may only exercise jurisdiction if FTCA waives sovereign immunity).

     **G.**    **Plaintiff Failed to Exhaust His Administrative Remedies Prior to Filing Suit**

     Plaintiff's claim against the United States under the FTCA should be dismissed for lack of subject matter jurisdiction, because Plaintiff did not fully exhaust his administrative remedies under the FTCA prior to the filing of the Complaint in this civil action.  28 U.S.C. § 2675(a).

     The exclusive remedy for Plaintiff's negligence claim is an action against the United States pursuant to the FTCA, 28 U.S.C. §§ 2671-2680.   The FTCA represents a limited waiver

of sovereign immunity for certain types of alleged tortious conduct. However, the FTCA

expressly limits the Court's jurisdiction to hear such claims by imposing strict administrative

requirements for claimants wishing to file a federal lawsuit. The statute requires that a claimant

<u>must</u> file an administrative claim with the relevant agency before commencing suit:

> An action shall not be instituted upon a claim against the United States for money
> damages for injury or loss of property or personal injury or death cause by the
> negligent or wrongful act or omission of any employee of the government who
> acted within the scope of his office or employment, unless the claimant <u>shall have</u>
> <u>first presented the claim to the appropriate federal agency and his claim shall have</u>
> <u>been finally denied by the agency in writing</u>

28 U.S.C. §2675(a) (emphasis added). <u>See also</u> <u>McNeil v. United States</u>, 508 U.S. 106, 113

(1993)(Plaintiff must present administrative tort claim to appropriate agency and tort claim must

be finally denied by agency before civil action may be initiated).

The filing of an administrative tort claim for a claim of negligence is a jurisdictional

prerequisite to an FTCA suit which cannot be waived. 28 U.S.C. § 2675(a). <u>See</u> <u>Peterson v.</u>

<u>United States</u>, 694 F.2d 943, 944-45 (3d Cir. 1982); <u>Bialowas v. United States</u>, 443 F.2d 1047,

1049 (3d Cir. 1971). Thus, if a plaintiff files suit without first having submitted a timely claim

for administrative adjustment, the suit must be dismissed. <u>McNeil</u>, 508 U.S. at 112-13.

Likewise, if a plaintiff submits an administrative claim to the agency and then files a

complaint before either (1) the agency has finally denied the claim in writing or (2) the six-month

period for agency action has expired, the complaint must be dismissed for lack of subject matter

jurisdiction. <u>McNeil</u>, 508 U.S. at 112-13. <u>See</u>, <u>e.g.</u>, <u>National Sea Clammers Ass'n v. City of</u>

<u>New York</u>, 616 F.2d 1222, 1236 & n. 43 (3d Cir. 1980).

Nor can a plaintiff maintain an FTCA action when he failed to exhaust his administrative

remedies <u>prior</u> to filing suit, but did exhaust before substantial progress was made in the

34

litigation.  <u>McNeil</u>, 508 U.S. 106.  <u>See</u> <u>also</u> <u>Livera v. First Nat. State Bank</u>, 879 F.2d 1186, 1194

(3d Cir.), <u>cert.</u> <u>denied</u>, 493 U.S. 937 (1989).

Although the Third Circuit has not ruled on this issue, every court to consider the

question of whether an amended complaint filed after exhaustion could cure a prematurely-filed

original complaint, in light of <u>McNeil</u>, <u>supra</u>, concluded that it could not.  <u>Duplan v. Harper</u>, 188

F. 3d 1195 (10th Cir. 1999); <u>Gaerman v. FBI</u>, 2003 WL 23537963 (D. Or. 1995); <u>Webster v.</u>

<u>U.S.</u>, 2005 WL 3031154 (E.D. Cal. 2005); <u>Sparrow v. US Postal Service</u>, 825 F.Supp. 252, 254-

55 (E.D.Cal. 1993).  In <u>Sparrow</u>, <u>supra</u>, the plaintiff filed a complaint under the FTCA

approximately six months prior to the denial of his administrative tort claim.  Six months after

the denial of his administrative tort claim, the plaintiff attempted to cure the jurisdictional flaw

by filing an amended complaint under the FTCA, rather than by instituting a new suit.  The

United States District Court dismissed the amended complaint for lack of subject matter

jurisdiction.  The court explained:

> to permit the premature filing of an FTCA action to be cured by the filing of an
> amended complaint upon denial of the administrative claim would be inconsistent
> with both <u>McNeil</u> and the rationale behind the jurisdictional prerequisite
> mandated by the FTCA, 28 U.S.C. § 2675(a).

