IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNY HILL, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 05-160E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| MICHAEL  HILL, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-323E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| LESLIE KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-368E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| KEVIN SIGGERS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-355E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | |
|---|---|
| MYRON WARD, | ) |
| | ) |
| Plaintiff, | )    CIVIL ACTION NO. 04-11E |
| | ) |
| v. | )    JUDGE McLAUGHLIN |
| | )    MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) |
| | )    (Electronic Filing) |
| Defendants. | ) |

## <u>DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION TO DISMISS</u>

AND NOW, come the Defendants, John LaManna, Marty Sapko, Deborah Forsyth, Stephen Housler, Robert Klark, Robert Reome, and Beth Fantaskey (hereinafter collectively referred to as "Defendants")[1] by and through their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Michael C. Colville, Assistant United States Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully request the Court grant summary judgment in favor of Defendants pursuant to Federal Rule of Civil Procedure 56.  As Defendants have already moved to Dismiss and for Summary Judgment at least once previously in each case, this is to be considered a supplemental motion.  All arguments of law and averments of fact which were previously raised, but not explicitly mentioned herein, are considered incorporated into this brief by reference.

---

[1] Defendants Fantaskey, Klark, and Reome, are named only in the action brought by Plaintiff Michael Hill, 03-323E.  Plaintiff Michael Hill also raised a separate complaint against Defendants Collins, LaManna, and the United States of America.  That complaint, which involved his dental care, will be briefed separately.

2

## I.    __INTRODUCTION__

This is a series of five cases raised by Plaintiffs Michael Hill, Kenny Hill, Kevin Siggers, Myron Ward, and Leslie Kelly, all of whom are Federal inmates (or former Federal inmates), all of which have been consolidated for trial.[2]  Plaintiffs each brought separate pro se actions styled after the type recognized by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Subsequently, however, the law firm of Knox, McLaughlin, Gornall & Sennett was appointed by the Court to represent all five inmate-Plaintiffs, and these cases were consolidated for trial.  Plaintiffs' claims generally relate to alleged hazardous work conditions at their UNICOR work assignments.

The procedural history of these cases spans a period of over three years, involving numerous Amended Complaints and Motions to Dismiss, or for Summary Judgment. Defendants will not repeat the entire procedural history at this time, as it is well known to the Court.

Currently pending before the Court are Plaintiffs' Amended Complaints[3], in which Plaintiffs  assert the following claims: 1) Plaintiffs' First Count alleges that they were exposed to

---

[2] Because these cases have been consolidated for trial, and because the legal arguments in each case are identical, Defendants will address the contentions of all five inmates together.  Unless otherwise specified throughout this brief, references to the docket, record, and previously filed briefs, motions, or exhibits refer to the lead case, Michael Hill v. LaManna, 03-323.

[3] Each Plaintiff has amended the Complaints in each respective case several times.  Currently, the status is as follows:

        Michael Hill v. LaManna, 03-323, Fifth Amended Complaint
        Leslie Kelly v. LaManna, 03-368, Amended Complaint
        Kevin Siggers v. LaManna, 03-355, Second Amended Complaint
        Myron Ward v. LaManna, 04-11, Second Amended Complaint
        Kenny Hill v. LaManna, 05-160, Second Amended Complaint.

Although there is some factual variance, the legal arguments raised in each complaint are identical.

environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Eighth Amendment, 2) Plaintiffs' First Count further alleges that they were exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Fifth Amendment Due Process Clause; 3) Plaintiffs' Second Count alleges that they were negligently exposed to environmental hazards inside the UNICOR factory at FCI McKean. [4]

In a Report and Recommendation (R&R) dated July 31, 2006 (Dkt. No. 89), this Court dismissed all of the remaining claims against the United States. As such, the United States is no longer a Defendant in any of these actions. Additionally, this Court dismissed all claims relating to the Fifth Amendment Due Process Clause. These R&Rs were respectively adopted in full by the Court on August 18, 2006 (Dkt. No. 92). As such, the only remaining claim in these actions is Plaintiffs' First Count alleging that they were exposed to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Eighth Amendment. For the reasons that follow, the Court should grant summary judgment in favor of the Defendants.

## II.    FACTS

The facts in this case are, by now, well known and have been laid out on numerous occasions. FPI is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities. FPI operates factories in over 100 locations across the country. It manufactures products and services in seven different business groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling, and Industrial Products. See Declaration of Martin Sapko ¶ 3.

---

[4] Although Plaintiffs had previously alleged various violations of the Fifth Amendment Equal Protection Clause, and the First Amendment, based upon a theory of retaliation, those claims have not been included in Plaintiffs' latest Amended Complaints.

Typically, each prison (with the exception of minimum security and administrative/ pretrial facilities) in the Federal system contains one UNICOR factory. At all times relevant to this case, the FCI McKean UNICOR factory was part of the Office Furniture Business Group.[5] <u>See</u> Declaration of Martin Sapko ¶ 4.

### A. The Air Quality In The UNICOR Factory

#### 1. The Microbac and OSHA Inspections

On July 3, 2001, the Area Director of the Occupational Safety and Health Administration ("OSHA") sent a letter to Stephen Housler, FCI McKean Safety Manager. The letter advised Housler that OSHA had received a notice of safety hazards regarding the ventilation system in FCI McKean's UNICOR factory. The notice of safety hazards alleged that ventilation was inadequate, employees were being exposed to excessive wood dust, and that dust masks were not readily available. OSHA's letter to Housler indicated that OSHA had not made any determination that the alleged hazards existed, and that OSHA did not intend to conduct an inspection at that time. Nevertheless, since allegations of violations and/or hazards had been made, OSHA requested that FCI McKean investigate the alleged conditions and make any necessary corrections or modifications. <u>See</u> Declaration of Stephen Housler ¶¶ 8-10, and Attachment A (previously submitted).

The Warden responded to OSHA's concerns on July 27, 2001. In that letter, he described the dust collection system in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room, and are issued upon request. <u>See</u> Declaration of Stephen Housler ¶ 11, and Attachment B.

---

[5] The factory at FCI McKean stopped producing furniture in 2006, due to an administrative decision made at the corporate level. The factory now produces plastic goods, such as meal trays, plasticware, and cups. <u>See</u> Deposition of Stephen Housler, page 10, line 23 thru page 11, line 9; page 45, line 4 thru page 46, line 3.

On July 31, 2001, FCI McKean had Microbac Laboratories, Inc. conducted an indoor air quality survey of the UNICOR factory at FCI McKean.  Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for total Particulates/Nuisance Dust.  See Declaration of Stephen Housler ¶ 12, and Attachment C.

Indeed, the survey results showed that the air quality was well within the OSHA standards.  According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/Respirable Nuisance Dust.  According the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter.  See Declaration of Stephen Housler ¶ 13, and Attachment C; Report of Deitrich Weyel, ScD, CIH.

Nearly two years later, on April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean.   The OSHA notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes.  The dusts included wood dust, particle board dust and Micoreboard dust. The Notice also alleged that the ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes.  See Declaration of Stephen Housler ¶¶ 14-15, and Attachment D; Declaration of Brendan M. Claybaugh ¶¶ 3-4, and Attachments A-B.

On Wednesday, April 16, 2003, an OSHA compliance officer visited the UNICOR factory at FCI McKean and conducted a walk-through inspection.  At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and

necessary practices were being followed in accordance with OSHA regulations.  The inspector

indicated that OSHA inspectors would return to the factory to conduct a formal inspection.  See

Declaration of Stephen Housler ¶ 16; Declaration of Brendan M. Claybaugh ¶¶ 4-8, and

Attachments B-D.

On May 14, 2003, the OSHA Compliance Officer conducted a more thorough inspection

of the UNICOR factory.   On June 17 and 18, 2003, representatives from OSHA returned to FCI

McKean to conduct air monitoring of the UNICOR factory.  On June 18, 2003, after the air

monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air

monitoring had gone well, and he did not foresee any violations with respect to the air quality in

the UNICOR factory.  See Declaration of Stephen Housler ¶ 17; Declaration of Brendan M.

Claybaugh ¶¶ 9-11, and Attachments B-E.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard

applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards.

The letter included results of the OSHA air monitoring, which had evaluated worker exposures

to airborne dust concentrations of vitreous fiber and perlite.  The results showed that no worker's

exposure exceeded 10% of the relevant exposure limit.  See Declaration of Stephen Housler  ¶

18, and Attachment E; Declaration of Brendan M. Claybaugh ¶¶ 15-16, and Attachment F;

Report of Deitrich Weyel, ScD, CIH.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire

UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of

Unsafe or Unhealthful Working Conditions was issued.  None of the citations noted in OSHA's

Notice of Unsafe or Unhealthful Working Conditions dealt with the air quality, dust in the air, or

any other hazardous conditions relating to Micore Board.  See Declaration of Brendan

Claybaugh ¶¶ 17-20, and Attachment G; Deposition of Stephen Housler, page 52, line 3 thru

page 53, line 19. In fact, the only mention Micore Board or the factory air quality in the Notice

of Unsafe or Unhealthful Working Conditions was Citation 2, Items 1, 2, and 3. These citations

all dealt with training and the way in which information relating to the Micore Board was

communicated to inmates, and was termed "Other"or "Other Than Serious". Id. When a

violation is termed, "Other" by OSHA, that means, "a situation in which the most serious injury

or illness that would be likely to result from a hazardous condition cannot reasonably be

predicted to cause death or serious physical harm to exposed employees, but does have a direct

and immediate relationship to their safety and health." OSHA, Employer Rights and

Responsibilities Following an OSHA inspection. This document is available on OSHA's

website at the following URL:http://www.osha.gov/Publications/osha3000.pdf. See also,

Deposition of Stephen Housler, page 53, lines 4-7 (understanding "Other" to mean a

recommendation that you do something to make the protection better.)

Plaintiffs further allege that the air quality in the factory was affected by the use of

Lokweld adhesive. Lokweld 860/861 ("Lokweld") is a spray grade adhesive used in the

UNICOR factory at FCI McKean. Lokweld is applied to materials in the UNICOR factory using

a sprayer, which is located in an enclosed spraying booth with an independent exhaust system.

See Declaration of Stephen Housler ¶ 21. The booth in which Lokweld is used is a completely

enclosed unit. No leaks or other hazards have been identified. Furthermore, if a leak were to

form, the vapors emanating from the booth would have a noxious and easily identifiable odor.

There have been no reports or complaints of any unusual odors or vapors in or around the

Lokweld spray station. See Declaration of Stephen Housler ¶ 22.

8

During the OSHA inspection, which occurred from April 16, 2003 through August 1, 2003, OSHA personnel also conducted a full inspection of the Lokweld spray booth. During its inspection, OSHA did not note any concerns relating to: Lokweld fumes emanating from the spray booth; ventilation in the Lokweld area; or protecting inmates against Lokweld fumes. See Declaration of Stephen Housler ¶¶ 23-26, and Attachments E-G; Declaration of Brendan M. Claybaugh ¶ 19; Report of Deitrich Weyel. ScD, CIH.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI McKean had taken corrective measures regarding all of the identified Unsafe Working Conditions, with four exceptions, which were awaiting additional information from the Bureau of Prisons Central Office. Defendant LaManna's letter advised OSHA that by April 25, 2003, LokWeld glue and the fire cabinet had been removed from the Special Projects Area. The Warden advised that LokWeld would no longer be used in making their products. See Declaration of Stephen Housler ¶ 29-30, and Attachment H.

### 2.    The Dust Collection Systems

The factory was equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal. The dust collectors were operational in the UNICOR factory at FCI McKean since approximately September 11, 1989, and each of the two dust collectors had the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory. See Declaration of Martin Sapko ¶7, and Attachment C; Declaration of Michael Salerno ¶¶4- 5.

Micore Board was initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine had two dust collection connections: (1) a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine. Each of these connections provided

9

dust collection to the saw blade at the point of machining. In the next step of the process, the four edges of the Micore Board were shaped on the Delta Shaper machine. This machine had one four inch port connected to the shaper fence, which supplied dust collection directly at the point of machining. In the third and final machining operation, the Onsrud Inverted Router was used to create a pocket in the back side of the Micore Board for support brackets. This operation as only performed on half of the quantity ordered. This machine had a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, which were not collected from the bottom. All of the aforementioned machines were connected to the main dust collection plenum leading to one of the two main dust collection systems. See Declaration of Martin Sapko ¶9; Declaration of Michael Salerno ¶ 6.

Dust and air entering the dust collection system through spiral pipes such as the ones described above were moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above were actually smooth on the inside for better dust collection. The vacuum pulled dust and air from the factory to one of the two large cone-shaped filter houses where air was filtered and dust was evacuated into to a hopper, which was also located outside of the UNICOR building. The filtered air was then returned to the factory though square ducts. The dust that was filtered from the factory air was collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko ¶10, and Attachments D-E; Declaration of Michael Salerno 5-6. The manufacturing machinery was

not to be operated unless the dust collection system was turned on first. [6] See Declaration of Martin Sapko ¶ 8; Declaration of Michael Salerno ¶¶ 5-7.

Each of the two dust collection systems produced 34,000 cubic feet/minute, meaning they were each strong enough to move 34,000 cubic feet of air in one minute. On system Number one, there were eight machines drawing dust collection, requiring 9,900 cubic feet/minute. On system number 2, there were 15 machines, drawing dust collection, requiring a total of 13,100 cubic feet per minute. This means the dust collection system generated 20,900 cubic feet per minute in excess of the requirements of the factory. See Declaration of Michael Salerno ¶ 7; Deposition of Stephen Housler p. 37, line 3 thru page 38, line 1 (December 19, 2006).

In fact, these dust collections systems were so powerful, that, "on more than a couple of occasions we had screwdrivers and that kind of thing get sucked up in them." See Deposition of Debora Forsyth, page 15, lines 13-20 (December 6, 2006). See also, Deposition of Stephen Housler, page 37, line 20 thru page 38, line 1 (December 19, 2006)("Our dust collection system was so strong, we had – we lost tools in it. We had crescent wrenches, screwdrivers, and tape measures get sucked up in it."); Deposition of David G. English, page 59, lines 22-25 (December 20, 2006)("the dust collections…had enough suction to suck up tools."). As a result of these incredibly powerful dust collection systems, the air in the factory was maintained in a better condition even than the air outside. See Deposition of Debora Forsyth, p. 22, lines 15-17 and page 27, lines 22-24(December 6, 2006); Deposition of Stephen Housler, page 49, lines 7-22 (December 19, 2006)("I would bet my life on it; that it's one of the cleanest – was one of the cleanest factories in the world."); Declaration of Brendan M. Claybaugh ¶¶ 5, 13, and

---

[6] It is relevant to note that the design of the dust collection system on the panel saws, pin routers, and other equipment made it virtually impossible for dust to be expelled into the air around the operator of the equipment. See Declaration of Michael Salerno, ¶¶ 12-17; Declaration of Brendan Claybaugh, ¶ 7, and Attachment C.

Attachment C.  Additionally, there is no evidence to suggest that these ventilation systems were

ever broken, down for repairs or not operating at full capacity at any time while the factory was

operational.[7]  See Deposition of Stephen Housler, page 19, lines 17-22 (December 19, 2006);

Declaration of Michael Salerno ¶ 10; Declaration of Brendan M. Claybaugh ¶¶ 5, 13, and

Attachment C; Report of Deitrich Weyel, ScD, CIH.  In his deposition, Mr. Housler was asked:

> Q: Were there ever any problems with the functioning of the ventilation system
> that you have described removing the dust from the saws and other machines that
> cut the Micore Board?

Mr. Housler emphatically responded with:

> A: The dust collection system functioned all the time.  We had a maintenance
> man who monitored it, and if there was an issues with it, he corrected them
> immediately.  I was never aware of any problems with the dust collection
> system.  **It functioned properly at all times**. (emphasis added)

The "maintenance man" referenced by Mr. Housler was Michael Salerno who, at all times

relevant to this collective action, was the Maintenance Mechanic Supervisor at the UNICOR

factory in FCI McKean.  Mr. Salerno was directly responsible for ensuring that all of the

equipment in the factory was maintained in proper working condition, including the dust

collection (or ventilation) system.  See Declaration of Michael Salerno ¶¶ 1-2, 9.  Mr. Salerno

---

[7] Inmate were provided with shop-vacs and brooms with which any residual dust could be collected.  To the extent any inmates may have used air hoses or blowers to clean themselves or their work stations off after working in UNICOR, this practice should not have been necessary, and was completely unauthorized by staff.  The blowers were provided solely for the purpose of cleaning underneath some of the larger equipment.  If inmates used the blowers (which were capped at 30 psi) for other purposes, Defendants were not aware of this practice and did not authorize it.  See Deposition of Stephen Housler, page 19, lines 6-10; page 46, lines 4-17 (December 19, 2006); Deposition of Martin Sapko, page 14, line 18 thru page 15, line 10 (December 19, 2006); Deposition of Debora Forsyth, page 24, line 2 thru page 25, line 25 (December 6, 2006); Deposition of David G. English, page 23, lines 12-25, page 60, line 20 thru page 61 line 18 (December 20, 2006); Deposition of John J. LaManna, page 30, lines 1-4 (December 6, 2006).

testifies through his declaration that the dust collection system was fully operational at all times. To the extent there was a problem with the dust collection system, he would either fix it immediately or lock the appropriate piece of equipment until it could be fixed.  Id. ¶ 10.

Likewise, excessive levels of dust in the factory (even levels which would be well within the OSHA threshold) could have caused significant damage to the machinery and equipment in the factory.  Many of these machines were extremely delicate, and had various ball bearings, gears, wheels, and other moving components.[8]  See Declaration of Michael Salerno ¶ 18.

If there was a significant amount of dust in the air or settling on these components, the resulting buildup of dirt and debris in the machinery components could have caused the machinery to fail.  Such damage would be readily apparent by the frequency that the machinery was required to be cleaned, as well as the need to replace ball bearings, gears, blades, and other moving parts.  Id. ¶ 19-20.

There is no evidence that there was ever a significant amount of dust inside the machinery which would require cleaning.  Additionally, Mr. Salerno was never required to effectuate any of the type of repairs which would be associated with excessive dust in the machinery.  Id. ¶ 21.

