IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL W. HILL, | ) | Docket No. 03-323E |
| | ) | (Judge Susan Paradise Baxter) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| JOHN J. LAMANNA, WILLIAM K. | ) | |
| COLLINS, MARTY SAPKO, | ) | |
| STEPHEN HOUSLER, ROBERT | ) | |
| KLARK, ROBERT REOME, | ) | |
| BETH FANTASKEY, and | ) | |
| DEBORAH FORSYTH, | ) | |
| | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| LESLIE R. KELLY, | ) | Docket No. 03-368E |
| | ) | (Judge Susan Paradise Baxter) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| JOHN J. LAMANNA, MARTY SAPKO, | ) | |
| DEBORAH FORSYTH, STEPHEN | ) | |
| HOUSLER | ) | |
| | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| KEVIN SIGGERS, | ) | C.A. No. 03-355 Erie |
| | ) | (Judge Susan Paradise Baxter) |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| JOHN LAMANNNA, DEBORAH | ) | |
| FORSYTH, MARTY SAPKO, and | ) | |
| STEPHEN HOUSLER, | ) | |
| | ) | |

|  |  |
|---|---|
| Defendants | ) |

---

|  |  |
|---|---|
| MYRON WARD, | ) Docket No. 04-11 |
|  | ) (Judge Susan A. Paradise Baxter) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| UNITED STATES OF AMERICA, | ) |
| JOHN LAMANNA, DEBORAH | ) |
| FORSYTH, MARTY SAPKO, | ) |
| STEPHEN HOUSLER, NED WATSON, | ) |
|  | ) |
| Defendants | ) |

---

|  |  |
|---|---|
| KENNY HILL, | ) Docket No. 05-160E |
|  | ) (Judge Susan Paradise Baxter) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| JOHN J. LAMANNA, DEBORAH | ) |
| FORSYTH, MARTY SAPKO, and | ) |
| STEPHEN HOUSLER | ) |
|  | ) |
| Defendants | ) |

### DECLARATION OF MICHAEL SALERNO, Plastics Worker Supervisor

I, Michael Salerno, Plastics Worker Supervisor, do declare and state as follows:

1. I am a Plastics Worker Supervisor with Federal Prison Industries, Inc. (FPI or trade name UNICOR), and assigned to the Federal Correctional Institution (FCI) McKean. At all times relevant to this action I was the Maintenance Mechanic Supervisor for the UNICOR factory at FCI McKean. I began my career with UNICOR on July 16, 1989, as a Woodworking Supervisor. I was promoted to Maintenance Mechanic Supervisor

in January 1995. I held that position until January 2006, at which time, the factory converted to a plastic factory, and the position of Maintenance Mechanic Supervisor was abolished.

2. As the maintenance mechanic supervisor, I was responsible for ensuring that all of the equipment in the factory was maintained in proper working condition. This included properly installing new equipment, providing routine maintenance, locking and tagging equipment that was damaged or not working properly, and any other maintenance work which may be required.

3. I am aware that a number of Federal inmates who are presently, or had been previously assigned to FCI McKean, have filed lawsuits in which they allege they were exposed to a hazardous work environment while working with Micore Board in the Federal Prison Industries, Inc. (UNICOR) factory at the Federal Correctional Institution (FCI) McKean. Specifically, they allege that the ventilation in the factory was not adequate and that they were exposed to silica dust as a result.

4. I am further aware that the Plaintiffs in this case allege that they were subjected to unreasonably dusty conditions relating to their work with Micore Board.

5. The UNICOR factory at FCI McKean was actually two separate dust collection systems. Each dust collection system was installed with its own separate duct work which attached to the equipment on one end and removes all dust from that equipment or machinery to one of two large dust hoppers located outside the factory.

6. The dust collection system worked by creating a vacuum on each piece of equipment at the work surface. In this manner, any dust which was created would be sucked

JAN 16 07 01:22PM UNICOR MCKEAN (814) 362-4151    p.4
Mike Salerno - salernodec.DOC                                    Page 4

away from the worker, instead of up from the table and toward the worker.

7. The design of this ventilation system was intended to capture as much dust as possible, as close to the point of manufacturing as possible. Each dust collector had a series of ductwork "arms" which connected to the various pieces of equipment and machinery around the factory. Although we could easily have hooked all of the equipment up to a single dust collector, we chose to utilize both. As such, each dust collector was attached to approximately half of the machinery in the factory.