<u>Sparrow</u>, 825 F.Supp. 252, 254.

In this case, Plaintiff filed his original Complaint on February 6, 2004.  <u>See</u> Docket No. 3.

At that time, although Plaintiff attempted to raise a negligence claim, the Complaint did not

name the United States as a Defendant, and Plaintiff had not submitted any administrative tort

claims relating to the allegations against FCI McKean.  <u>See</u> Docket Nos. 3 and 25.  <u>See</u> <u>also</u>

Exhibit 1 ¶ 5, and Attachment C.  On January 31, 2005, this Court issued an R&R dismissing the

negligence claim for failure to exhaust and for failure to name the United States as a Defendant.

See Docket No. 25.[11]  The District Court adopted the Amended R&R on April 1, 2005.  See Docket No. 29.

Only after the dismissal of his negligence claim did Plaintiff file an administrative tort claim on or around April 7, 2005.  That claim was denied on or around April 28, 2005.  See Exhibit 1 ¶ 5, and Attachment C.

On or about January 20, 2006, Plaintiff filed a Second Amended Complaint, in which he again included allegations of negligence under the FTCA and, for the first time, named the United States as a Defendant.  See Docket No. 44.

Because Plaintiff did not exhaust his available administrative remedies under the FTCA until over a year after he filed the Complaint in this matter, this Court lacks subject matter jurisdiction over the FTCA portion of this lawsuit.  28 U.S.C. § 2675(a); McNeil, supra. Moreover, under case law interpreting the FTCA, such a flaw cannot be cured simply by the filing of an amended complaint after exhaustion.  Sparrow, supra.  Thus, the Second Count of Plaintiff's Second Amended Complaint must be dismissed.

**H.     Even if the Second Amended Complaint Is Construed As A New Action Against the United States, Plaintiff's FTCA Claim Must be Dismissed as Time Barred.**

As discussed in Section B, supra, under the FTCA, exhaustion is required by 28 U.S.C. § 2675.  McNeil v. U.S., 508 U.S. 106 (1993). The Federal Bureau of Prisons has a system established whereby inmates may seek formal review of a complaint which relates to any aspect of their imprisonment ("Administrative Remedy Procedure for Inmates"). See 28 C.F.R. § 542.10. However, the FTCA has a separate administrative remedy procedure that is governed by

---

[11] The R&R was further amended on February 10, 2005.  See Docket No. 27.

28 U.S.C. § 2675. Administrative tort claims alleging personal injury and/or property damages occurring as a result of negligence of staff must be filed with the Northeast Regional Office.

Records reflect Plaintiff filed a tort claim with the Northeast Regional Office on April 7, 2005. He sought $2,500.00,[12] claiming staff negligently exposed him to environmental hazards in the UNICOR factory. See Exhibit 1 ¶ 5, and Attachment C. The matter was investigated and the claim was denied on April 28, 2005. A memorandum was sent to Plaintiff advising him of the denial and the requirement that he bring an action against the United States within six months if he was dissatisfied with the response. Id. A cause of action against the United States, therefore, had to be filed on or before the expiration of the six month period (which would have been on or before October 28, 2005). However, Plaintiff did not file his Second Amended Complaint until January 20, 2006, well after the six month requirement had expired.

Title 28 U.S.C. § 2401(b) bars claims that are not begun within six months after the date of **mailing** of the notice of final denial of the claim by the agency to which it was presented. See Pascale v. United States of America, 998 F.2d 186 (3d Cir. 1993). This statute of limitations requirement is strictly construed to run from the date of mailing of the denial. Tuttle v. United States Postal Service, 585 F.Supp. 55 (M.D.Pa. 1983), aff'd 735 F.2d 1351 (3d Cir. 1984), Hammond v. United States of America, 613 F.Supp. 358 (W.D.Pa. 1985). Additionally, if the statute is not satisfied, the court may not extend the six-month time period. See United States v.