The pin routers are a perfect example of this.  Pin routers utilize a large fly-wheel which drives the blade.  If there is a build up of dust on the fly-wheel, then it can become unbalance, causing uneven cuts in the wood, and damage to the machine.  Mr. Salerno inspected the fly-wheel in the pin routers on a routine and regular basis.  He rarely observed excessive dust on or around the flywheel.  Additionally, He never observed the flywheel on any of the pin routers to be off balance or otherwise damaged.  Id. ¶ 22.

---

[8] It is further relevant to note that much of the equipment in the factory was designed to trap and expel dust through the dust collection system.  As such, when the equipment was properly operated, almost no dust could be expelled into the air around the operator.  See Declaration of Michael Salerno ¶¶ 12-17; Declaration of Brendan M. Claybaugh ¶ 8, and Attachment C.

C.    **The Plaintiffs Histories**

1.    **Michael Hill** [9]

Plaintiff is Michael Hill, Register Number 40428-133, a Federal inmate currently in the custody of the United States Marshals Service pursuant to a Write of Habeas Corpus Ad Testificandum (Dkt No. 100).  To the best of the Defendants' knowledge, he is currently being housed in the Erie County Jail awaiting trial in this case.

Plaintiff was convicted in the District of Columbia Superior Court of Manslaughter While Armed, and sentenced to 21 years in prison on May 1, 1994.  His projected release date is January 16, 2014, via Mandatory Parole.  See Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

Plaintiff arrived at FCI McKean on October 18, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on August 1, 2002.  He worked on the evening shift in the Packing Department until August 24, 2002.  See Deposition of Michael Hill, page 4, line 20, thru page 5, line 2 (November 1, 2006); UNICOR Work File of Michael Hill (attached).  Plaintiff's work area in the Packing Department was located approximately 77 feet from the Holzma Panel Saw, 66 feet from the Z-32 Panel Saw, and 78 feet from the pin routers.  See Deposition of David G. English, page 57, line 3 thru page 58, line 15; Diagram of UNICOR Factory Floor (attached).  At that time, Plaintiff was assigned to a section known as the "Car Wash".  This was, "the end of the line."  In Plaintiff's words:

> When the material – like the material that – such as that table you're sitting at, we
> would take that and wipe it down and stack it, and right at the edge of the table
> that we had, that was where the guys would box it up and seal it up, and ship it to

---

[9] For purposes of this sub-section only, unless otherwise indicated, references to previously submitted declarations, exhibits, and references to the docket, refer only to documents previously submitted in the case Michael Hill v. LaManna, 03-323.

the dock to be – to go out.  We would just clean it, wipe it down, and stack it for those guys to put over into the crates that it would go out in.

Deposition of Michael Hill, page 6, lines 6-14 (November 1, 2006).  Plaintiff was removed from the UNICOR factory on August 24, 2002, when he was transferred to the Special Housing Unit (SHU).  See Unicor Work File of Michael Hill (attached); Inmate Quarters History Data of Michael Hill (attached).  He was released from SHU and returned to the UNICOR factory on or around October 21, 2002, and assigned to the same position in the Packing Department.  See UNICOR Work File of Michael Hill.  He was removed for a second time and transferred to SHU on December 16, 2002.  See UNICOR Work File of Michael Hill; Inmate Quarters History Data of Michael Hill.

He again returned to UNICOR in the same position on or around January 7, 2003.  See UNICOR Work File of Michael Hill.  He remained in that position until April 19, 2003, at which time he voluntarily left his work assignment in UNICOR.  See UNICOR Work File of Michael Hill.

Plaintiff was rehired in the UNICOR factory on or around June 24, 2003.  At that time, he was assigned to the day shift, and was assigned to the loading dock.  See Deposition of Michael Hill, page 19, line 17 thru page 20, line 8; UNICOR Work File of Michael Hill.  While assigned to the loading dock, Plaintiff was primarily responsible for transferring scrap board and other trash from the dumpster located inside the factory to the dumpster located outside the factory.  See Deposition of Michael Hill, page 21, line 3 thru page 22, line 2 (November 1, 2006).

On November 13, 2003, Plaintiff was permanently removed from the UNICOR factory.  See UNICOR Work File of Michael Hill; Deposition of Michael Hill, page 19, lines 17-20 (November 1, 2006).

In total, Plaintiff had been assigned to the factory from August 2002 thru November 2003 – 15 months.  He was, however, removed from the factory on three separate occasions, totaling 5 months during the period of time that he was assigned to SHU or a work assignment in another part of the institution.  As such, he spent a total of only ten months of this 15 month period working inside the factory.  Additionally, during much of this time, he was assigned to the "car wash" or an area of the loading dock that took him outside the factory, and into the fresh air on a regular basis.

Plaintiff was transferred to FCI Gilmer on December 23, 2003.  See Declaration of Douglas S. Goldring ¶ 4, and Attachment B; Declaration of Martin Sapko ¶ 6, and Attachment B.

Based upon this intermittent ten months which he spent in the UNICOR factory (most of which was spent wiping boards and emptying trash), Plaintiff alleges he experienced several health related conditions, including:

> quite a few sinus infections, upper respiratory infections, swollen membranes; itching, scratching, different type of skin problems; my buttocks, back, legs; sneezing, dizziness, tiredness, headaches, different – stuff with my eyes; you know, just kind of like allergic-type stuff.
> Deposition of Michael Hill, page 29, lines 1-6 (November 1, 2006).[10]  In addition to

working in the UNICOR factory, Plaintiff also smoked a maximum of ten cigarettes per day

---

[10] Plaintiff further alleges that he has a connective tissue disorder, for which he has received treatment.  See Deposition of Michael Hill, page 29, line 18 thru page 30, line 22.  There is no indication, however, that this condition was related to his work in the UNICOR factory.  See Deposition of Michael Hill, page 31, lines 1-10(November 1, 2006)(testifying that his doctor had not told him the condition was related to his work in the UNICOR factory); Report of Gregory J. Fino, MD, FCCP.

from 1995 thru 1999 and also smoked marijuana for approximately 3 years.  <u>See</u> Deposition of

Michael Hill, page 37, line 1 thru page 38, line 10 (November 1, 2006).

Most recently, on January 3, 2007, Plaintiff was examined by Gregory J. Fino, MD,

FCCP.  <u>See</u> Report of Gregory J. Fino, MD, FCCP.[11]  During his examination, Dr. Fino

performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities

consistent with an occupationally acquired pneumoconiosis."  <u>See</u> Report of Gregory J. Fino,

MD, FCCP.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung

functions.  <u>Id.</u>  Plaintiff was, however, noncompliant with the Spirometry testing, causing it to be

invalid.  "If he really had the lung function suggested by the invalid spirometry, there is no way

he could be shooting baskets."  At the time he was examined by Dr. Fino, however, he was on

crutches, due to a recently injured foot he received from shooting baskets.  <u>See</u> Report of

Gregory J. Fino, MD, FCCP. As a result of this examination, Dr. Fino found no evidence of

respiratory impairment or disability.  <u>See</u> Report of Gregory J. Fino, MD, FCCP.  He concluded:

> There is no evidence of either chronic or accelerated silicosis based on the normal
> chest films.
>
> This patient should have no fear of contracting silicosis in the future.  First of all,
> there were no measurable levels of respirable silica noted by OSHA.
> Furthermore, it is well documented in the medical literature that at least 20 years
> of exposure to dust that is measurable and above the PEL is required before
> chronic silicosis occurs.
>
> Report of Gregory J. Fino, MD, FCCP.  Dr. Fino went on to conclude that there was, "no

evidence of any chronic condition with reference to his eyes or throat or skin."  <u>Id.</u>

---

[11] Dr. Fino issued a separate report relating to each of the five inmate-Plaintiffs in this case.  All references to Dr.
Fino's report cited in this sub-section refer to his report of his examination of Michael Hill.

3.    **Plaintiff Kenny Hill**[12]

Plaintiff is Kenny Hill, Register Number 17110-016, a Federal inmate currently in the custody of the United States Marshals Service pursuant to a Write of Habeas Corpus Ad Testificandum (Dkt. No. 32).  To the best of the Defendants' knowledge, he is currently being housed in the Erie County Jail awaiting trial in this case.

He was convicted in the District Court for the District of Columbia of Unlawful Possession With Intent to Distribute Five or More Grams of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)B)(III); and Using and Carrying a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1).  He was sentenced to a total of 19 years on December 17, 1992.   His projected release date is January 3, 2017, via Good Conduct Time Release.  See Declaration of Douglas S. Goldring¶ 3, and Attachment A.

Plaintiff arrived at FCI McKean on April 6, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on June 19, 2001.  See Declaration of Martin Sapko ¶ 6, and Attachment B.

When Plaintiff first arrived in the UNICOR factory, he was assigned as a floater on the day shift in the Packing Department.  See Deposition of Kenny Hill, page 4, lines 8-19 (November 1, 2006); UNICOR Work File of Kenny Hill.  As a floater, he would typically assist in any areas of the factory which needed an extra person   He would help the inmates operating the saws, pack the cut boards, and push them to the next section in the factory.  See Deposition of Kenny Hill, page 4, line 20 thru page 7, line 14 (November 1, 2006).  Plaintiff, however, did not actually operate the saw or any other machines.  Id., page 7, lines 11-16.

---

[12] For purposes of this sub-section only, unless otherwise indicated, references to previously submitted declarations, exhibits, and references to the docket, refer only to documents previously submitted in the case Kenny Hill v. LaManna, 05-160.

On or around July 5, 2001, Plaintiff transferred to the evening shift in the Packing Department.  See Deposition of Kenny Hill, page 10, line 8-12 (November 1, 2006); UNICOR Work File of Kenny Hill.  Plaintiff's work area in the Packing Department was located approximately 77 feet from the Holzma Panel Saw, 66 feet from the Z-32 Panel Saw, and 78 feet from the pin routers.  See Deposition of David G. English, page 57, line 3 thru page 58, line 15; Diagram of UNICOR Factory Floor (attached).

Plaintiff remained in that position until he was removed from UNICOR and transferred to FCI Petersburg, Virginia on or around August 20, 2004.  See Declaration of Martin Sapko ¶ 6, and Attachment B; Deposition of Kenny Hill, page 10, line 20 thru page 11, line 6 (November 1, 2006); UNICOR Work File of Kenny Hill.  While in that work assignment, Plaintiff would:

> Clean the boards, to take, like they have a red glue machine up there, so when the boards come over to me it is my job to put this some kind of gas-like substance on the board and then I have to scrape the red glue off all those boards, then slide them down to the rest of the guys, and they have got to clean it up and pack it right on top, send it to another section.

> See Deposition of Kenny Hill, page 11, lines 10-18 (November 1, 2006).  Occasionally, he might also be asked to perform other duties in the factory as necessary.  Id., page 12, line 14-23.

Based upon this 38 month period of time which he spent in the UNICOR factory (most of which was spent cleaning and packing previously cut or machined boards), Plaintiff alleges he experience several health related conditions, including: a rash, irritation in his eyes, and respiratory problems.  See Deposition of Kenny Hill, page 13, line 11 thru page 14, line 11 (November 1, 2006)

19

Most recently, on December 21, 2006, Plaintiff was examined by Gregory J. Fino, MD, FCCP. [13]  See Report of Gregory J. Fino, MD, FCCP.  During his examination, Dr. Fino performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities consistent with an occupationally acquired pneumoconiosis."  See Report of Gregory J. Fino, MD, FCCP.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung functions.  Id.  Plaintiff was, however, noncompliant with the Spirometry testing, causing it to be invalid.  If he really had the lung function suggested by the invalid spirometry, he would have required oxygen and would not be able to ambulate more than 50 feet.  See Report of Gregory J. Fino, MD, FCCP. As a result of this examination, Dr. Fino found no evidence of respiratory impairment or disability.  See Report of Gregory J. Fino, MD, FCCP.  He concluded:

> There is no evidence of either chronic or accelerated silicosis based on the normal chest films.
>
> This patient should have no fear of contracting silicosis in the future.  First of all, there were no measurable levels of respirable silica noted by OSHA.  Furthermore, it is well documented in the medical literature that at least 20 years of exposure to dust that is measurable and above the PEL is required before chronic silicosis occurs.

Report of Gregory J. Fino, MD, FCCP.  Dr. Fino went on to conclude that although dermatology and ophthalmology are not his specialties, there was no evidence of eye irritation at the time of the examination. Id.

---

[13] Dr. Fino issued a separate report relating to each of the five inmate-Plaintiffs in this case.  All references to Dr. Fino's report cited in this sub-section refer to his report of his examination of Kenny Hill.

4.    **Myron Ward** [4][1]

Plaintiff is Myron Ward, Register Number 05967-084, a Federal inmate currently in the custody of the United States Marshals Service pursuant to a Write of Habeas Corpus Ad Testificandum (Dkt. No. 64).  To the best of the Defendants' knowledge, he is currently being housed in the Erie County Jail awaiting trial in this case.

He was convicted in the Western District of Virginia of various drug related offenses, in violation of 21 U.S.C. §§ 841, 844, and 846.  He was sentenced to 24 years and 4 months in prison on January 15, 1999.  His projected release date is July 10, 2018, via Good Conduct Time Release.  See Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

Plaintiff arrived at FCI McKean on July 20, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on April 9, 2002.  See Declaration of Martin Sapko ¶ 6, and Attachment B.

At that time, he was assigned to the Layup Department on the day shift.  There, he was assigned to the Coldpress.  The Coldpress applies glue to the cut boards, and attaches the "wood grain top."(veneer)  Additionally, after this veneer was attached, they would stack the boards on a pallet and move them to another area in the factory.  See Deposition of Myron Ward, page 4, lines 14-24 (November 1, 2006); UNICOR Work File for Myron Ward (attached).

Notably, Plaintiff indicated in his deposition that, although during this time he may have helped stack or carry boards in other areas of the factory, he never operated any of the machines. See Deposition of Myron Ward, page 6, lines 7-16 (November 1, 2006).

---

[14] For purposes of this sub-section only, unless otherwise indicated, references to previously submitted declarations, exhibits, and references to the docket, refer only to documents previously submitted in the case Myron Ward v. LaManna, 04-11.

Plaintiff worked on the Coldpress until September 3, 2002, at which time he was transferred to the evening shift, in the Packing Department. <u>See</u> Deposition of Myron Ward, page 9, lines 2-4 (November 1, 2006); UNICOR Work File for Myron Ward (attached). Plaintiff's work area in the Packing Department was located approximately 77 feet from the Holzma Panel Saw, 66 feet from the Z-32 Panel Saw, and 78 feet from the pin routers. <u>See</u> Deposition of David G. English, page 57, line 3 thru page 58, line 15; Diagram of UNICOR Factory Floor (attached). There, his responsibilities included stacking boards after they had been routed or machined, and packing the cut boards to prepare them for shipping. <u>See</u> Deposition of Myron Ward, page 10, lines 8-14 (November 1, 2006). Again, though, Plaintiff, "never operated any of the machines; just helping out, stacking down." <u>Id.</u>, at page 10, lines 19-20. Plaintiff remained in that position until October 17, 2003, at which time he was removed from his UNICOR work assignment and transferred to FCI Petersburg. <u>Id.</u>, page 9, line 14; Declaration of Martin Sapko ¶ 6, and Attach B. In total, Plaintiff was assigned to the UNICOR factory for 18 months, during which time he was primarily responsible for cleaning, gluing, stacking, and packing boards which were cut in other parts of the factory.

Based upon this 18 month period, Plaintiff alleges he experienced several health related conditions. Specifically, he alleges that he had headaches and eye irritation. <u>See</u> Deposition of Myron Ward, page 13, lines 23-24 (November 1, 2006). He goes on to indicate that he also had, "what is called lymph nodes. Chronic sinusitis. Rumenitis. Nasal Swelling. Nasal soreness. And uncontrollable coughing. Dermitis. Respiratory problems." <u>See</u> Deposition of Myron Ward, page 14, lines 13-18 (November 1, 2006).

Most recently, on January 8, 2007, Plaintiff was examined by Gregory J. Fino, MD, FCCP.  See Report of Gregory J. Fino, MD, FCCP.[15]  During his examination, Dr. Fino performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities consistent with an occupationally acquired pneumoconiosis."  See Report of Gregory J. Fino, MD, FCCP.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung functions.  Id.  Plaintiff was, however, noncompliant with the Spirometry testing, causing it to be invalid.  If he really had the lung function suggested by the invalid spirometry, he would have required oxygen and would not be able to ambulate more than 50 feet.  See Report of Gregory J. Fino, MD, FCCP. As a result of this examination, Dr. Fino found no evidence of respiratory impairment or disability.  See Report of Gregory J. Fino, MD, FCCP.  He concluded:

> There is no evidence of either chronic or accelerated silicosis based on the normal chest films.
>
> This patient should have no fear of contracting silicosis in the future.  First of all, there were no measurable levels of respirable silica noted by OSHA.  Furthermore, it is well documented in the medical literature that at least 20 years of exposure to dust that is measurable and above the PEL is required before chronic silicosis occurs.

See Report of Gregory J. Fino, MD, FCCP.  Dr. Fino went on to conclude that there was, "no evidence of any chronic condition with reference to his eyes or throat or skin."  Id.

---

[15] Dr. Fino issued a separate report relating to each of the five inmate-Plaintiffs in this case.  All references to Dr. Fino's report cited in this sub-section refer to his report of his examination of Myron Ward.

### 5.    Plaintiff Leslie Kelly [6][1]

Plaintiff is Leslie Kelly, Register Number 26864-039, a Federal inmate currently in the custody of the United States Marshals Service pursuant to a Write of Habeas Corpus Ad Testificandum (Dkt. No. 75).  To the best of the Defendants' knowledge, he is currently being housed in the Erie County Jail awaiting trial in this case.

He was convicted in the Southern District of Alabama of Accessory After the Fact In the Retaliation Against a Witness, in violation of 18 U.S.C. § 3.  He was sentenced to 120 months in prison on December 1, 2000.   His projected release date is April 21, 2008, via Good Conduct Time Release.  See Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

Plaintiff arrived at FCI McKean on July 19, 2002, and was first assigned to the Federal Prison Industries, Inc. ("FPI" or trade name "UNICOR") factory on September 3, 2002.  See Declaration of Martin Sapko ¶ 6, and Attachment B; Declaration of Douglas S. Goldring ¶ 4, and Attachment B.  He worked on the dayshift in the Layup Department  See Deposition of Leslie Kelly, page 4, line 19 thru page 5, line 16 October 31, 2006); UNICOR Work File of Leslie Kelly (attached).