8. Each of the two dust collection systems produced 34,000 cubic feet/minute, meaning they were each strong enough to move 34,000 cubic feet of air in one minute. On system Number one, there were eight machines drawing dust collection, requiring 9,900 cubic feet/minute. On system number 2, there were 15 machines, drawing dust collection, requiring a total of 13,100 cubic feet per minute. This means the dust collection system generated 20,900 cubic feet per minute in excess of the requirements of the factory.

9. As the maintenance mechanic supervisor, I was primarily responsible for inspecting and repairing the equipment and machinery used in the UNICOR factory. In this capacity, I was constantly on the factory floor and in the vicinity of the equipment while it was in use on a regular daily basis.

10. All of the inmates were instructed, if a piece of equipment was damaged, or the ventilation system was not removing the dust properly from the inmates' work space, to stop working and come see me immediately. I would then inspect the dust collection system and equipment. If it could not be immediately repaired, then I

would lock the equipment until it could be repaired.

11. During the time I spent working directly on the factory floor, I rarely observed any dust in the air. In fact, the UNICOR factory at FCI McKean was one of the cleanest work environments I have ever witnessed.

12. In fact, much of the equipment utilized in the UNICOR factory was simply incapable of expelling a significant amount of dust.

13. The panel saw, for example, was completely enclosed when cutting. No part of the cutting operation was exposed to the air with the exception of a hole in the bottom of the saw which was connected to the ventilation system. All of the dust generated by the cutting operation was evacuated from the top and bottom of the cut line into the ventilation system.

14. Likewise, it would also have been impossible for the pin router to expel a significant amount of dust. The pin router operated by placing the board over a table with a hole in the center. The blade came up through this hole to contact the board. When the board was being cut, the hole was completely covered by the board.

15. The ventilation system on this unit was connected to the same hole containing the blade. As such, the dust was sucked down immediately upon being cut. Again, because the top of the hole was completely covered by the board, any dust which was not gathered and removed by the ventilation system would be stuck to the board.

16. Any remaining dust was removed from the board by tapping it over the ventilation hole, thus knocking the remaining dust into the ventilator. The board was not lifted from the table until the freshly cut area was tapped over the hole.

17. With respect to the pin routers, as well as the rounders and much of the other equipment, because the blade was cutting an indentation or shaping the board from underneath, it would not be possible to machine multiple boards at one time. The only piece of equipment on which this would have been possible was the panel saws. I have no personal recollection as to whether or how frequently multiple boards were cut at the same time on the panel saw.

18. Finally, it is important to note that excessive levels of dust in the factory (even levels which would be well within the OSHA threshold) could cause significant damage to the machinery and equipment in the factory. Many of these machines are extremely delicate, and have various ball bearings, gears, wheels, and other moving components.

19. If there was a significant amount of dust in the air or settling on these components, the resulting buildup of dirt and debris in the machinery components could cause the machinery to fail. Such damage would be readily apparent by the frequency that the machinery was required to be cleaned, as well as the need to replace ball bearings, gears, blades, and other moving parts.

20. In the time I was assigned as the Maintenance Mechanic Supervisor, I inspected all of the equipment regularly, and in accordance with the manufacturer's recommendations. For some equipment, this could mean daily inspections, for other equipment, this could mean weekly inspections.

21. During these inspections, I rarely saw a significant amount of dust inside the machinery which would require cleaning. Additionally, I was never required to effectuate any of the type of repairs which would be associated with excessive dust in

the machinery.

22. The pin routers are a perfect example of this. Pin routers utilize a large fly-wheel which drives the blade. If there is a build up of dust on the fly-wheel, then it can become unbalance, causing uneven cuts in the wood, and damage to the machine. I inspected the fly-wheel in the pin routers on a routine and regular basis. I rarely observed excessive dust on or around the flywheel. Additionally, I never observed the flywheel on any of the pin routers to be off balance or otherwise damaged.

I declare under penalty of perjury in accordance with the provisions of 28 U.S.C. § 1746 that the above is accurate to the best of my knowledge and belief.

_Michael Salerno_ (signature)     1-16-07
Michael Salerno                   Date
Plastics Worker Supervisor
FCI McKean