---

[12] To the extent any portion of Plaintiff's FTCA survives this motion, he may not recover more than the $2,500.00 he presented to BOP in his Administrative Tort Claim, unless he can come forward with "newly discovered evidence" or show "intervening facts" as mandated by 28 U.S.C. § 2675(b). See generally Martinez v. United States, 780 F.2d 525 (5th Cir. 1986). The manifest purpose of this requirement is to ensure that Federal agencies charged with making an initial attempt to settle tort claims against the United States are given full notice of the government's potential liability. Id. See also Caidin v. United States, 564 F.2d 284, 287 (9th Cir.1977); Adams v. United States, 615 F.2d 284, 288-90 (5th Cir.1980).

Kubrick, 444 U.S. 111, 117-118 (1979).

Because Plaintiff failed to name the United States in this cause of action within the six month time limitation set forth under 28 U.S.C. § 2401(b), the claim is time barred and must be dismissed for lack of jurisdiction.

I.    **Plaintiff's Negligence Claim Is Barred by the Prison Industries Fund, 18 U.S.C. § 4126(c)(4), Which Provides Procedures for Compensating Inmates Who Have Been Injured at Their Institution Work Assignment.**

It is well settled that the exclusive remedy for any injury suffered by an inmate during the course of his work assignment is the Inmate Accident Compensation system, 18 U.S.C. § 4126(c)(4).  U.S. v. Demko, 385 U.S. 149, 151-52 (1966); Joyce v. United States, 474 F.2d 215, 219 (3rd Cir. 1973)(discussing the same issue with respect to the analogous FECA statute); Vaccaro v. Dobre, 81 F.3d 854, 857 (9th Cir. 1996)(Demko establishes that 18 U.S.C. § 4126 is the exclusive remedy against the government); Aston v. U.S., 625 F.2d 1210, 1211 (5th Cir. 1980)(citing Demko); Granade v. U.S., 356 F.2d 837, 840-41 (2nd Cir.), cert. denied 385 U.S. 1012 (1967).   Thus, the FTCA's waiver of sovereign immunity does not and cannot extend to actions relating to an injury suffered by an inmate during the course of performing his institution work assignment.  Demko, 385 U.S. at 151-52.

Here, because Plaintiff's alleged injuries were purportedly suffered while working, this Court must dismiss the claims against the United States (Second Count of the Second Amended Complaint) for lack of subject matter jurisdiction.  Demko, 385 U.S. at 153; Premachandra v. U.S., 739 F.2d 392, 394 (8th Cir. 1984)(a precisely drawn, detailed statute pre-empts more general remedies); Aston, 625 F.2d at 1211 (where an inmate was injured "on the job", the district court lacks jurisdiction to hear a cause of action grounded on the Federal Tort Claims Act); Wooten v. United States, 825 F.2d 1039, 1044 (6th Cir. 1987)(whether Plaintiff's injuries

were caused by the performance of work is irrelevant; as long as the injury occurred while the inmate was on the job, section 4126 is the exclusive remedy.)

Plaintiff's Second Amended Complaint focuses on the conditions at his UNICOR work assignment, and Plaintiff does not allege he has been exposed to unsafe conditions anywhere else within the institution.  Rather, he contends that the air quality in the UNICOR factory was unsafe.  Thus, the allegations raised pursuant to the FTCA must be dismissed because section 4126 is Plaintiff's exclusive remedy against the United States.

## IV.    <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, for Summary Judgment.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7452

OF COUNSEL:

Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served this date a copy of the within **DEFENDANTS' BRIEF**

**IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED**

**COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** by either

electronic filing and/or first-class United States mail, upon the following:

Richard A. Lanzillo, Esquire
Knox, McLaughlin, Gornall & Sennett
120 West Tenth Street
Erie, PA 16501

**Counsel for Plaintiff**


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney


Date: February 15, 2006