When he first arrived, in July 2002, Plaintiff was assigned to the glue machine, which glued panels together.  He worked there for approximately two or three months.  See Deposition of Leslie Kelly, page 5, lines 22-24, page 6, line 5 thru page 7, line 5 (October 31, 2006); UNICOR Work File of Leslie Kelly (attached).

Following that assignment, Plaintiff shifted to a new position in which some inmates operated a drill press, and drilled holes in the Micore board, fastened them together, packed them

---

[16] For purposes of this sub-section only, unless otherwise indicated, references to previously submitted declarations, exhibits, and references to the docket, refer only to documents previously submitted in the case Leslie Kelly v. LaManna, 03-368.

and shipped them out.  <u>See</u> Deposition of Leslie Kelly, page 5, lines 3-6 (October 31, 2006);

UNICOR Work File of Leslie Kelly.  At that time, Plaintiff was not the operator of any

machines, but was assembling the products that came off of the machines.  <u>See</u> Deposition of

Leslie Kelly, page 8, lines 20-23 (October 31, 2006); UNICOR Work File of Leslie Kelly.  His

work responsibilities included:

> Sometimes, we'll – we'll screw the – we'll screw the padding on there.  And
> we'll screw the – it's a little round thing that the –the mouse sit on, we'll screw
> that together.  We'll put in there together and we'll shift them.  Then we put it to
> the side.

> <u>See</u> Deposition of Leslie Kelly, page 8, lines 12-19 (October 31, 2006).  Additionally, at

times, Plaintiff may have been asked to assist with sawing some boards and sweeping the floors.

<u>Id.</u>, page 11, line 7-23 (October 31, 2006).

On April 25, 2003, Plaintiff was removed from the UNICOR factory.  He did not return to

any work assignment in UNICOR prior to his transfer to FCI Bennettsville, South Carolina, on

May 21, 2004.  <u>See</u> UNICOR Work File of Leslie Kelly, Declaration of Martin Sapko ¶ 6, and

Attachment B; Declaration of Douglas S. Goldring ¶ 4, and Attachment B.

Based upon this eight month period of time, which he spent in the UNICOR factory

(most of which was spent gluing and assembling boards), Plaintiff alleges he experienced several

health related conditions, including: three or four nose bleeds, a flu-like illness, headaches, chest

pains and respiratory problems.  <u>See</u> Deposition of Leslie Kelly, page 13, line 18 thru page 15,

line 1 (October 31, 2006).  In addition to working in the UNICOR factory, Plaintiff also smoked

two to four cigarettes per day, from 1981 to 2005, but stopped on more than one occasion.

Plaintiff estimates that he smoked for a total of about 18 years.  He also smoked marijuana for

approximately 10 years.  See Deposition of Leslie Kelly, page 26, line 25, thru page 29, line 5.

(October 31, 2006); Report of Gregory J. Fino, MD, FCCP.

Most recently, on January 16, 2007, Plaintiff was examined by Gregory J. Fino, MD,

FCCP.  See Report of Gregory J. Fino, MD, FCCP.[17]  During his examination, Dr. Fino

performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities

consistent with an occupationally acquired pneumoconiosis."  See Report of Gregory J. Fino,

MD, FCCP.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung

functions.  Id.  Despite not giving a maximum effort on the Spirometry testing, Plaintiff's results

were still within the normal range.  See Report of Gregory J. Fino, MD, FCCP. As a result of this

examination, Dr. Fino found no evidence of respiratory impairment or disability.  Report of

Gregory J. Fino, MD, FCCP.  He concluded:

> There is no evidence of either chronic or accelerated silicosis based on the normal chest films.
>
> This patient should have no fear of contracting silicosis in the future.  First of all, there were no measurable levels of respirable silica noted by OSHA. Furthermore, it is well documented in the medical literature that at least 20 years of exposure to dust that is measurable and above the PEL is required before chronic silicosis occurs.
>
> See Report of Gregory J. Fino, MD, FCCP.  Dr. Fino went on to conclude that there was,

"no evidence of any chronic condition with reference to his eyes or throat or skin."  Id.

---

[17] Dr. Fino issued a separate report relating to each of the five inmate-Plaintiffs in this case.  All references to Dr. Fino's report cited in this sub-section refer to his report of his examination of Leslie Kelly.

6. **Plaintiff Kevin Siggers** [18]

Plaintiff is Kevin Siggers, Register Number 51627-060, a Federal inmate currently housed in a Community Corrections Center in Cleveland, OH. See Inmate History Public Information Data for Kevin Siggers (attached).

On January 24, 1992, he was sentenced in the United States District Court for the Northern District of Ohio to a 41 month term of imprisonment, with a three year term of supervised release to follow, for Assault of a Mail Carrier, in violation of 18 U.S.C. § 2114. On January 14, 1995, he was released on supervised release. See Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

On or about February 26, 1998, the United States District Court for the Northern District of Ohio committed Plaintiff to Bureau of Prisons custody for 60-day study pursuant to 18 U.S.C. §§ 4241-4245, for a determination of his mental competency to stand trial. See Declaration of Douglas S. Goldring ¶ 4, and Attachment A. On May 1, 1998, at the conclusion of the study, Plaintiff was released. See Declaration of Douglas S. Goldring ¶ 5, and Attachment A. On August 5, 1998, Plaintiff was sentenced in the United States District Court for the Northern District of Ohio to a 117-month term of imprisonment, with a five year term of supervised release to follow, for a violation of 18 U.S.C. §§ 2113(a), 2113(d), Armed Bank Robbery, and for a violation of 18 U.S.C. § 924(c)(1), Use of a Firearm During a Crime of Violence. His sentence commenced upon imposition on August 5, 1998. Plaintiff's projected satisfaction date from his sentence was May 17, 2006. See Declaration of Douglas S. Goldring ¶ 5, and Attachment A.

---

[18]For purposes of this sub-section only, unless otherwise indicated, references to previously submitted declarations, exhibits, and references to the docket, refer only to documents previously submitted in the case Kevin Siggers v. LaManna, 03-355.

On August 11, 1998, Plaintiff's supervised release was revoked, and a 15 month supervised release violator (SRV) term was imposed.  The court directed the SRV term run consecutive to his 117-month sentence.  See Declaration of Douglas S. Goldring ¶ 6, and Attachment A. Plaintiff's SRV commenced on May 17, 2006, upon satisfaction of the 117-month sentence.  Assuming Plaintiff receives all good conduct time available to him under 18 U.S.C. § 3624(b), his projected release date is June 18, 2007, via Good Conduct Time release. In accordance with BOP policy, however, he was transferred to a Community Corrections Center in Cleveland, Ohio on December 21, 2006.  See Declaration of Douglas S. Goldring ¶ 6, and Attachment A; Inmate History Public Information Data (attached).  See also Dkt. Nos. 64-65. On October 21, 1998, Plaintiff was designated to FCI McKean.  See Declaration of Douglas S. Goldring ¶ 7, and Attachment A. On or about March 23, 1999, Plaintiff was first assigned to the Federal Prison Industries, Inc. ("FPI" or trade name "UNICOR") factory.  See Declaration of Martin Sapko ¶ 6, and Attachment B; UNICOR Work File of Kevin Siggers (attached); Deposition of Kevin Siggers, page 3, line 25 thru page 4, line 2 (October 31, 2006).  At that time, he was assigned as a laborer at the vertical boring machine, flipping boards and stacking them on the machine.  See Deposition of Kevin Siggers, page 6, line 11 thru page 7, line 2 (October 31, 2006).  Plaintiff remained at that work assignment until November 9, 1999, when he was removed from UNICOR and transferred to the SHU.  See Inmate History Quarters Data for Kevin Siggers (attached); UNICOR Work File of Kevin Siggers.  He returned to UNICOR in that same capacity on or around June 1, 2000.  Id.  Again, he was assigned to work on the boring machine until November 13, 2001, when he was assigned to work on the Z-32 and Holzma panel saws.  See Deposition of Kevin Siggers, page 10, lines 5-15, page 16, line 24 (October 13, 2001); UNICOR Work File for Kevin Siggers.

28

During the period of time he operated the panel saw, Plaintiff would primarily cut the plastic material used to make keyboard trays and mouse pads, micore board, and laminate. See Deposition of Kevin Siggers, page 17, lines 16-21, page 18, lines 8-23 (October 31, 2006).[19] Plaintiff remained a panel saw operator until 2005 when the UNICOR factory switched from making furniture to plastic products. He continued, however, to be assigned to the UNICOR factory until his transfer to the Community Corrections Center on December 21, 2006. See UNICOR Work File of Kevin Siggers; Inmate History Public Information Data of Kevin Siggers.

Based upon this 6 year period of time which he spent in the UNICOR factory, Plaintiff alleges he experienced several health related conditions, including: asthma, nosebleeds, and skin irritation. See Deposition of Kevin Siggers, page 34, line 4 thru page 37, line 8 (November 1, 2006). In addition to working in the UNICOR factory, Plaintiff also smoked up to three cigars a day from 1980 to 2004, but stopped on more than one occasion. He also smoked up to a pack of cigarettes a day off-and-on since he was a teenager, as well as occasionally smoking marijuana. See Deposition of Kevin Siggers, page 47, line 1, thru page 49, line 8. (October 31, 2006); Report of Gregory J. Fino, MD, FCCP.

Most recently, on January 2, 2007, Plaintiff was examined by Gregory J. Fino, MD, FCCP. See Report of Gregory J. Fino, MD, FCCP.[20] During his examination, Dr. Fino performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities

---

[19] He did not work on Micore board at all after November 2003. See Deposition of Kevin Siggers, page 42, line 16-18 (October 31, 2006).

[20] Dr. Fino issued a separate report relating to each of the five inmate-Plaintiffs in this case. All references to Dr. Fino's report cited in this sub-section refer to his report of his examination of Kevin Siggers.

consistent with an occupationally acquired pneumoconiosis." <u>See</u> Report of Gregory J. Fino, MD, FCCP.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung functions. Id. Plaintiff was, however, noncompliant with the Spirometry testing, causing it to be invalid. If he really had the lung function suggested by the invalid spirometry, he would have required oxygen and would not be able to ambulate more than 50 feet. <u>See</u> Report of Gregory J. Fino, MD, FCCP. As a result of this examination, Dr. Fino found no evidence of respiratory impairment or disability. <u>See</u> Report of Gregory J. Fino, MD, FCCP. More specifically, Dr. Fino found no evidence to support the diagnosis of asthma. This was based upon the lack of wheezing as well as a lack of lung function studies that showed changes consistent with asthma. As such, Dr. Fino concluded, "there is no objective evidence of an asthmatic condition." <u>Id.</u> He concluded:

> There is no evidence of either chronic or accelerated silicosis based on the normal chest films.
>
> This patient should have no fear of contracting silicosis in the future. First of all, there were no measurable levels of respirable silica noted by OSHA. Furthermore, it is well documented in the medical literature that at least 20 years of exposure to dust that is measurable and above the PEL is required before chronic silicosis occurs.

> Report of Gregory J. Fino, MD, FCCP. Dr. Fino went on to conclude that there was no

evidence of a chronic condition with reference to his eyes or throat or skin. <u>Id.</u>

## VII.   LEGAL ARGUMENTS

### A.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered "forthwith" if there is no genuine issue as to any "material fact." In recent years there has been a

dramatic change and much greater willingness of the courts to grant this remedy.  In 1986 the

Supreme Court decided three cases which greatly liberalized summary judgment practice and

encouraged a much greater use of summary judgment by trial courts.  See Matsushita Electrical

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Anderson v. Liberty Lobby, Inc. 477

U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

> As stated by Chief Justice Rehnquist, summary judgment now:
>
> is properly regarded not as a disfavored procedural shortcut but rather as an
> integral part of the Federal Rules as a whole... Rule 56 must be construed with
> due regard not only for the rights of person asserting claims and defenses tried to
> a jury, but also for the rights of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior to trial, that the claims and
> defenses have no factual basis.

Celotex, 477 U.S. at 327.  "Modern, post-trilogy summary judgment doctrine is a stronger and

more aggressive approach to summary judgment practice that places a reduced burden on the

movant, greater burdens on the nonmovant, and makes summary judgment more likely to be

granted than the pre-trilogy approach."  Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually

unsupported claims or defenses."  Celotex, 477 U.S. at 323-324.  The fact that a plaintiff has

some facts on his side, or that there are some factual disputes, is not enough to deny the motion.

The "mere existence of a scintilla of evidence in support of plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

Anderson, 477 U.S. at 252;  Matsushita Elec. Indus. Co., 475 U.S. at 586 (The motion will not

be denied merely because of  "some metaphysical doubt" about the material facts); Davidson v.

Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of "some" alleged factual dispute is not

enough to defeat summary judgment, the opponent must show that there is no "genuine" issue of

material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(The responding party may not rest on the allegations of his/her pleading but must present by affidavit or otherwise specific facts sufficient to create a genuine issue of material fact.  Fed.R.Civ.P. 56(e)).

**B. Defendants are Entitled to the Protection of Qualified Immunity in this Case Because No Eighth Amendment Violation Can Be Established.**

Summary judgment is appropriate with regard to all of the named Defendants based on the Doctrine of Qualified Immunity.   A plaintiff may only maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, (1971).  The Supreme Court has held that federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978). "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. See also Jeffers v. Gomez, 267 F.3d 895, 910-912(9th Cir. 2001).  This is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511 (1985); see also Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam).   Therefore, once an individual raises Qualified Immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official

in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified immunity should be decided by the court before trial.  Hunter, 502 U.S. at 227.  See also Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000).  The **Plaintiffs** have the burden of showing that the defendant federal employees violated his clearly established Constitutional rights. Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).

The Harlow rule on qualified immunity was further clarified by the Supreme Court in Anderson v. Creighton, 483 U.S. 635 (1987), as follows: "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, ... assessed in light of the legal rules that were "clearly established" at the time it was taken." Id. at 639 (citation to Harlow omitted).  Both questions are to be decided by the court. This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law."  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).  As long as a defendant government employee could reasonably have thought his actions were consistent with the rights he was alleged to have violated, said employee is entitled to qualified immunity.  Anderson, 483 U.S. at 638.

Government officials are not expected to be legal scholars like law professors. Ward v. San Diego County, 791 F.2d 1329, 1332 (9th Cir.), cert. denied sub nom., Duffy v. Ward, 483 U.S. 1020 (1987).  The contours of the right allegedly violated must be sufficiently clear so that

a reasonable government official would understand that his or her conduct violated the plaintiff's constitutional rights. Officers who reasonably but mistakenly conclude their conduct was lawful are entitled to immunity. Anderson, 483 U.S. at 641; Hunter, 502 U.S. at 228-229.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity defense, making it much more difficult for Plaintiff to prevail. Saucier v. Katz, 533 U.S. 194 (2001). In Saucier, the Court held that the lower courts had been ignoring a significant threshold question. Specifically, this Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 200-01. Only if Plaintiff's allegations make out a constitutional violation does the analysis move to the second sequential step, asking "whether the right in question was clearly established." Id. The Court went on to caution, however, that this second inquiry is not taken in a broad, general context, but must be "undertaken in light of the specific context of the case." Id. The reason for such an analysis is to avoid treating prison administrators as attorneys or holding them to an impossible standard. As such:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted). Thus, if the law "did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

Therefore, in order for Defendants to be denied the protection of Qualified Immunity in this case, **Plaintiffs bear the overwhelming burden** of demonstrating to the Court that: 1) a

34

hazardous condition existed in the UNICOR factory; 2) that the individual Defendants each knew of the hazardous condition, and 3) that the individual defendants were each deliberately indifferent to such a condition.  See Helling v. McKinney, 509 U.S. 25 (1993).  If Plaintiffs can satisfy that burden, then they will have the further burden of establishing that the Constitutional right in question was clearly established.  In other words, Plaintiffs must establish that a reasonable officer would have acted differently in these circumstances.  Because it is now beyond clear that no set of facts or circumstances exist which will allow Plaintiffs to satisfy this burden of proof, the case must be resolved in favor of the Defendants and dismissed.

1.  **Plaintiffs Cannot Satisfy Their Burden Of Proof, Because No Hazardous Conditions Existed In The UNICOR Factory and, Therefore, These Cases Must All Be Dismissed.**

In these cases, Plaintiffs allege that they were exposed to dust from Micore Board fibers containing crystalline silica, as well as Lokweld adhesive without appropriate ventilation and/or protective gear.[21]  The clear and objective evidence in this case, however, leaves little room for speculation with respect to the conditions in the UNICOR factory.  At most, there was an insignificant amount of dust in the factory, and certainly not nearly enough to constitute the type of hazardous working condition alleged in Plaintiff's complaint.  See Report of Dietrich A. Weyel, ScD, CIH**;** Declaration of Brendan M. Claybaugh, ¶¶ 5-8, 23, and Attachment C; Deposition of Stephen Housler, page 18, lines 5-25 (December 19, 2006).

It is, by now, well settled and beyond dispute that respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors.  See Declaration of Stephen Housler ¶¶ 12-13 and 18, Attachments C and E; Report of Dietrich A. Weyel, ScD, CIH**;**

---

[21] Defendants note that an exposure to potentially harmful chemicals, without more, does not rise to the level of a Constitutional violation.  In order to violate the Eighth Amendment standard, Plaintiffs must show that there was a dangerous and unreasonably high level of the chemical in question in the air.

Declaration of Brendan M. Claybaugh, ¶¶ 10-16, and Attachments C-F; Deposition of Stephen

Housler, page 51, lines 5-20 (December 19, 2006).

Indeed, with respect to all of the chemical components of Micore Board, the OSHA

inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant

exposure limit. Id. Thus, OSHA determined that Plaintiffs and other workers were not exposed

to inappropriate levels of contaminants in the UNICOR factory. Id. Plaintiffs simply cannot, in

this case, "show that he himself is being exposed to unreasonably high levels of" harmful

substances, where the UNICOR facility is in compliance with relevant federal air quality

standards.[22] See Carroll v. DeTella, 255 F.3d 470 (7th Cir. 2001); Wooten v. Goord, 2004 WL

816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005); Baker v.

Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002). See also Jones v. Kearney, 2001 WL

1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on

inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was

being exposed to "unreasonably high levels" of environmental tobacco smoke, because the

institution had an "open air only" smoking policy).

Nonetheless, this Court has previously held in these cases that, "these test results are not

dispositive," because, "the results of the OSHA inspection and air testing cannot be held to

conclusively reflect the air quality within the UNICOR facility during the entire period of time

---

[22] Additionally, in their Amended Complaints, Plaintiffs allege that Defendants' failure to
provide them with NIOSH-approved respirators also constituted a violation of their Eighth
Amendment rights. As discussed in section C, infra, however, the Micore Fiber MSDS sheet
clearly discusses the circumstances under which a NIOSH-approved respirator should be used.
Defendants' evidence clearly establishes that a respirator was not required in this circumstance.
See Declaration of Stephen Housler, ¶¶ 18, 32-35, and Attachments E and I.

Plaintiff[s] [were] working in the factory." See Magistrate Judge's Report and Recommendation, Dkt. No. 89, page 16 (July 31, 2006).

Defendants do not dispute the conclusion that the air sampling results are only conclusive as to the date or dates on which sampling was conducted. Nonetheless, all of the available evidence clearly shows that the air quality and other conditions in the factory on the dates air sampling was conducted were consistent with and representative of the air quality and conditions in the factory on any other period of time.[23] See Report of Dietrich A. Weyel, ScD, CIH; Declaration of Brendan M. Claybaugh, ¶¶ 5-15, and Attachment C; Declaration of Michael Salerno ¶¶ 8-22.

The most telling pieces of evidence in this case are the videos which were filmed inside the UNICOR factory between May 14, 2003, and June 18, 2003. These videos, which are attached to the Declaration of Brendan Claybaugh, were recorded by Mr. Claybaugh, the Compliance Safety and Health Officer who oversaw the OSHA inspection of the factory. See Declaration of Brendan M. Claybaugh, ¶ 7, and Attachment C.

These videos clearly show the conditions in the factory. Notably, they do not indicate support for dust clouds or heavy dust exposure in the air within the factory. As part of his

_____

[23] The Court further expressed a concern through the Reports and Recommendations in these cases regarding airborne silica dust which was potentially created by throwing scrap pieces of Micore board into a dumpster. Magistrate Judge's Report and Recommendation, July 31, 2006 (Dkt. No. 89). When a cut piece of board is thrown like this, it is true that a small amount of dust may be released into the air. While this may not be ideal, the amount of dust actually released into the air would be minuscule. See Report of Dietrich A. Weyel, ScD, CIH. It would certainly not generate a quantity of dust into the air sufficient to cause respiratory injury. Furthermore, the duration of time the dust would spend in the air would be insignificant. Id. The amount of dust in question would be further diluted by the distance Plaintiff's stood from the dumpster into which the boards were tossed. Id. Finally, it is relevant to not that this practice was noted in OSHA's report. This means that it must have been occurring on the dates OSHA was in the factory, particularly when they tested the air samples on June 17-18, 2003. As such, any dust generated by the practice of throwing boards into the dumpster would have been integrated into their air samples. Id.

investigation, Mr. Claybaugh inspected the ventilation equipment at FCI McKean.  Contrary to

the complaint, the level of dust generated appeared to be adequately exhausted by the system, as

supported by sampling results, and removed through duct work to an outside repository.  As a

result, the factory lacked any indication of a problem with the quality of the air, and there were

no signs that a cloud of dust had existed and been subsequently removed prior to Mr.

Claybaugh's arrival, such as: excess dust under the machines, on the sills, or in other hard to

reach areas.  See Declaration of Brendan M. Claybaugh ¶¶ 5-6, 8, 13, and Attachment C.

These conditions caused Mr. Claybaugh to recently conclude, after reviewing his notes of

this investigation, "**I do not now, nor did I then, have any concerns** with respect to the levels

of dust in the UNICOR factory at FCI McKean."  Id. ¶ 23 (emphasis added).

If there had been a significant amount of dust or particulates in the air, this material would

have been visible in the video, either in the air or settled on the surfaces within the factory.  See

Report of Dietrich A. Weyel, ScD, CIH.

Additionally, the video identifies none of the telltale signs of a cleanup effort.  Plaintiffs

would have the Court believe that Defendants quickly cleaned the factory to remove evidence of

an overexposure when they learned that OSHA was coming to inspect the factory.

Mr. Claybaugh's notes reflect that he contacted the institution on April 15, 2003; and

entered the institution to begin its inspection on April 16, 2003.  See Declaration of Brendan M.

Claybaugh ¶ 4, and Attachment B.[24]  If conditions in the factory had significantly changed

between the initial inspection on April 16, 2003, and May 14, 2003, when the video commenced,

---

[24] Although properly referenced, Attachment B was inadvertently not identified in Mr.
Claybaugh's declaration.  Attachment B is a true and correct copy of Mr. Claybaugh's field
notes, recorded contemporaneously to his investigation.

Mr. Claybaugh would presumably have noted the discrepancy on the video. No such discrepencies were noted either in the video, or in Mr. Claybaugh's notes. Id. ¶¶ 5-8.

The video depicts a factory which "lacked any indication of a problem with the quality of the air," but still had a small amount of dust on various hard to reach surfaces, such as ledges and sills. Id. This is consistent with the normal operation of a woodworking factory. A woodworking factory is not an operating room. It is not a sterile environment, and some dust is to be expected. See Report of Dietrich A. Weyel, ScD, CIH, Deposition of Stephen Housler, page 18, lines 5-25 (December 19, 2006); Deposition of Martin Sapko, page 13 line 17 thru page 14 line 14. This is exactly what was shown in the video.

These conditions show that the factory has been consistently clean, and not hastily cleaned in anticipation of the OSHA investigation. Id. See also Report of Dietrich A. Weyel, ScD, CIH. Thus, the air sampling data is clearly representative of the conditions in the factory throughout the entire relevant period of time.[25] See Report of Dietrich A. Weyel, ScD, CIH.

Further supporting the conclusion that the air sampling data was taken on a normal day for the factory is the dust collection system. The UNICOR factory at FCI McKean was equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal. The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989. See Declaration of Martin Sapko ¶7, and Attachment C; Declaration of Michael Salerno ¶¶4- 5.

---

[25] Likewise, there is no evidence that any of the Defendants ever observed an inmate with dust on their bodies, hair or clothing. See Deposition of Stephen Housler, page 19, lines 1-12 (December 19, 2006); Declaration of Martin Sapko, page 13, line 24 thru page 14, line 22; Deposition of Debora Forsyth, page 24, lines 7-12 (December 6, 2006); Deposition of John J. LaManna, page 25.

Micore Board was initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1) a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine. Each of these connections provides dust collection to the saw blade at the point of machining. In the next step of the process, the four edges of the Micore Board are shaped on the Delta Shaper machine. This machine has one four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining. In the third and final machining operation, the Onsrud Inverted Router is used to create a pocket in the back side of the Micore Board for support brackets. This operation is only performed on half of the quantity ordered. This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom. All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems. See Declaration of Martin Sapko ¶9; Declaration of Michael Salerno ¶ 6.

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above are actually smooth on the inside for better dust collection. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko ¶10, and Attachments D-E;

Declaration of Michael Salerno 5-6.  The manufacturing machinery is not to be operated unless the dust collection system is turned on first.  See Declaration of Martin Sapko ¶8; Declaration of Michael Salerno 7.

The design of this dust collection system was intended to capture as much dust as possible, as close to the point of manufacturing as possible.  Each dust collector had a series of ductwork "arms" which connected to the various pieces of equipment and machinery around the factory.  The dust collection system then created a vacuum on each piece of equipment at the work surface, which sucked dust from the work surface into the ductwork arms, and ultimately out of the factory.  In this manner, any dust which was created would be sucked away from the worker, instead of up from the table and toward the worker.[26]  See Declaration of Michael Salerno ¶¶ 5-6.  Each of the two dust collection systems produced 34,000 cubic feet/minute, meaning they were each strong enough to move 34,000 cubic feet of air in one minute.  On system Number one, there were eight machines drawing dust collection, requiring 9,900 cubic feet/minute.  On system number 2, there were 15 machines, drawing dust collection, requiring a total of 13,100 cubic feet per minute.  This means the dust collection system generated 20,900 cubic feet per minute in excess of the requirements of the factory.  See Declaration of Michael Salerno ¶ 7; Deposition of Stephen Housler p. 37, line 3 thru page 38, line 1 (December 19, 2006).

In fact, these dust collections systems were so powerful, that, "on more than a couple of occasions we had screwdrivers and that kind of thing get sucked up in them."  See Deposition of Debora Forsyth, page 15, lines 13-20 (December 6, 2006).   See also, Deposition of Stephen Housler, page 37, line 20 thru page 38, line 1 (December 19, 2006)("Our dust collection system

---

[26]  It is relevant to note that the design of the dust collection system on the panel saws, pin routers, and other equipment made it virtually impossible for dust to be expelled into the air around the operator of the equipment.  See Declaration of Michael Salerno, ¶¶ 12-17; Declaration of Brendan Claybaugh, ¶ 7, and Attachment C.

was so strong, we had – we lost tools in it.  We had crescent wrenches, screwdrivers, and tape measures get sucked up in it."); Deposition of David G. English, page 59, lines 22-25 (December 20, 2006)("the dust collections…had enough suction to suck up tools.").  As a result of these incredibly powerful dust collection systems, the air in the factory was maintained in a better condition even than the air outside.  See Deposition of Debora Forsyth, p. 22, lines 15-17 and page 27, lines 22-24(December 6, 2006); Deposition of Stephen Housler, page 49, lines 7-22 (December 19, 2006)("I would bet my life on it; that it's one of the cleanest – was one of the cleanest factories in the world."); Declaration of Brendan M. Claybaugh ¶¶ 5, 13, and Attachment C.  Additionally, there is no evidence to suggest that these ventilation systems were ever broken, down for repairs or not operating at full capacity at any time while the factory was operational.[27]  See Deposition of Stephen Housler, page 19, lines 17-22 (December 19, 2006); Declaration of Michael Salerno ¶ 10; Declaration of Brendan M. Claybaugh ¶¶ 5, 13, and Attachment C; Report of Deitrich Weyel, ScD, CIH.  In his deposition, Mr. Housler was asked:

> Q: Were there ever any problems with the functioning of the ventilation system that you have described removing the dust from the saws and other machines that cut the Micore Board?

---

[27] With respect to the minimal residual dust which could be expected to be left over after a cutting operation was concluded, inmates were provided with shop-vacs and brooms with which this dust could be collected.  To the extent any inmates may have used air hoses or blowers to clean themselves off after working in UNICOR, this practice was completely unauthorized by staff.  The blowers were provided solely for the purpose of cleaning underneath some of the larger equipment.  If inmates used the blowers (which were capped at 30 psi) for other purposes, staff were not aware of this practice and did not authorize it.  See Deposition of Stephen Housler, page 19, lines 6-10; page 46, lines 4-17 (December 19, 2006); Deposition of Martin Sapko, page 14, line 18 thru page 15, line 10 (December 19, 2006); Deposition of Debora Forsyth, page 24, line 2 thru page 25, line 25 (December 6, 2006); Deposition of David G. English, page 23, lines 12-25, page 60, line 20 thru page 61 line 18 (December 20, 2006); Deposition of John J. LaManna, page 30, lines 1-4 (December 6, 2006).

Mr. Housler emphatically responded with:

> A: The dust collection system functioned all the time.  We had a maintenance man who monitored it, and if there was any issues with it, he corrected them immediately.  I was never aware of any problems with the dust collection system.  **It functioned properly at all times**.

See  Deposition of Stephen Housler, page 19, lines 17-25 (December 19, 2006)(emphasis added).  The "maintenance man" referenced by Mr. Housler was Michael Salerno who, at all times relevant to this collective action, was the Maintenance Mechanic Supervisor at the UNICOR factory in FCI McKean.  Mr. Salerno was directly responsible for ensuring that all of the equipment in the factory was maintained in proper working condition, including the dust collection (or ventilation) system.  See Declaration of Michael Salerno ¶¶ 1-2, 9.  Mr. Salerno testifies through his declaration that the dust collection system was fully operational at all times.  To the extent there was a problem with the dust collection system, he would either fix it immediately or lock the appropriate piece of equipment until it could be fixed.  Id. ¶ 10.

Likewise, excessive levels of dust in the factory (even levels which would be well within the OSHA threshold) could cause significant damage to the machinery and equipment in the factory. Many of these machines are extremely delicate, and have various ball bearings, gears, wheels, and other moving components.[28]  See Declaration of Michael Salerno ¶ 18.

If there was a significant amount of dust in the air or settling on these components, the resulting buildup of dirt and debris in the machinery components could cause the machinery to fail.  Such damage would be readily apparent by the frequency that the machinery was required

---

[28] It is further relevant to note that much of the equipment in the factory was designed to trap and expel dust through the dust collection system.  As such, when the equipment was properly operated, almost no dust would be expelled into the air around the operator.  See Declaration of Michael Salerno ¶¶ 12-17; Declaration of Brendan M. Claybaugh ¶ 8, and Attachment C.

to be cleaned, as well as the need to replace ball bearings, gears, blades, and other moving parts. Id. ¶ 19-20.

There is no evidence that there was ever a significant amount of dust inside the machinery which would require cleaning. Additionally, Mr. Salerno was never required to effectuate any of the type of repairs which would be associated with excessive dust in the machinery. Id. ¶ 21.

The pin routers are a perfect example of this. Pin routers utilize a large fly-wheel which drives the blade. If there is a build up of dust on the fly-wheel, then it can become unbalance, causing uneven cuts in the wood, and damage to the machine. Mr. Salerno inspected the fly-wheel in the pin routers on a routine and regular basis. He rarely observed excessive dust on or around the flywheel. Additionally, He never observed the flywheel on any of the pin routers to be off balance or otherwise damaged. Id. ¶ 22.

Again, the presence of a dust collection system which was at least twice as powerful as necessary, coupled with the lack of any mechanical breakdowns to the equipment clearly shows that there was not an abundance of dust in the air. This evidence is consistent with the only available conclusion in this case, that the condition of the factory on the dates that the air samples were taken was consistent with and representative of the condition of the factory on all other days. See Report of Dietrich A. Weyel, ScD, CIH; Declaration of Brendan M. Claybaugh ¶ 23. [29]

---

[29] With respect to Plaintiffs' claims regarding exposure to Lokweld, a spray-grade adhesive that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation." See Declaration of Stephen Housler, Attachment G. Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth that is equipped with an independent exhaust system. See Declaration of Stephen Housler ¶ 21. The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld. See Declaration of Stephen Housler ¶ 22. Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor. See Declaration of Stephen Housler ¶ 22. FCI McKean has not received any complaints about odors in or around the Lokweld station, nor

Thus, it is clear that Plaintiffs were being exposed to air quality and working conditions that OSHA and our society deem to be entirely acceptable for all persons, whether free or incarcerated. Every scintilla of evidence clearly indicates that staff at FCI Mckean took every reasonable and appropriate measure to ensure a safe and hazard free work environment. See Report of Dietrich A. Weyel, ScD, CIH. The only available conclusion in this case is that Plaintiffs were never subjected to "unreasonably high" levels of air pollutants or, for that matter, even reasonably high levels of air pollutants. Any argument Plaintiff could make to assert the air quality in the factory was unacceptable would necessarily be based solely on pure speculation.

---

has Safety Manager Housler ever noticed any unusual odors in the area. See Declaration of Stephen Housler ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, the inspectors conducted a full inspection of the Lokweld spray booth. See Declaration of Stephen Housler ¶ 23; Declaration of Brendan M. Claybaugh ¶¶ 17-19, and Attachment G. The OSHA inspectors did not reveal any concerns relating to Lokweld fumes emanating from the spray booth. See Declaration of Stephen Housler ¶¶ 24-25, and Attachment F; Report of Deitrich Weyel, ScD, CIH; Declaration of Brendan M. Claybaugh ¶¶ 17-19, and Attachment G. The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory. See Declaration of Stephen Housler ¶¶ 24-27, and Attachment F; Declaration of Brendan Claybaugh ¶ 19, and Attachment G. Each of OSHA's concerns relating to Lokweld were corrected by September 22, 2003. See Declaration of Stephen Housler ¶ 29, and Attachment H; Declaration of Brendan Claybaugh ¶ 21. Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, the Declaration of Safety Manager Housler, the statement of the OSHA compliance officer who conducted the investigation, and a Certified Industrial Hygienist. All of these statements and evidence clearly indicates that Lokweld fumes were not emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

Such an argument would not even satisfy the most generous of evidentiary standards.  As such, these cases must all be dismissed because Plaintiffs cannot satisfy their burden of proof. [30]

### 2. Even If Plaintiff Could Identify A Period Of Time In Which The Air In The Factory Was Contaminated, There Is No Evidence The Defendants Were Ever Aware Of It.

Even assuming arguendo that there was a period of time during which the levels of silica dust exceeded allowable levels (and there is no evidence to indicate that this was the case), Plaintiff must still demonstrate that Defendants were aware of this condition.  See Saucier v. Katz, 533 U.S. 194 (2001); Farmer v. Brennan, 511 U.S. 825, 844 (1994); Helling v. McKinney, 509 U.S. 25 (1993).  In other words, government officials cannot be held liable for being deliberately indifferent to a Constitutional violation of which they were not aware.  Id.

It is important, now, to recognize exactly what is meant by "knowledge" in this context in order to avoid confusion, because it can take on numerous meanings in this case.  The knowledge prong does not look at whether Defendants were aware of the hazards of silica dust generally.  This is red herring with no relevance to the analysis at hand.  Asking whether Defendants were aware of the hazards associated with Micore Board and silica dust would be akin to asking whether a driver was aware of the dangers of speeding after receiving a traffic

---

[30] Even if the Court were to determine that this evidence was still insufficient to demonstrate the quality of the air on dates on which air sampling was not performed, these cases must still be dismissed.  It is the **Plaintiffs' burden** to demonstrate that there was a problem with the air in the factory, not Defendants' burden to demonstrate that the air was quality was acceptable.  Saucier v. Katz, 533 U.S. 194 (2001); Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).  The evidence presented by Defendants represents all of the evidence available with respect to the quality of the air in the UNICOR factory during the relevant period of time.  If this evidence is insufficient to draw the conclusion, as Defendants suggest, that the air was clean; then it is likewise insufficient to draw the conclusion that the air was somehow hazardous.  In other words, if no evidence exists which would allow a reasonable finder of fact to draw any conclusion, then Plaintiffs are unable to satisfy their burden and the cases must be dismissed.

46

ticket.  Whether or not the driver was aware of the dangers of speeding has no bearing on whether the driver was actually speeding.  Likewise, whether or not Defendants in this case were aware of the hazards associated with Micore Board and silica dust is not relevant to the question of whether there was an unreasonably high level of silica dust in the air or whether the Defendants were aware of a hazardous condition in the factory.  Id.  Because there is no evidence to suggest that Defendants were ever made aware of a hazardous condition in the factory, Plaintiff cannot satisfy this burden of proof, and these cases must be dismissed.

Defendants Sapko and Forsyth worked in the UNICOR factory, and were available on an ongoing and regular daily basis on the factory floor to observe the conditions within the factory and address inmate concerns.[31]  See Deposition of Martin Sapko, page 11, lines 18-22 (December 19, 2006); Deposition of Debora Forsyth, page 12, lines 3-15 (December 6, 2006).  Defendants Housler and LaManna were also available in the UNICOR factory, less frequently, but still regularly.  See Deposition of Stephen Housler, page 19, lines 11-16 (December 19, 2006)(indicating that he or someone on his staff inspects the factory at least three times per week); Deposition of John J. LaManna, page 10, lines 5-9(December 6, 2006)(indicating that he visited the UNICOR factory on a weekly basis). Therefore, each of these Defendants were in a position to make regular and ongoing personal observations regarding the air quality in the factory.[32]  Id.  Furthermore, all of the Defendants testified that they had no concerns about the

---

[31] Prior to the conclusion of the 2003 OSHA inspection, Defendant Forsyth was promoted to Associate Warden at FCI Jesup, Georgia.  See Deposition of Debora Forsyth, page 4, lines 10-11 (December 6, 2006)(indicating that she has been assigned to Jessup, Ga. Since June 2003).

[32] It is relevant to note that none of these staff members wore any kind of protective gear or respirator while in the factory, and none of them suffered any adverse health conditions as a result.  See Deposition of John J. LaManna, page 18, line 22 thru page 19, line 5 (December 6, 2006); Deposition of Stephen Housler, page 38, line 14 thru page 39, line 1; Deposition of Debora Forsyth, page 37, lines 12-17.

quality of the air, because all of the dust, except an insignificantly minimal amount, was handled and removed from the factory by the dust collection system. [33] See Deposition of John J. LaManna, page 17, line 17 thru page 18, line 9 (December 6, 2006); Deposition of Stephen Housler, page 14, lines 19-25, page 18, line 5-page 19, line 10, page 37 line 3 thru page 38, line 1, page 49, lines 7-22 (December 19, 2006); Deposition of Martin Sapko, page 13, line 17 thru page 15, line 10, page 24, lines 7-10 (December 19, 2006); Deposition of Debora Foryth, page 15, lines 9-20, page 22, lines 13-21, page 23, line 15 thru page 25, line 12, page 27, lines 20-25 (December 6, 2006). Furthermore, none of he Defendants ever saw dust in the air, on an inmate, on an inmate's clothing, or in an inmate's hair. Id. Any minuscule amount of dust they did observe was lying prone on the machinery, the floor, or other level surface. Id. In addition to their presence in the factory, all of the Defendants were also available to speak with inmates on a daily basis at "mainline". [34] Id.

Additionally, all inmates assigned to the UNICOR factory in FCI Mckean are provided with specific instructions for reporting a safety concern, health hazard, or injury. See Deposition of Stephen Housler, page 22, lines 2-10, page 39, line 18 thru page 40, line 16 (December 19, 2006); Declaration of Michael Salerno ¶ 10. See also UNICOR Mckean Familiarization Handbook (attached). [35] On page 4 of this handbook is a form titled, "Factory Rules and Safety

---

[33] Defendants Fantaskey, Klark, and Reome are still named in Plaintiff Hill's complaint. None of these three Defendants were employed at UNICOR, and none of them had any involvement with the UNICOR factory. See Deposition of Michael Hill, page 63, line 22, through page 67, line 16 (November 1, 206)

[34] Mainline refers to the afternoon meal, a time during which the Executive Staff and Department Heads assigned to the institution are available to discuss any issues with any inmate. See Deposition of John J. LaManna, page 22, line 23 thru page 23, line 6 (December 6, 2006); Deposition of Stephen Housler, page 39, lines 8-16 (December 19, 2006).

[35] This handbook was updated and replaced with a new handbook in December 16, 2004. The attached handbook, however, was in effect at all times relevant to this lawsuit.

Regulations for Inmate Workers." This form, which all inmates assigned to the UNICOR factory are required to read and sign reads in pertinent part:

> 10) <u>Report</u> all safety hazards to your work supervisor immediately. <u>Do not</u> continue to work under unsafe conditions.
>
> 11) All injuries, no matter how minor, should be reported to your supervisor immediately.

<u>See</u> UNICOR McKean Familiarization Handbook, page 4 (attached)(emphasis in the original). All of the Plaintiffs in this case were required to read and sign this form. Copies of these forms, signed by each Plaintiff, are also attached to this brief. This requirement is restated later in the handbook, on page 13, where it read under the heading "Safety Issues,"

7) Report all injuries to your foreman **immediately**.

<u>See</u> UNICOR McKean Familiarization Handbook, page 13 (attached) (emphasis in the original). Nonetheless, despite these instructions and the availability of all of the Defendants, there is absolutely no evidence to suggest that Plaintiffs complained, or even mentioned, the air quality in the factory at any time prior to the 2003 OSHA inspection (with the exception of an anonymous complaint to OSHA in 2001, which led to the Microbac inspection); nor did any inmates complaint about any medical conditions to any of the Defendants. <u>See</u> Deposition of Martin Sapko, page 16, line 25 thru page 17, line 4, page 24, lines 7-14 (December 19, 2006); Deposition of Debora Forsyth, page 16, line 12 thru page 17, line 3 (December 6, 2006); Deposition of Stephen Housler, page 21, line 24 thru page 23, line 12 (December 19, 2006); Deposition of John J. LaManna, page 23, lines 10-20 (December 6, 2006). Specifically, during the Defendants' depositions, the following exchanges took place:

49

**Martin Sapko –**

I never heard about anyone complaining about any irritations of their eyes or their skin. I mean, we had a dust-collection system in there that would suck everything out of the air that I ever saw.

Q: Do you have any knowledge, Mr. Sapko, of any complaints of skin, eye, or respiratory irritation?

A: **No. I never heard anybody complain about it**. Until Mr. Hill [in 2003].

Deposition of Martin Sapko, page 24, lines 7-14 (December 19, 2006)(emphasis added).

**Stephen Housler –**

Q: Did any inmate or staff member ever complain about health problems or health concerns regarding Micore board?

A: I never received a complaint from anybody concerning Micore board. And to make it very clear in my A&O lessons to inmates, if they have a problem that's related to safety, they need to contact me, and let me know what their problem is. I will investigate it, and if there is an issue, I will correct the problem. No one ever came to me if they had a problem with the Micore board and the air monitoring. Had they come to me, I would have checked it out.

Q: Did you ever hear indirectly about any health concerns or potential health problems associated with Micore board?

A: **No. Nobody ever mentioned it to me or came to me.**

Declaration of Stephen Housler, page 21, line 24 thru page 22, line 14 (December 19, 2006)(emphasis added). Mr. Housler went on to testify that, despite his availability to inmates, no inmate ever complained to him about the conditions in the UNICOR factory. Likewise, he never received a report from Health Services that any inmate assigned to UNICOR had been treated for any type of chronic irritation or respiratory problem. See Deposition of Stephen Housler, page 39, line 2 thru page 40, line 21 (December 19, 2006). "We're very proactive here in our – in our safety program," he testified. "If we get a complaint, we're going to check it out,

and we're going to do whatever we have to, to correct it." <u>Id.</u>, page 42, lines 6-9 (emphasis

added).

**Debora Forsyth –**

Q: Did you ever receive or become aware of any complaints by any inmates or
staff employees regarding respiratory problems associated with the handling of
Micore board?

A: No one made me specifically aware of it.  Later I heard from other staff – Mr.
Sapko, I believe, in particular, and Mr. Houlihan – that was telling me that
inmates were complaining.  Or had filed BP-9's or something.  But that was in
the interim of me coming here, so I'm –

Q: During the entire time you were superintendent, do I understand your
testimony correctly that during that entire time you were superintendent, that **no
inmate or staff employee brought to you any complaints regarding
respiratory problems associated with the use of Micore board?**

A: **No. To the best of my knowledge, no.**

Deposition of Debora Forsyth, page 16, line 12 thru page 17, line 3 (December 6,

2006)(emphasis added).

**John J. LaManna –**

Q: During that, did you receive any questions or complaints from inmates regarding the
UNICOR facility that you can recall?

A: Not that I can recall, no.

Deposition of John J. LaManna, page 23, lines 10-13 (December 6, 2006).   In fact, there is

no evidence that the Plaintiffs in these cases even complained to any staff members who were

not named in this lawsuit.  On December 20, 2006, Plaintiffs deposed David G. English, who is a

staff member in the UNICOR factory at FCI McKean.  Mr. English, at all times relevant to this

action, was the night shift supervisor.  Most of the Plaintiffs were assigned to the night shift for

some or all of the time they worked in UNICOR.  Mr English testified as follows:

Q: Did any inmate or any staff member at UNICOR ever complaint of respiratory problems?

A: No inmate ever complained to me ever about any problem and no staff, except for Mr. Bevevino in your Exhibit 1.

Q: Is that also true if I were to ask you whether anyone ever complained about skin or eye irritation?

A: Correct.  No one ever complained to me about it.

Q: Did you ever hear indirectly that anyone had complained or was having trouble with respiratory problems or skin or eye irritation?

A: No.  The best I can recall, no.

Q: So as far as you know, no one had any of those problems in the shop?

A: Best of my knowledge.  No.

Deposition of David G. English, page 30, line 18 thru page 31, line 7 (December 20, 2006).

As such, it is clear that none of the Plaintiffs raised any concerns about the air quality in the factory with any of the Defendants, despite the fact that Defendants were available to the Plaintiffs on a daily basis. [36]

Furthermore, in July 2001, a letter was received from OSHA indicating they had received a complaint regarding the air quality in the factory.  As a result of this letter, air sampling was conducted within the factory.  As noted above, the results of these tests indicated that there was

---

[36] Likewise, Plaintiffs provided no substantive response when asked, through Defendants' Second Request for Interrogatories, about the time, place, and manner of any complaints.  Instead they indicated only that they had already answered these questions in their depositions.  Nonetheless, Defendants are entitled to have all discovery requests, even those which may be construed as repetitive or redundant, fully answered.  Defendants, therefore, understand Plaintiffs' nonresponsive responses to these interrogatories to mean that any and all complaints they made were fully discussed in their depositions.  None of the Plaintiff's, however, discussed any specific complaints they made to the Defendants prior to the commencement of the OSHA inspection in their depositions.  See Deposition of Michael Hill, passim.; Deposition of Kenny Hill, passim.; Deposition of Kevin Siggers, passim.; Deposition of Leslie Kelly, passim.; Deposition of Myron Ward, passim.  As such, despite numerous inquiries, even the Plaintiff's themselves can provide no evidence that they complained about the conditions in the factory, or otherwise put the Defendants on notice of any concerns prior to the OSHA inspection in 2003.

virtually no respirable silica dust in the air. <u>See</u> Declaration of Stephen Housler ¶¶12-13, 18, and Attachments C and E; Report of Deitrich Weyel, ScD, CIH. It would be simply nonsensical to suggest that Defendants knew or should have known about a hazard in the air, in light of these test results.

A subsequent and more detailed inspection was conducted following a second complaint in 2003. That inspection confirmed the results of the first test, that there was <u>no</u> <u>respirable</u> <u>silica</u> dust in the air.[37] <u>Id.</u> <u>See also</u> Declaration of Brendan M. Claybaugh ¶¶ 5-15, and Attachments C-F. Therefore, although there were two complaints made to OSHA, no inmates or staff expressed any of these concerns to any of the Defendants prior to the OSHA inspection, which commenced in April 2003. <u>See</u> Deposition of Martin Sapko, page 16, line 25 thru page 17, line 4, page 24, lines 7-14 (December 19, 2006); Deposition of Debora Forsyth, page 16, line 12 thru page 17, line 3 (December 6, 2006); Deposition of Stephen Housler, page 21, line 24 thru page 23, line 12 (December 19, 2006); Deposition of John J. LaManna, page 23, lines 10-20 (December 6, 2006). Additionally, both air sample tests support the conclusion that Defendants had no notice of any concern with the air quality. Both tests found a lack of any respirable silica dust in the air. <u>See</u> Declaration of Stephen Housler ¶ 12-13, 18, and Attachments C and E;

---

[37] Plaintiffs have alleged that these test results were inaccurate because they would typically cut three boards at a time; however, on the day of testing they allege they were instructed to cut only one board at a time. Magistrate Judge's Report and Recommendation, page 17, n. 10, July 31, 2006 (Dkt. No. 89). This is simply not an accurate representation of the practices in the UNICOR factory. While it is true that the panel saws could cut between one and four boards at a time, depending upon the thickness of the board, there was no consistency to how many boards were cut at a time. Depending upon the amount of work available, they might cut three or they might cut one. <u>See</u> Deposition of Martin Sapko, page 12, lines 8-13 (December 19, 2006). Nonetheless, the number of boards cut at a time is irrelevant. The suction at the hood does not change with the amount of wood being cut, and the saw dust generation would not be three times that of a single sheet; the cutting speed, the feed to the blade, would be slower for three sheets than for one sheet and the suction of the ventilation system would handle the dust for three sheets as well as one sheet. As such, for purposes of, "the amount of dust in the air and the air sampling, this would not have made a relevant difference." <u>See</u> Declaration of Brendan M. Claybaugh ¶ 22. <u>See also</u> Report of Deitrich Weyel, ScD, CIH. Nonetheless, as Dr. Weyel points out, even if one were to assume that the amount of dust generated by cutting three boards would be three times as high as that generated by cutting a single board, the resulting dust would still be well below the applicable OSHA standard. <u>See</u> Report of Deitrich Weyel, ScD, CIH.

Declaration of Brendan Claybaugh ¶¶ 10-15, and Attachments C-F; Report of Deitrich Weyel, ScD, CIH.  While the 2003 inspection did lead to some voluntary recommendations, there was not a finding that the factory's air was unsafe or contained any silica dust.  Id.  See also Declaration of Brendan M. Claybaugh ¶ 16.  Therefore, there is simply no basis upon which to conclude that, if a hazardous condition had developed at any time while Plaintiffs were assigned to the UNICOR factory at McKean, that Defendants had any knowledge of it

3.    **With Respect to the Conditions in the UNICOR Factory, Plaintiffs Cannot Establish Deliberate Indifference on the Part of Prison Officials, Because All of the Defendants Acted Appropriately.**

Even assuming that Plaintiffs can show Defendants had knowledge of a hazardous condition, which they cannot; they still have not established deliberate indifference on the part of prison officials.  Defendants' compliance with OSHA standards and other actions within the factory clearly insulates them from liability.  See Helling v. McKinney, 509 U.S. 25 (1993); Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004);  Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002); Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming, arguendo, as this Court has asserted, that Defendants' compliance with OSHA standards is not enough, Defendants respectfully assert that not only did they evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the UNICOR factory, but also, they took significant measures to rectify voluntary recommendations made by the OSHA inspector in 2003.  See Declaration of Brendan Claybaugh ¶¶ 15-16, and Attachment F; Report of Deitrich Weyel, ScD, CIH; Deposition of Martin Sapko, page 29, line 10 thru page 30, line 6.  These are simply not the actions of individuals who have learned of potentially inappropriate or hazardous conditions, and determined to ignore them, as

would be required to show deliberate indifference.  To the contrary, Defendants' actions

following the OSHA investigation illustrate a significant level of concern for the safety of

inmates and staff alike.

Courts have established that, with respect to the subjective prong of the Eighth

Amendment analysis, defendants are not deliberately indifferent to plaintiffs' health where they

conduct air quality testing and results comply with federal standards.  Carroll v. DeTella, 255

F.3d 470 (7th Cir. 2001).  Even if compliance with OSHA standards was not sufficient to insulate

Defendants from being deemed deliberately indifferent, however, Defendants also relied on, and

acted consistently with, the applicable MSDS sheets and product warning labels in determining

what protective equipment to provide for UNICOR employees.  MSDS sheets are required to,

and do, list risks associated with overexposure to various chemicals.  More importantly,

however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect

against such risks.  See Declaration of Stephen Housler ¶ 33.  As is discussed in more detail in

Section D, infra., Defendants' decisions regarding the UNICOR work environment and

protective equipment were consistent with the MSDS sheets and with product warning labels.

See Declaration of Stephen Housler ¶¶ 32-37, and Attachment I.

Additionally, it is clear that the FCI McKean UNICOR factory was more than adequately

ventilated.  Specifically, the factory is equipped with two dust collection systems, each

consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The

dust collectors have been operational in the UNICOR factory at FCI McKean since

approximately September 11, 1989, and each of the two dust collectors has the capacity to move

34,000 cubic feet of air per minute from the UNICOR factory.  See Declaration of Martin Sapko

¶7, and Attachment C; Declaration of Michael Salerno ¶ 8.

55

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first. See Declaration of Martin Sapko ¶8; Declaration of Michael Salerno ¶ 10. Specifically, system number one was hooked up to eight machines drawing dust collection, requiring 9,900 cubic feet/minute.  System number two was hooked up to 15 machines, drawing dust collection requiring 12,100 cubic feet per minute.  Declaration of Michael Salerno ¶ 8.

The "Special Precautions" section of the Micore Board MSDS indicates "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation...  Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn." See Declaration of Stephen Housler ¶¶ 32-35, and Attachment I.

This language is similar to, but not the same as, the warning contained on the Micore Board product label.  The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators.   Defendants reasonably opted to employ a dust collector system.  See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.  The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required.  See Declaration of Stephen Housler ¶¶ 32-35, and Attachment I.  Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, but

did not require, the use of NIOSH-approved respirators. <u>See</u> Declaration of Stephen Housler ¶ 18, and Attachment E; Declaration of Brendan Claybaugh ¶¶ 15-16, and Attachment F.

     Finally, and perhaps most importantly, Defendants' actions are simply not consistent with the actions of an individual who is deliberately ignoring a significant health hazard in the factory. To be sure, staff conducted routine inspections of all areas of the factory, including the equipment. <u>See</u> Deposition of Stephen Housler, passim. (December 19, 2006); Deposition of Martin Sapko, passim. (December 19, 2006); Deposition of Debora Forsyth, passim. (December 6, 2006); Deposition of David G. English, passim. (December 20, 2006); Declaration of Michael Salerno ¶¶ 9-10. To the extent any equipment was damaged or not working properly; or if the ventilation system was not working properly on that piece of equipment, they took appropriate action to ensure that it was not used again until it could be repaired. <u>Id.</u>

     Furthermore, when OSHA did cite them with several voluntary recommendations in order to ensure that the air quality in the factory remained at a superior level, the institution took immediate action to implement every recommendation made by OSHA.[38] <u>See</u> Deposition of Stephen Housler, page 57, line 3 thru page 58, line 20 (December 19, 2006); Declaration of

---

[38] None of the citations noted in OSHA's Notice of Unsafe or Unhealthful Working Conditions dealt with the air quality, dust in the air, or any other hazardous conditions relating to Micore Board. <u>See</u> Declaration of Brendan Claybaugh ¶¶ 17-20, and Attachment G; Deposition of Stephen Housler, page 52, line 3 thru page 53, line 19. In fact, the only mention of Micore Board or the air quality in the Notice of Unsafe or Unhealthful Working Conditions was Citation 2, Items 1, 2, and 3. These citations all dealt with training and the way in which information relating to the Micore Board was communicated to inmates, and was termed "Other"or "Other Than Serious". <u>Id.</u> When a violation is termed, "Other" by OSHA, that means, "a situation in which the most serious injury or illness that would be likely to result from a hazardous condition **cannot reasonably be predicted to cause death or serious physical harm** to exposed employees, but does have a direct and immediate relationship to their safety and health." <u>OSHA, Employer Rights and Responsibilities Following an OSHA inspection,</u> <u>http://www.osha.gov/Publications/osha3000.pdf</u> (emphasis added). <u>See also</u>, Deposition of Stephen Housler, page 53, lines 4-7 (understanding "Other" to mean a recommendation that you do something to make the protection better.)

Brendan M. Claybaugh ¶ 21; Report of Deitrich Weyel, ScD, CIH.  As such, it is beyond

argument that Defendants took every measure that any reasonable employee would have taken to

ensure the safety of the factory for both inmates and staff.  There is absolutely no merit to the

Plaintiff's claim that Defendants were somehow deliberately indifferent to their health and

safety, and these cases must be dismissed.

C.     **Plaintiffs Have Alleged No Physical Injury Which Would Subject The Defendants to Personal Liability in This Lawsuit.**

Pursuant to the Prison Litigation Reform Act,  Pub.L.No. 104-134, 110 Stat. 1321 (April

26, 1996) (PLRA) "[n]o Federal civil action may be brought by a prisoner confined in a jail,

prison, or other correction facility, for mental or emotional injury suffered while in custody

without a **prior showing of physical injury**."  PLRA, 42 U.S.C. § 1997e(e)(emphasis added).

Mitchell v. Horn, 318 F.3d 523, 533-36 (3rd Cir. 2003); Davis v. District of Columbia, 158 F. 3d

1342 (D.C. Cir. 1998); Zehner v. Trigg, 133 F. 3d 459 (7th Cir. 1997).

The physical injury requirement was discussed at length by the Third Circuit in the

landmark decision Mitchell v. Horn, 318 F.3d 523 (3rd Cir. 2003).  There, the Third Circuit held

that the physical injury requirement required, "a less-than-significant-but-more-than-de minimus

physical injury as a predicate to allowing the successful pleading of an emotional injury."

Mitchell, 318 F.3d at 534.  The court reasoned this standard was most appropriate because:

reading 1997e(e) to allow a plaintiff to allege any physical injury, no matter how minor, would produce an unintended (indeed absurd) result. Were we not to read 1997(e) as requiring more than a de minimis physical injury, we would turn its physical injury prerequisite into a mere pleading requirement, thereby rendering the requirement meaningless as a practical matter. Another prisoner might be able to assert an emotional injury by pleading that he received a paper cut, for example. This result runs counter to Congress's intent to curtail frivolous and abusive prisoner litigation. In so doing, Congress noted that, unlike physical injuries, emotional injuries are inherently difficult to verify and therefore tend to be concocted for frivolous suits. On the other hand, we do not adopt a test that would prevent those experiencing real physical injury at the hands of government officials from pursuing their rights.

Mitchell, 318 F.3d at 535-36 (internal quotes and citations omitted).  See also Allah v. Al-Hafeez, 226 F.3d 247 (3rd Cir. 2000);  Ostrander v. Horn, 145 F. Supp. 2d 614 (M.D. Pa. 2001); Mayo v. Morris, 2006 WL 3337385 (W.D. Va. 2006)(citing cases).

In the present cases, all of the Plaintiffs allege a variety of minor inconveniences, all of which are akin to the paper cut example contemplated by Mitchell as not rising to the level of a Constitutional violation.  See Deposition of Michael Hill, page 28, line 7 thru page 29, line 14 (November 1, 2006)(congestion, itchy or irritated skin, dizziness, drowsiness, and "like allergic-type stuff.");[39] Deposition of Leslie Kelly, page 13, line 18 thru page 15, line 1(October 31,

---

[39] Although Plaintiff Hill also alleges that he has been diagnosed with a positive ANA – a connective tissue disorder – there is absolutely no indication that this condition was related, in any way, to Plaintiff's work in the UNICOR factory.  See Deposition of Michael Hill, page 29, line 15 thru page 31, line 12 (November 1, 2006); Report of Dr. Gregory J. Fino, MD, FCCP. Specifically, at his deposition, the following exchange took place:

Q: Has she [Dr. Colleen Watkins, the treating physician] told you the this connective tissue disorder is somehow related to the work environment that you were exposed to at FCI McKean?

A: No.

Q: Okay.  Has she told you what she believes is the cause of this connective tissue disorder?

A: No.

See Deposition of Michael Hill, page 31, lines 1-10 (November 1, 2006).

2006)(nose bleeds, headaches, shortness of breath); Deposition of Kenny Hill, page 13, line 14

thru page 14, line 11 (November 1, 2006)(rash, eye irritation, shortness of breath, and skin

irritation); Deposition of Kevin Siggers, page 34, lines 7-16(October 31, 2006)(asthma and

nosebleeds);[40] Deposition of Myron Ward, page 13, line 23 thru page 14, line 18 (November 1,

2006)(headaches, eye irritation, irritations in his nose and throat, and a rash).

    In addition to their own sworn statements, all five of the Plaintiffs were recently

examined by Gregory Fino, MD, FCCP.[41]  Dr. Fino conducted identical examinations on all five

Plaintiffs.  In each case, he performed a two view chest x-ray, which showed no pleural and no

parenchymal abnormalities consistent with occupationally acquired pneumoconiosis in any of the

five Plaintiffs.  See Reports of Gregory J. Fino, MD, FCCP.

    Additionally, Dr. Fino conducted a pulmonary function test, in accordance with

guidelines established by the American Thoracic Society and the European Respiratory Society.

The spirometry, which is a test of lung function, was invalidated by each of the Plaintiff's failure

to fully cooperate.  See Reports of Gregory J. Fino, MD, FCCP.  In fact, if the Plaintiffs actually

had the lung function indicated by their aborted spirometry testing, none of them would have

been mobile at all, and they would likely have been hospitalized on respirators.  See Reports of

Gregory J. Fino, MD, FCCP.  To the contrary, they all appear to be extremely active.  Plaintiff

Michael Hill, in fact, recently injured his leg playing basketball.  These are not the actions of an

---

[40] Although Plaintiff Siggers alleges that he has been diagnosed and treated for asthma, Dr. Fino found no objective evidence to support this diagnosis. See Report of Gregory J. Fino, MD, FCCP (relating to his examination of Kevin Siggers).

[41][4]Pennsylvania law requires that in order to successfully defeat summary judgment and show the existence of a physical injury in this case, Plaintiff must also produce expert testimony that would refute Dr. Fino's testimony. See Gindraw v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990).

individual with the impaired lung function suggested by the spirometry tests.  See Reports of Gregory J. Fino, MD, FCCP.

The fact that Plaintiffs did not fully participate in their medical examinations, and attempted to fake the results in order to fabricate a medical condition is clearly indicative of their complete lack of any significant injury.  In fact, with respect to each Plaintiff, Dr. Fino concluded that there was no evidence of any chronic conditions with respect to the lungs, pulmonary system, skin, nose or eyes.  See Reports of Gregory J. Fino, MD, FCCP.  As such, it is clear that none of the Plaintiffs experienced more than a de minimus, or paper cut, injury as a result of working in the factory at FCI McKean.

In addition to their alleged current and past injuries, Plaintiffs each alleged in their Amended Complaints a fear of developing cancer or silicosis as a result of their exposure to Micore board dust and silica.[42]  Clearly, however, the fear of a potential, but as yet unrecognized, pain or injury cannot rise to the level of a Constitutional violation.  Mitchell v. Horn, 318 F.3d 523 (3rd Cir. 2003).  See also Snipes v. DeTella, 95 F.3d 586 (7th Cir. 1996)(fear and emotional distress experienced from contemplating the risk of contracting pain or illness in the future does not rise to the level of an Eighth Amendment claim); Mayo v. Morris, 2006 WL 3337385 (W.D. Va 2006)(same); Canell v. Multomah County, 141 F. Supp. 2d 1046 (D. Or. 2001)(same).

In Mayo, the Plaintiff, who at the time was an inmate at the Albemarle Charlottesville Regional County Jail, alleged that his cellmate passed a brown paper bag containing a used colostomy bag through the cell bars.  As a result, human waste was deposited on those bars. Mayo then claims that when he reached through the bars, this human waste was deposited onto his own arms, causing his open sores to become painful, itchy and infected.  Mayo, 2006 WL 3337385 *1.

_____

[42] It is relevant to note that none of the Plaintiffs expressed this fear during their depositions.

Mayo alleged that the prison staff were deliberately indifferent to his medical needs because their failure to remove this dangerous condition by cleaning the bars, resulted in his constant concern that, "due to the exposure, he may have contracted AIDS or another disease." Id., at *5.

In that case, as in the present case, Defendants argued that this fear does not state a claim upon which relief can be granted, because there is no Constitutional protection from fear or concern of contracting a disease while imprisoned.  Id.

Ultimately, the district court agreed with the Defendants, holding that Plaintiff's "concerns of developing AIDS, or some other disease in the future related to his alleged brief exposure to human waste are insufficient to state a claim on which relief can be granted."  Id., at *6.

The present case is almost identical to Mayo.  Although this case involves a brief exposure to silica dust instead of human waste; and this case involves the fear of cancer and silicosis instead of AIDS, the primary points are on all fours.  Significantly, Plaintiffs, like Mayo, allege that they have an ephemeral fear of developing a serious illness based upon their brief and limited exposure to a hazardous condition.  Here, like Mayo, these fears are not sufficient to subject Defendants to liability, because there is simply no protection from fear of contracting a disease while imprisoned.  Id., at *5-6.

Nonetheless, even if there was a theory, under which Plaintiff could recover damages for a reasonable fear of developing an injury or disease in the future, there is absolutely no reasonable basis for any such fear or concern in this case.  In his reports, Dr. Fino indicated that none of the Plaintiffs showed any evidence of either chronic or acute silicosis.  He went on to state that these five individuals, "should have no fear of contracting silicosis in the future."  He

based this conclusion on his examination, as well as medical literature, which indicates that in order for chronic silicosis to occur, an individual must be exposed to dust that is measurable and above the PEL for a period in excess of 20 years.  See Reports of Gregory J. Fino, MD, FCCP.

As discussed in sections B and C, above, there is no evidence of any measurable amount of dust in the factory; nor was there ever a level of dust which exceeded the PEL.  As such, the conditions in the UNICOR factory were not consistent with conditions which would cause silicosis or other silica related illnesses.  Likewise, Dr. Fino indicated that it would take prolonged exposure, in excess of 20 years, to develop a significant likelihood of illness.  In this case, the Plaintiffs' exposure ranged from a 7 months (Kelly) to 6 years (Siggers).  See Plaintiffs' UNICOR Work Files, which are attached to this brief.  None of these inmates worked in the factory for a long enough period of time to develop a reasonable fear of developing silicosis.  See Reports of Dr. Fino, MD, FCCP.  As such, it is clear that none of the evidence in this case supports the existence of any injury for which Pennsylvania law would allow the Defendants to be held liable.  To the extent the Court finds any injury in any of the Plaintiffs in this case, like the paper cut example in Mitchell, it simply could not rise above the level of de minimus.  To allow this case to continue would ignore Mitchell's de minimus standard entirely and reduce the physical injury requirement to a mere pleading requirement; thereby rendering the necessity to show a physical injury completely meaningless as a practical matter, and significantly impairing a powerful tool given to the courts to combat frivolous inmate lawsuits.  Mitchell, 318 F.3d at 336.  This is exactly the outcome the Third Circuit cautioned again.  Id.  Therefore, this case must be dismissed.

**D.  Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation**

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has satisfied neither the objective nor subjective prongs of the Eighth Amendment test.  Farmer v. Brennan, 511 U.S. 825 (1994); Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

## 1.    The Eighth Amendment Standard

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of action exists under the Eighth Amendment when a prisoner alleges that prison officials have exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS") that pose an unreasonable risk of harm to his future health.  Id., at 35.  In Helling, the Court established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth Amendment.  The first prong is objective.  The Plaintiff must show that "he himself is being exposed to unreasonably high levels of ETS."  Id. at 35 (emphasis added).  With respect to this prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to the contaminant, but also "to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Id. at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were deliberately indifferent to a serious risk of harm.  Id.  The Supreme Court has held that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

aware of facts for which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiffs allege that they were exposed to Micore Board fibers and Lokweld adhesive without appropriate ventilation and/or protective gear.  However, the evidence presented by Plaintiffs with respect to this claim fails to establish either prong of the Helling test, because Plaintiffs cannot show that they were exposed to "unreasonably high" levels of air pollution or toxins, or that Defendants exhibited deliberate indifference to such exposure.

> **2.      Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances**

With respect to the first prong of the Eighth Amendment analysis, Plaintiffs cannot show that they were exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency, because respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors.  See Declaration of Stephen Housler ¶¶ 12-13 and 18, Attachments C and E; Report of Deitrich Weyel, ScD, CIH; Declaration of Brendan Claybaugh ¶ 10-15, and Attachment F.  Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit.  Id.  Thus, OSHA determined that Plaintiffs and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory.  Plaintiffs simply cannot, in this case, "show that [they themselves were] being exposed to unreasonably high levels of" harmful substances, as required by Helling, where the UNICOR facility is in compliance with relevant federal air quality standards.

Additionally, in the Amended Complaints, Plaintiffs allege that Defendants' failure to provide them with NIOSH-approved respirators also constituted a violation of their Eighth

Amendment rights.  The Micore Fiber MSDS sheet clearly discusses the circumstances under which a NIOSH-approved respirator should be used. Section VIII of the MSDS sheet indicates that special respiratory protection is "not typically necessary under normal conditions of use." See Declaration of Stephen Housler ¶ 32, and Attachment I.   A NIOSH-approved respirator is necessary only "in poorly ventilated areas, if TLV is exceeded and/or when dusty conditions exist."  See Declaration of Stephen Housler ¶¶ 34-35, and Attachments I.   Here, however, Defendants' evidence establishes that Plaintiffs were exposed only to air that comported with federal guidelines, was not poorly ventilated or unusually dusty, and that any American might be exposed to on a daily basis in the course of his or her job.  See Declaration of Stephen Housler¶¶ 18 and 36, and Attachments E and I; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E; Declaration of Brendan Claybaugh ¶ 5-15, and Attachments C-F; Report of Deitrich Weyel, ScD, CIH ("During the relevant time period, the staff took necessary and appropriate measures to insure a safe and hazard free working environment.")

Based upon the tests and inspections conducted by the OSHA inspectors, the conditions in the UNICOR factory did not require the Defendants to take any other precautions with respect to the use and processing of Micore Board.  See Declaration of Stephen Housler ¶¶ 12-13, 18, 35, and Attachments C, E and I; Declaration of Brendan Claybaugh ¶ 15-16, and Attachment F; Report of Deitrich Weyel, ScD, CIH.  Although several suggestions were made to increase the safety measures available to personnel assigned to the UNICOR factory, these were recommendations only, and OSHA fully recognized that levels of contaminants in the UNICOR factory were well within the applicable guidelines.  Id.

Because the respiratory exposure level for dangerous contaminants amounted to a mere 10% of the relevant exposure limit, and BOP did not violate requirements regarding safety

precautions, the risk to Plaintiffs simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the <u>Helling</u> test.[43]  OSHA standards reflect contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA.  <u>See, e.g.</u>, <u>Wooten v. Goord</u>, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), <u>aff'd.</u>, 2005 WL 387971 (2nd Cir., Feb 17, 2005);  <u>Saahir v. Holligan</u>, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards.  As such, Plaintiff cannot, and has not, established the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards. The United States District Court for the Western District of New York recently addressed a § 1983 claim by <u>pro se</u> prisoners that New York state correctional officials

---

[43] Plaintiffs have further alleged that these test results were inaccurate because they would typically cut three boards at a time; however, on the day of testing they cut only one board at a time.  Magistrate Judge's Report and Recommendation, page 17, n. 10, July 31, 2006 (Dkt. No. 89).  This is simply not an accurate representation of the practices in the UNICOR factory. While it is true that the panel saws could cut between one and four boards at a time, depending upon the thickness of the board, there was no consistency to how many boards were cut at a time.  Depending upon the amount of work available, they might cut three or they might cut one.  <u>See</u> Deposition of Martin Sapko, page 12, lines 8-13 (December 19, 2006).  Nonetheless, the number of boards cut at a time is irrelevant.  The suction at the hood does not change with the amount of wood being cut, and the saw dust generation would not be three times that of a single sheet; the cutting speed, the feed to the blade, would be slower for three sheets than for one sheet and the suction of the ventilation system would handle the dust for three sheets as well as one sheet.  As such, for purposes of, "the amount of dust in the air and the air sampling, this would not have made a relevant difference."  <u>See</u> Declaration of Brendan M. Claybaugh ¶ 22.  <u>See also</u> Report of Deitrich Weyel, ScD, CIH.  Nonetheless, as Dr. Weyel points out, even if one were to assume that the amount of dust generated by cutting three boards would be three times as high as that generated by cutting a single board, the resulting dust would still be well below the applicable OSHA standard.  <u>See</u> Report of Deitrich Weyel, ScD, CIH.

had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments.  See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005).  The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems.  See Wooten, 2004 WL 816919 at *1.  In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment.  See id.  The OSHA specialist had not taken air quality samples.  An industrial hygienist associated with the state department of corrections later conducted air quality tests to determine whether employees were being exposed to hazardous chemicals at levels that exceeded state guidelines.  Id. at *2.  The air quality tests confirmed that the substances tested were below the permissible levels set by the state.  Id.  Based on the air quality tests, the correctional officials determined that the air quality in the print shop did not pose an unreasonable risk to inmate employees' health.  Id.

The Wooten Court agreed with the correctional officials' decision and granted summary judgment in their favor.  The Court concluded that plaintiffs had not shown that the allegedly poor ventilation in the print shop was serious enough to satisfy the objective element of their Eighth Amendment claim.  Id. at *5.  The Court acknowledged that plaintiffs' evidence had shown that OSHA had made recommendations for improvements to the print shop air quality.  Id.  However, plaintiffs' evidence did not show that the air quality failed to comply with federal workplace safety standards.  Id.  Moreover, defendants' evidence regarding air quality indicated that print shop workers were not being "excessively exposed to hazardous materials."  Id.

Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were erroneous or unreliable.  Id.  Accordingly, plaintiffs failed to raise a triable issue of fact with respect to the objective element of their Eighth Amendment claim.  See also Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes. Defendants were entitled to summary judgment based on fact that boot factory had been inspected and air quality met OSHA standards).

Similarly, the United States District Court for the District of Delaware granted summary judgment in favor of state correctional officials on an inmate's claim that he was exposed to unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth Amendment rights.  See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002).  In Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky" conditions, as well as a chart detailing the time of day and the number of inmates smoking at any given time over the course of a five-day period.  Id.  He also produced affidavits from several other inmates in support of his claims.  Id.  The Baker Court granted summary judgment in favor of defendant prison officials because, even if plaintiff had shown that he was subject to some level environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of such ETS."  Id.  Accordingly, the Court found that the inmate failed to meet the Supreme Court's requirement in Helling that he show that his exposure to a toxin "created a risk [that] is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. (quoting Helling, 509 U.S. at 36).  See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth

Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution had an "open air only" smoking policy).

Here, like the inmates in <u>Baker</u> and <u>Wooten</u>, Plaintiffs cannot show that they were exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency. To the contrary, Defendants have come forward with conclusive evidence establishing that the air quality in the UNICOR factory was well below the acceptable threshold established by OSHA, and exposed Plaintiffs to virtually no risk. <u>See</u> Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E; Declaration of Brendan Claybaugh ¶¶ 5-15, and Attachments C-F; Declaration of Michael Salerno ¶¶ 4-22; Report of Deitrich Weyel, ScD, CIH.

Courts have even granted summary judgment in favor of prison officials where the correctional facility is <u>not</u> in compliance with applicable federal standards. In <u>Carroll v. DeTella</u>, 255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility <u>did</u> exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). <u>See id.</u> at 472. However, despite the fact that the correctional facility's radium level continued to exceed the federal maximum, the state environmental agency informed the plaintiff-inmate that other communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed that no remedial action would be taken to address radium levels, because the EPA was considering raising the maximum level. However, at the time the plaintiff filed suit, the

EPA had not raised the radium standard, and the plaintiff continued to be subject to radium levels that violated the applicable federal standards. Nonetheless, the Seventh Circuit affirmed the District Court's grant of summary judgment in favor of prison officials.

In granting summary judgment, the <u>Carroll</u> Court recognized that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards. <u>Id.</u> Because many Americans live under conditions of exposure to various contaminants, the Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." <u>Id.</u> (internal citations omitted). As the Court recognized:

> It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

<u>Id.</u> at 472-73. Although Defendants have previously posited that this precedent should be conclusive and dispositive of these cases, this Court has previously held, "these test results are not dispositive," because, "the results of the OSHA inspection and air testing cannot be held to conclusively reflect the air quality within the UNICOR facility during the entire period of time Plaintiff[s] [were] working in the factory." <u>See</u> Magistrate Judge's Report and Recommendations (R&R), Dkt. No. 89, page 16 (July 31, 2006).

Defendants do not now dispute the conclusion that the air sampling results are only conclusive as to the date or dates on which sampling was conducted. Nonetheless, all of the available evidence clearly shows on the dates on which air sampling was conducted, the air quality and conditions in the factory were consistent with and representative of the air quality

and conditions in the factory on any other period of time.[44]  See Report of Dietrich A. Weyel,

ScD, CIH; Declaration of Brendan M. Claybaugh, ¶ 7-16, and Attachment C; Declaration of

Michael Salerno ¶¶ 8-22.

The most telling pieces of evidence in this case are  the videos which were taken inside

the UNICOR factory between May 14, 2003, and June 18, 2003.  These videos, which are

attached to the Declaration of Brendan Claybaugh, were recorded by Mr. Claybaugh, the

Compliance Safety and Health Officer who oversaw the OSHA inspection of the factory.  Id. ¶ 7,

and Attachment C.

These videos clearly show the conditions in the factory.  Notably, they do not indicate

support for dust clouds or heavy dust exposure in the air within the factory.  As part of his

investigation, Mr. Claybaugh inspected the ventilation equipment at FCI McKean.  Contrary to

the complaint, the level of dust generated appeared to be adequately exhausted by the system, as

supported by sampling results, and removed through duct work to an outside repository.  As a

result, the factory lacked any indication of a problem with the quality of the air, and there were

no signs that a cloud of dust had existed and been subsequently removed prior to Mr.

---

[44] The Court further expressed a concern through the Reports and Recommendations in these cases regarding a practice airborne silica dust which was potentially created by throwing scrap pieces of Micore board into a dumpster.  Magistrate Judge's Report and Recommendation, July 31, 2006 (Dkt. No. 89).  When a cut piece of board is thrown like this, it is true that a small amount of dust may be released into the air.  While this may not be ideal, the amount of dust actually released into the air would be minuscule.  See Report of Dietrich A. Weyel, ScD, CIH. It would certainly not generate a quantity of dust into the air sufficient to cause respiratory injury.  Furthermore, the duration of time the dust would spend in the air would be insignificant. Id.  The amount of dust in question would be further diluted by the distance Plaintiff's stood from the dumpster into which the boards were tossed.  Id.  Finally, it is relevant to not that this practice was noted in OSHA's report.  This means that it must have been occurring on the dates OSHA was in the factory, particularly when they tested the air samples on June 17-18, 2003.  As such, any dust generated by the practice of throwing boards into the dumpster would have been integrated into the air samples.  Id.

Claybaugh's arrival, such as: excess dust under the machines, on the sills, or in other hard to reach areas.  See Declaration of Brendan M. Claybaugh ¶¶ 5-6, 8, 13, and Attachment C.

These conditions caused Mr. Claybaugh to recently conclude, after reviewing his notes of this investigation, "**I do not now, nor did I then, have any concerns** with respect to the levels of dust in the UNICOR factory at FCI McKean."  Id. ¶ 23 (emphasis added).

If there had been a significant amount of dust or particulates in the air, this material would have been visible in the video, either in the air or settled on the surfaces within the factory.  See Report of Dietrich A. Weyel, ScD, CIH.

Additionally, the video identifies none of the telltale signs of a cleanup effort.  Plaintiffs would have the Court believe that Defendants quickly cleaned the factory to remove evidence of an overexposure when they learned that OSHA was coming to inspect the factory.

Mr. Claybaugh's notes reflect that he contacted the institution on April 15, 2003; and entered the institution to begin its inspection on April 16, 2003.  See Declaration of Brendan M. Claybaugh ¶ 4, and Attachment B.  If conditions in the factory had significantly changed between the initial inspection on April 16, 2003, and May 14, 2003, when the video commenced, Mr. Claybaugh would presumably have noted the discrepancy on the video.  No such discrepencies were noted either in the video, or in Mr. Claybaugh's notes.  Id. ¶¶ 5-8.

The video depicts a factory which "lacked any indication of a problem with the quality of the air," but still had a small amount of dust on various hard to reach surfaces, such as ledges and sills.  Id.  This is consistent with the normal operation of a woodworking factory.  A woodworking factory is not an operating room.  It is not a sterile environment, and some dust is to be expected.  See Report of Dietrich A. Weyel, ScD, CIH, Deposition of Stephen Housler,

page 18, lines 5-25 (December 19, 2006); Deposition of Martin Sapko, page 13 line 17 thru page 14 line 14.   This is exactly what was shown in the video.

These conditions show that the factory has been consistently clean, and not hastily cleaned in anticipation of the OSHA investigation.  Id.  See also Report of Dietrich A. Weyel, ScD, CIH.  Thus, the air sampling data is clearly representative of the conditions in the factory throughout the entire relevant period of time.[45]  See Report of Dietrich A. Weyel, ScD, CIH.

Further supporting the conclusion that the air sampling data was taken on a normal day for the factory is the dust collection system.  The UNICOR factory at FCI McKean was equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989.  See Declaration of Martin Sapko ¶7, and Attachment C; Declaration of Michael Salerno ¶¶4- 5.

The design of this dust collection system was intended to capture as much dust as possible, as close to the point of manufacturing as possible.  Each dust collector had a series of ductwork "arms" which connected to the various pieces of equipment and machinery around the factory. The dust collection system then created a vacuum on each piece of equipment at the work surface, which sucked dust from the work surface into the ductwork arms, and ultimately out of the factory.  In this manner, any dust which was created would be sucked away from the worker, instead of up from the table and toward the worker.  See Declaration of Michael Salerno ¶¶ 5-6. Each of the two dust collection systems produced 34,000 cubic feet/minute, meaning they were each strong enough to move 34,000 cubic feet of air in one minute.  On system Number one,

---

[45] Likewise, there is no evidence that any of the Defendants ever observed an inmate with dust on their bodies, hair or clothing.  See Deposition of Stephen Housler, page 19, lines 1-12 (December 19, 2006); Declaration of Martin Sapko, page 13, line 24 thru page 14, line 22; Deposition of Debora Forsyth, page 24, lines 7-12 (December 6, 2006); Deposition of John J. LaManna, page 25.

there were eight machines drawing dust collection, requiring 9,900 cubic feet/minute.  On system

number 2, there were 15 machines, drawing dust collection, requiring a total of 13,100 cubic feet

per minute.  This means the dust collection system generated 20,900 cubic feet per minute in

excess of the requirements of the factory.  See Declaration of Michael Salerno ¶ 7; Deposition of

Stephen Housler p. 37, line 3 thru page 38, line 1 (December 19, 2006).

In fact, these dust collections systems were so powerful, that, "on more than a couple of

occasions we had screwdrivers and that kind of thing get sucked up in them."  See Deposition of

Debora Forsyth, page 15, lines 13-20 (December 6, 2006).   See also, Deposition of Stephen

Housler, page 37, line 20 thru page 38, line 1 (December 19, 2006)("Our dust collection system

was so strong, we had – we lost tools in it.  We had crescent wrenches, screwdrivers, and tape

measures get sucked up in it."); Deposition of David G. English, page 59, lines 22-25 (December

20, 2006)("the dust collections…had enough suction to suck up tools.").  As a result of these

incredibly powerful dust collection systems, the air in the factory was maintained in a better

condition even than the air outside.  See Deposition of Debora Forsyth, p. 22, lines 15-17 and

page 27, lines 22-24(December 6, 2006); Deposition of Stephen Housler, page 49, lines 7-22

(December 19, 2006)("I would bet my life on it; that it's one of the cleanest – was one of the

cleanest factories in the world.").  Additionally, there is no evidence to suggest that these

ventilation systems were ever broken, down for repairs or not operating at full capacity at any

time while the factory was operational.  See Deposition of Stephen Housler, page 19, lines 17-22

(December 19, 2006).  There, Mr. Housler was asked:

> Q: Were there ever any problems with the functioning of the ventilation system
> that you have described removing the dust from the saws and other machines that
> cut the Micore Board?

Mr. Housler emphatically responded with:

> A: The dust collection system functioned all the time. We had a maintenance man who monitored it, and if there was an issues with it, he corrected them immediately. I was never aware of any problems with the dust collection system. **It functioned properly at all times**. (emphasis added)

The "maintenance man" referenced by Mr. Housler was Michael Salerno who, at all times relevant to this collective action, was the Maintenance Mechanic Supervisor at the UNICOR factory in FCI McKean. Mr. Salerno was directly responsible for ensuring that all of the equipment in the factory was maintained in proper working condition, including the dust collection (or ventilation) system. See Declaration of Michael Salerno ¶¶ 1-2, 9. Mr. Salerno testifies through his declaration that the dust collection system was fully operational at all times. To the extent there was a problem with the dust collection system, he would either fix it immediately or lock the appropriate piece of equipment until it could be fixed. Id. ¶ 10.

Likewise, excessive levels of dust in the factory (even levels which would be well within the OSHA threshold) could cause significant damage to the machinery and equipment in the factory. Many of these machines are extremely delicate, and have various ball bearings, gears, wheels, and other moving components.[46] See Declaration of Michael Salerno ¶ 18.

If there was a significant amount of dust in the air or settling on these components, the resulting buildup of dirt and debris in the machinery components could cause the machinery to fail. Such damage would be readily apparent by the frequency that the machinery was required to be cleaned, as well as the need to replace ball bearings, gears, blades, and other moving parts. Id. ¶ 19-20.

---

[46] It is further relevant to note that much of the equipment in the factory was designed to trap and expel dust through the dust collection system. As such, when the equipment was properly operated, almost no dust would be expelled into the air around the operator. See Declaration of Michael Salerno ¶¶ 12-17.

76

There is no evidence that there was ever a significant amount of dust inside the machinery which would require cleaning. Additionally, Mr. Salerno was never required to effectuate any of the type of repairs which would be associated with excessive dust in the machinery. Id. ¶ 21.

The pin routers are a perfect example of this. Pin routers utilize a large fly-wheel which drives the blade. If there is a build up of dust on the fly-wheel, then it can become unbalance, causing uneven cuts in the wood, and damage to the machine. Mr. Salerno inspected the fly-wheel in the pin routers on a routine and regular basis. He rarely observed excessive dust on or around the flywheel. Additionally, He never observed the flywheel on any of the pin routers to be off balance or otherwise damaged. Id. ¶ 22.

Again, the presence of a dust collection system which was at least twice as powerful as necessary, coupled with the lack of any mechanical breakdowns to the equipment clearly shows that there was not an abundance of dust in the air. This evidence is consistent with the only available conclusion in this case, that the condition of the factory on the dates that the air samples were taken was consistent with and representative of the condition of the factory on all other days. See Report of Dietrich A. Weyel, ScD, CIH.

Thus, it is clear that Plaintiffs were being exposed to air quality and working conditions that OSHA and our society deem to be entirely acceptable for all persons, whether free or incarcerated. Every scintilla of evidence clearly indicates that staff at FCI Mckean took every reasonable and appropriate measure to ensure a safe and hazard free work environment. See Report of Dietrich A. Weyel, ScD, CIH. The only available conclusion in this case is that Plaintiffs were never subjected to "unreasonably high" levels of air pollutants or, for that matter, even reasonably high levels of air pollutants. Any argument Plaintiff could make to assert the air quality in the factory was unacceptable would necessarily be based solely on pure speculation.

77

Such an argument would not even satisfy the most generous of evidentiary standards.  As such, Plaintiffs have failed the objective portion of the <u>Helling</u> Eighth Amendment test, and summary judgment must be entered in favor of Defendants.

> **3.    Plaintiffs Cannot Establish Deliberate Indifference on the Part of Prison Officials**

Even assuming that Plaintiffs can show Defendants had knowledge of a hazardous condition, which they cannot; they still have not established deliberate indifference on the part of prison officials.  Defendants' compliance with OSHA standards and other actions within the factory clearly insulates them from liability.  <u>See</u> <u>Helling v. McKinney</u>, 509 U.S. 25 (1993); <u>Wooten v. Goord</u>, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), <u>aff'd.</u>, 2005 WL 387971 (2nd Cir., Feb 17, 2005);  <u>Saahir v. Holligan</u>, 2004 WL 1418790 (N.D. Tex., June 24, 2004);  <u>Baker v. Williams</u>, 2002 WL 31015630 (D.Del., Sept. 10, 2002); <u>Jones v. Kearney</u>, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming, <u>arguendo</u>, as this Court has asserted, that Defendants' compliance with OSHA standards is not enough, Defendants respectfully assert that not only did they evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the UNICOR factory, but also, they took significant measures to rectify voluntary recommendations made by the OSHA inspector in 2003.  <u>See</u> Declaration of Brendan Claybaugh ¶¶ 5-16, and Attachments C-F; Report of Deitrich Weyel, ScD, CIH; Deposition of Martin Sapko, page 29, line 10 thru page 30, line 6.  These are simply not the actions of an individual who has learned of potentially inappropriate or hazardous conditions, and has determined to ignore them, as would be required to show deliberate indifference.  To the contrary, Defendants actions following the OSHA investigation illustrate a significant level of concern for the safety of inmates and staff alike.

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards.  In Carroll v. DeTella, 255 F.3d 470 (7th Cir. 2001), the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements.  See 2004 WL 816919, at *5.  "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards."  Id. at *5.

 Here, as in Carroll, both Microbac and OSHA conducted air quality tests and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E; Declaration of Brendan Claybaugh ¶¶ 10-16 and F; Report of Deitrich Weyel, ScD, CIH. It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory.  There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiffs' health.  The Court may not hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted

consistently with, the applicable MSDS sheets and product warning labels in determining what protective equipment to provide for UNICOR employees. MSDS sheets are required to, and do, list risks associated with overexposure to various chemicals. More importantly, however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect against such risks. See Declaration of Stephen Housler ¶ 33. Defendants' decisions regarding the UNICOR work environment and protective equipment were consistent with the MSDS sheets and with product warning labels. See Declaration of Stephen Housler ¶¶ 32-37, and Attachment I.

The product warning label for Micore Board states: "Dust hazard. Cut and trim with knife, razor, or hand saw. Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn." See Declaration of Stephen Housler ¶ 38, and Attachment J. Defendants do not dispute that power equipment was used to cut Micore Board. However, in accordance with the Micore 300 label, the UNICOR factory employed a dust collector on the cutting equipment. See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. Because the UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-approved mask was not required. See Declaration of Stephen Housler ¶¶ 35-38, and Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-approved masks are not required when a dust collecting system is in use.[47] See Declaration of Stephen Housler ¶¶ 34-37, and Attachment I. An MSDS is a technical bulletin prepared by

---

[47] Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of the chemicals they produce or import. Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins. Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals. 29 C.F.R. §1910.1200, App. E. See Declaration of Stephen Housler ¶ 33.

chemical manufacturers and importers to supplement the information contained on product

labels. 29 C.F.R. § 1910.1200, App. E. Pursuant to OSHA regulations, employers may rely on

the information contained on the product labels, as supplemented by the MSDS, and have no

independent duty to analyze the chemical or evaluate the hazards of it. See Declaration of

Stephen Housler ¶ 33.

> Section VII of the MSDS for Micore Board provides:
> **Respiratory protection:** Not typically necessary under normal conditions of use.
> Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold
> Limit Values)] requirements of individual ingredients and to control dusting
> conditions. Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated
> areas, if TLV is exceeded, and/or when dusty conditions exist. Avoid prolonged
> and repeated breathing of dust.

See Declaration of Stephen Housler ¶ 34, and Attachment I.

Thus, according to the MSDS for Micore Board, there are three situations which would

necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated

areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist. See

Declaration of Stephen Housler ¶ 35, and Attachment I. However, the air quality tests performed

by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not

poorly-ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board

were not exceeded, and that dusty conditions did not exist. See Declaration of Stephen Housler

¶¶ 12-13, 18, and Attachments C and E. Indeed, the evidence shows that air quality tests

conducted in 2001 and 2003, by Microbac Laboratories and by OSHA, respectively, revealed

that the respiratory particulates were well below applicable OSHA limits. See Declaration of

Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. More specifically, with respect to the

level of dust in the UNICOR factory, the objective air quality tests show that the total particulate

level was 1.1 mg per cubic meter, which is well below the applicable TLV standard for total

Particulates/Nuisance Dust – 15 mg per cubic meter.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

Additionally, it is clear that the FCI McKean UNICOR factory was more than adequately ventilated.  Specifically, the factory is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989, and each of the two dust collectors has the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory.  See Declaration of Martin Sapko ¶7, and Attachment C; Declaration of Michael Salerno ¶ 8.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first. See Declaration of Martin Sapko ¶8; Declaration of Michael Salerno ¶ 10.  Specifically, system number one was hooked up to eight machines drawing dust collection, requiring 9,900 cubic feet/minute.  System number two was hooked up to 15 machines, drawing dust collection requiring 12,100 cubic feet per minute.  See Declaration of Michael Salerno ¶ 8.

Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1) a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine.  Each of these connections provides dust collection to the saw blade at the point of machining.  In the next step of the process, the four edges of the Micore Board are shaped on the Delta Shaper machine.  This machine has one four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining.  In the third and final machining operation, the Onsrud Inverted Router is used to

create a pocket in the back side of the Micore Board for support brackets. This operation is only performed on half of the quantity ordered. This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom. All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems. See Declaration of Martin Sapko ¶9.

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above, are actually smooth on the inside for better dust collection. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko ¶10, and Attachments D-E; Declaration of Michael Salerno ¶¶ 5-8.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary. That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation... Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn." See Declaration of Stephen Housler ¶¶ 32-35, and Attachment I.

This language is similar to, but not the same as, the warning contained on the Micore Board product label.  The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators.   Defendants reasonably opted to employ a dust collector system.  See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.  The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required.  See Declaration of Stephen Housler¶¶ 32-35, and Attachment I.  Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who

recommended, but did not require, the use of NIOSH-approved respirators.[48]  See Declaration of Stephen Housler ¶ 18, and Attachment E.

Finally, and perhaps most importantly, Defendants' actions are simply not consistent with the actions of an individual who was deliberately ignoring a significant health hazard in the factory.  To be sure, staff conducted routine inspections of all areas of the factory, including the equipment.  See Deposition of Stephen Housler, passim. (December 19, 2006); Deposition of Martin Sapko, passim. (December 19, 2006); Deposition of Debora Forsyth, passim. (December 6, 2006); Deposition of David G. English, passim. (December 20, 2006); Declaration of Michael Salerno ¶¶ 9-10.  To the extent any equipment was damaged or not working properly; or if the

---

[48] With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation."  See Declaration of Stephen Housler, Attachment G.  Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth that is equipped with an independent exhaust system.  See Declaration of Stephen Housler ¶ 21.  The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld.  See Declaration of Stephen Housler ¶ 22.  Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor.  See Declaration of Stephen Housler ¶ 22.  FCI McKean has not received any complaints about odors in or around the Lokweld station, nor has Safety Manager Housler ever noticed any unusual odors in the area. See Declaration of Stephen Housler ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, the inspectors conducted a full inspection of the Lokweld spray booth.  See Declaration of Stephen Housler ¶ 23.  The OSHA inspectors did not reveal any concerns relating to Lokweld fumes emanating from the spray booth.  See Declaration of Stephen Housler ¶¶ 24-25, and Attachment F; Report of Deitrich Weyel, ScD, CIH.  The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory.  See Declaration of Stephen Housler ¶¶ 24-27, and Attachment F; Declaration of Brendan Claybaugh ¶ 19, and Attachment G.  Each of OSHA's concerns relating to Lokweld were corrected by September 22, 2003.  See Declaration of Stephen Housler ¶ 29, and Attachment H; Declaration of Brendan Claybaugh ¶ 21.  Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the Declaration of Safety Manager Housler, each of which indicate that Lokweld fumes were not emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

ventilation system was not working properly on that piece of equipment, they took appropriate action to ensure that it was not used again until it could be repaired.  Id.

Furthermore, when OSHA did cite them with several voluntary recommendations in order to ensure that the air quality in the factory remained at a superior level, the institution took immediate action to implement every recommendation made by OSHA.[49]  See Deposition of Stephen Housler, page 57, line 3 thru page 58, line 20 (December 19, 2006); Declaration of Brendan M. Claybaugh ¶ 21; Report of Deitrich Weyel, ScD, CIH.  As such, it is beyond argument that Defendants took every measure that any reasonable employee would have taken to ensure the safety of the factory for both inmates and staff.  There is absolutely no merit to the Plaintiff's claim that Defendants were somehow deliberately indifferent to their health and safety, and these cases must be dismissed.[50]

---

[49] None of the citations noted in OSHA's Notice of Unsafe or Unhealthful Working Conditions dealt with the air quality, dust in the air, or any other hazardous conditions relating to Micore Board.  See Declaration of Brendan Claybaugh ¶¶ 17-20, and Attachment G; Deposition of Stephen Housler, page 52, line 3 thru page 53, line 19.   In fact, there is no mention of Micore Board or the air quality in the Notice of Unsafe or Unhealthful Working Conditions was Citation 2, Items 1, 2, and 3.  These citations all dealt with training and the way in which information relating to the Micore Board was communicated to inmates, and was termed "Other"or "Other Than Serious".  Id.  When a violation is termed, "Other" by OSHA, that means, "a situation in which the most serious injury or illness that would be likely to result from a hazardous condition **cannot reasonably be predicted to cause death or serious physical harm** to exposed employees, but does have a direct and immediate relationship to their safety and health." OSHA, Employer Rights and Responsibilities Following an OSHA inspection, http://www.osha.gov/Publications/osha3000.pdf (emphasis added).  See also, Deposition of Stephen Housler, page 53, lines 4-7 (understanding "Other" to mean a recommendation that you do something to make the protection better.)

[50] Plaintiff further alleges that Defendants violated his Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber.  See Amended Complaints.  Even if this allegation could satisfy Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet.  Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one.  See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler¶¶ 32-42; Declaration of Debora Forsyth ¶ 8.  Because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet.  Such handwritten alterations to an

**E.    Defendants LaManna, Forsyth, Fantaskey, Reome, and Klark Must Be Dismissed Because Plaintiff Has Plead No Claims Against Them And, Therefore, Can Show No Personal Involvement.**

A plaintiff, in order to state a viable civil rights claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of law; and 2) that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990).

An inmate must plead and later prove that some affirmative act or omission was committed by the individual Defendant to submit him to personal liability for the actions of another person. Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974). Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988). See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986); Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a Plaintiff attempting to present a civil action against individual government officials must be able to present material facts on which he contends he can establish a right to recovery, such a Plaintiff should also be able to state those facts with some particularity, and finally must show why the official cannot show a valid defense of immunity).

---

MSDS sheet are not authorized by Defendant Housler or anyone else in the institution. See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 43-45; Declaration of Debora Forsyth ¶ 9. Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable. See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 43-45; Declaration of Debora Forsyth ¶ 9. Furthermore, there is absolutely no basis to presume that, to the extent an unauthorized mark was made on a single MSDS sheet, that it was made by one of the Defendants.

Furthermore, the doctrine of respondeat superior cannot form the basis of a <u>Bivens</u> claim. <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-17 (1988); <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability. <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir.) (en banc), <u>cert. denied</u>, 502 U.S. 1074 (1992); <u>Hansen v. Black</u>, 885 F.2d 642, 645-646 (9th Cir. 1989); <u>See also</u> <u>Terrell v. Brewer</u>, 935 F.2d 1015, 1018 (9th Cir. 1991). To find a supervisory official personally liable for the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened." <u>Haynesworth v. Miller</u>, 820 F.2d 1245, 1262 (D.C. Cir. 1987); <u>MacKinney v. Nielsen</u>, 69 F.3d 1002, 1008 (9th Cir. 1995); <u>Redman</u>, 942 F.2d at 1446-1447; <u>Hansen</u>, 885 F.2d at 646; <u>See also</u> <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); <u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195 (3d Cir. 1988); <u>Stoneking v. Bradford Area School District</u>, 882 F.2d 720, 729-30 (3d Cir.), <u>cert. denied</u>, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury. Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447. A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible. Ybarra, 723 F.2d at 680.

**DEFENDANT LAMANNA**

Plaintiffs have not alleged any facts implicating Defendant LaManna in the alleged denial of any Constitutional rights. Rather, Warden LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean.

Specifically, Warden LaManna testified at his deposition that his involvement with the UNICOR facility was limited to oversight responsibility, "as I did all other operations" in the prison. Deposition of John J. LaManna (December 6, 2006), page 10, lines 1-4. Additionally, Warden LaManna went on to testify that he was present in the UNICOR factory generally on no more than a weekly basis, and had no direct knowledge of the specific products being produced in the UNICOR factory or the specific components of those products. Id., page 10, line 5, through page 11, line 10.[51]    Accordingly, the Plaintiffs' claims against him should be dismissed

---

[51] Defendant LaManna further testified at his deposition that he had no personal involvement in administrative matters within the UNICOR factory such as: the types of equipment to use, the materials used, or safety equipment issued to inmates. See Deposition of John J, LaManna (December 6, 2006), page 14, lines 9-14.

because he clearly had no personal involvement in the decisions giving rise to this cause of action.[52]

## DEFENDANT FORSYTH

Plaintiffs have not alleged any facts implicating Defendant Forsyth in the alleged denial of any Constitutional rights.  Rather, Defendant Forsyth has been named in these lawsuits solely based upon her position as the Superintendent of Industries at the UNICOR factory in FCI McKean.

Specifically, she testified that, while she was present on the factory floor, she spent the bulk of her day in her office attending to administrative matters unless she was specifically called for assistance.  See Deposition of Debora Forsyth, page 12, lines 3-22 (December 6, 2006).  Additionally, she further testified that during the time she was assigned to FCI McKean as the Superintendent of Industries, no staff or inmates complained to her about the air quality in the UNICOR factory.  Id., page 16, line 22 thru page 17, line 3.  In fact, to the extent she became aware of any formal or informal complaints about the air quality in the UNICOR factory, that knowledge came during the time in which she was transferring to FCI Jesup and was no longer actively involved in the UNICOR factory at FCI McKean.  Id., page 16, lines 12-21.  Accordingly, the Plaintiffs' claims against her should be dismissed because she clearly had no personal involvement in the decisions giving rise to this cause of action.

---

[52]  It should be noted that, for purposes of this brief, Defendant LaManna's argument that he had no personal involvement relates only to the Eighth Amendment air quality claim.  To the extent Defendant LaManna is also named in Plaintiff Hill's Eighth Amendment Dental Claim, that matter will be briefed separately.

## DEFENDANT FANTASKEY [53]

It is clear from the face of the Fifth Amended Complaint that there are no longer any pending allegations involving Defendant Fantaskey.  Defendant Fantaskey had been named in the previous complaints solely based upon Plaintiff's retaliation claim, which alleged that Defendant Fantaskey participated in his removal from UNICOR.  <u>See also</u> Deposition of Michael Hill (November 1, 2006), Page 64, lines 9-20.  Specifically, during the course of the deposition, the following exchange occurred:

> Q:    Okay, and what is your specific claim with respect to Ms. Fantaskey?
>
> A:    Ms. Fantaskey was present, and she was the acting supervisor of industry [sic]  on the date that I was – that I filed my informal resolution, and I was called into the office by Defendant Sapko, Housler, and some of the other prison officials, and she was present, and she told me not to file anything else, or something of that nature she stated, but she was there as the acting supervisor of industry [sic]…"

<u>See</u> Deposition of Michael Hill (November 1, 2006), Page 64, lines 9-20.  Defendants do not deny that such a meeting took place; however, the substance of that meeting is no longer an issue in this case.  The fact that meeting occurred was raised as part of Plaintiff's retaliation claim, which is no longer pending in the Fifth Amended Complaint.  As such, she is entitled to be dismissed from this action.

## DEFENDANT REOME

Likewise, it is clear from the face of the Fifth Amended Complaint that there are also no longer any pending allegations involving Defendant Reome.  Defendant Reome had been named in the previous complaints solely based upon Plaintiff's retaliation claim, which alleged that

---

[53] Defendants Fantaskey, Klark and Reome were named only by Plaintiff Michael Hill. Originally, these three Defendants were named in Plaintiff Hill's Complaint with respect to his retaliation claim.  This claim, however, was dropped when Plaintiff filed his Fifth Amended Complaint.  As such, there is presently no claim pending against these defendants.

Defendant Reome participated in his removal from UNICOR.  Specifically, when asked about Defendant Reome's role in this action, Plaintiff responded:

> I'm pretty sure, he was present the day that I was called to the meeting by Defendant Sapko and Defendant Housler and Fantaskey.  The meeting was held in his office, and I believe he was – basically, my complaint with respect to him was the retaliation, the firing of the job and the threats that were made towards me.

See Deposition of Michael Hill (November 1, 2006), Page 66, line 21 through Page 67, line 8.  Again, Defendants do not deny that such a meeting took place; however, the substance of that meeting is no longer an issue in this case.  The fact that meeting occurred was raised as part of Plaintiff's retaliation claim (as he noted in his deposition), which is no longer pending in the Fifth Amended Complaint.

Furthermore, Defendant Reome, as Plaintiff indicates, was his Unit Manager.  See Fifth Amended Complaint ¶ 8.  See also Deposition of Michael Hill (November 1, 2006), Page 66, line 20 ("He was my Unit Manager").  As a the Unit Manager, Defendant Reome was an employee of the BOP, not assigned to FPI, and, as his title might suggest, he does not have any direct involvement in the operation of the UNICOR factory.  As such, Defendant Reome no longer plays any role in this litigation, and should be dismissed from this action.

## DEFENDANT KLARK

Finally, it is clear from the face of the Fifth Amended Complaint that there are no longer any pending allegations involving Defendant Klark.  Defendant Klark had been named in the previous complaints solely based upon Plaintiff's retaliation claim, which alleged that Defendant Klark participated in his removal from UNICOR.  Specifically, Plaintiff Hill testified at his deposition that, "Mr. Klark had me paged and brought to the lieutenant's office, where he and Mr. Housler, and a – another individual that was – I can't remember his name, he was, he worked

in the UNICOR – and he was trying to negotiate or find out what my complaints were with respect to the BP-9 or the administrative remedy that I had filed, and he said that I could go back to work, I could get my job back…"  <u>See</u> Deposition of Michael Hill (November 1, 2006), Page 65, lines 14-22.  Defendants do not deny that such a meeting took place; however, the substance of that meeting is no longer an issue in this case.  The fact that meeting occurred was raised as part of Plaintiff's retaliation claim (as he noted in his deposition), which is no longer pending in the Fifth Amended Complaint.

Furthermore, Defendant Klark, as Plaintiff indicates, is the former Executive Assistant to the Warden (retired).  <u>See</u> Fifth Amended Complaint ¶ 8; Deposition of Michael Hill (November 1, 2006), page 66, lines 2-15.  As a the Executive Assistant,[54] Defendant Klark was an employee of the BOP, not assigned to FPI, and, as his title might suggest, he did not have any direct involvement in the operation of the UNICOR factory.  <u>Id.</u>  As such, Defendant Klark no longer plays any role in this litigation, and should be dismissed from this action.

---

[54] As Plaintiff notes, Defendant Klark's responsibilities as Executive Assistant included oversight of the institution's satellite prison camp for minimum level offenders.  <u>See</u> Complaint ¶ 8.  There is no indication, however, that Plaintiff was ever housed in the prison camp, or that Defendant Klark ever interacted with Plaintiff in his role as Camp Administrator.

### V.    CONCLUSION

WHEREFORE, for the reasons stated above, Defendants' <u>Motion For Summary</u>

<u>Judgment</u> should be granted with a certification that any appeal would be deemed frivolous,

lacking in probable cause, and not taken in good faith.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney


<u>/s/ Michael C. Colville</u>
MICHAEL C. COLVILLE
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7337
PA ID No. 56668


<u>OF COUNSEL:</u>
Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 2nd day of February, 2007, a copy of the within **Defendants'**

**Brief in Support of Their Motion for Summary Judgment, or in the Alternative, Motion to**

**Dismiss** was served either electronically or by first-class United States mail, upon the following:


Richard A. Lanzillo, Esquire
Knox McLaughlin Gornall & Sennett, P.C.
120 West Tenth Street
Erie, PA 16501-1461




/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney